UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

JOHN A. ERLANDSON and JAMES IAN
NORRIS, Individually and on Behalf of All
Others Similarly Situated,

                              Plaintiffs,

        vs.

TRITERRAS, INC. (f/k/a NETFIN
HOLDCO), NETFIN ACQUISITION CORP.,
TRITERRAS FINTECH PTE. LTD., MVR
NETFIN LLC, RICHARD MAURER, MARAT
ROSENBERG, VADIM KOMISSAROV,
GERALD PASCALE, SRINIVAS KONERU,
JAMES H. GROH, ALVIN TAN, JOHN A.
GALANI, MATTHEW RICHARDS, VANESSA
SLOWEY and KENNETH STRATTON,

                            Defendants.

---------------------------------------------------------------- x

Case No. 7:20-cv-10795-CS

<u>CLASS ACTION</u>

AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

<u>JURY TRIAL DEMANDED</u>

I.      NATURE OF THE ACTION ................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................6

III.    PARTIES ............................................................................................................9

        A.      Plaintiffs ..................................................................................................9

        B.      Corporate Defendants ..............................................................................9

        C.      Netfin Individual Defendants.................................................................11

        D.      Fintech Individual Defendants................................................................13

        E.      Triterras Director Nominee Defendants.................................................15

IV.     SUMMARY OF ACTIONABLE STATEMENTS AND OMISSIONS ..........16

V.      ALLEGATIONS COMMON TO ALL CLAIMS ...........................................17

        A.      Many of the Individual Defendants Have Personal and Professional Ties to
                Each Other and Business Associates, Raising Conflicts of Interest ......17

                1.      Maurer and Koneru....................................................................17

                2.      Rosenberg, Pascale, and Groh ..................................................24

                3.      Koneru, Tan, and Galani............................................................32

                4.      Rosenberg and Komissarov .......................................................35

        B.      The Trade Finance Market Falters as Rhodium Is Sued Over Millions of
                Dollars and Forced to Restructure Its Debts .........................................35

        C.      Kratos's Failed Initial Coin Offering Requires Koneru and His Team to
                Shift Their Focus to Orchestrating a Friendly Transaction with Maurer..............40

        D.      Netfin Goes Public with Plans to Acquire the Operations of a Financial
                Technology Company in the Trade Finance Space ................................43

        E.      Three Days after the IPO and Six Months before the De-SPAC Deadline,
                Maurer and Koneru Begin Pursuing a Transaction Involving Fintech ................45

        F.      Investors Approve the Transaction and Acquire Securities Unaware of
                Defendants' Pervasive Conflicts of Interest, Rhodium's Dire Condition, or
                Triterras's True Operational Status or Exposure to Rhodium ..............49

        G.      After Triterras Goes Public, Investors Learn that Insiders' Conflicts of
                Interest Tainted the Transaction and Triterras Was Uniquely Exposed to
                Rhodium's Precarious Financial Condition ...........................................52

1.    Rhodium Tries to Restructure Its Growing Debts After Rejecting a Creditor's $5 Million Demand for Payment, Even as It Is Sued in Other Lawsuits and Owes Millions to Triterras and Others ....................53

2.    Previously Undisclosed Connections Between Maurer, Koneru, and Other Insiders Raise Questions Regarding Their Conflicts of Interest, Formation of the Transaction, and Triterras's Business ............55

3.    KPMG and Two Triterras Directors Resign as Fallout Intensifies from the Exposure of Previously Undisclosed Information ....................60

VI.    ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS ........................62

A.    The Materials Misrepresented and Omitted Material Facts Associated with the Transaction, the Background and Relationships of Insiders, and Fintech's (Now, Triterras's) Business, Including Facts about Rhodium ..............62

1.    The Background and Relationships of Officers and Directors of Netfin and Fintech and Their Conflicts of Interest ....................................63

a.    Forms F-4 and 20-F Impose Rules Governing Disclosure Regarding Directors, Officers, and Related Parties ....................63

b.    The Materials Incompletely and Misleadingly Described Background on the Directors and Officers of Netfin and Fintech and Their Many Conflicts of Interest ...............................65

(1)    Maurer and Koneru ...........................................66

(2)    Tan and Galani .................................................68

(3)    Groh, Rosenberg, and Pascale ...........................70

(4)    Rosenberg and Komissarov ...............................72

2.    The Prearranged or Preconceived Nature of the Transaction ...................72

3.    Rhodium's Financial Difficulties and Liabilities and Overlapping Management with Fintech........................................................................74

4.    The Contribution of Related Parties and Affiliates to Kratos's Transaction Volume and Number of Users ...............................................78

5.    A Confluence of Adverse Developments Disrupted Commodities Trading and Trade Finance before the Materials' Effective Date ............79

6.    Risks, Trends, and Uncertainties Arising from These Issues Were Reasonably Likely to, and Did, Adversely Affect Triterras ....................80

a.    Forms F-4 and 20-F and Items 303 and 105 of Regulation S-K Require Disclosure of Risks, Trends, or Uncertainties ..........80

b.    Based on Developments Described Herein, Risks, Trends, and Uncertainties Required Disclosure in the Materials...............84

B.    When Truthful Information about Triterras's Operations Emerged, the Value and Trading Price of its Securities Substantially Declined ........................86

VII.    ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS ........................86

A.    Defendants Knowingly or Recklessly Misled Investors with Materially Misleading Statements and Omissions during the Class Period..........................86

1.    The June 29, 2020 Press Release and Form 8-K ......................................86

2.    The July 29, 2020 Press Release, Investor Call and Presentation, and Form 8-K ..................................................................................................89

a.    The July 29, 2020 Press Release and Form 8-K ...........................89

b.    The July 29, 2020 Investor Call and Presentation ........................94

3.    The July 31, 2020 Form 10-Q.................................................................103

4.    The August 20, 2020 Investor Call and August 24, 2020 Press Release and Form 8-K ..............................................................................104

5.    The August 28 and 31, 2020 Draft Materials, September 9, 2020 Gateway Conference, and Related Transcript and SEC Filings .............110

6.    The September 16, 2020 Press Release and Related SEC Filings...........112

7.    The September 17, 2020 Investor Presentation and Related SEC Filings ......................................................................................................113

8.    The September 30, 2020 Form 8-K, Earnings Press Release, and Investor Presentation................................................................................114

9.    The October 1, 2020 Investor Presentation and Related SEC Filings ......................................................................................................115

10.    The October 1, 2020 Analyst Call Presentation.....................................117

11.    The Materials and Form 8-A...................................................................119

12.    The November 16, 2020 Form 20-F .......................................................119

13.    The December 3, 2020 Form 6-K and Results of Operations for Six Months Ended August 31, 2020.............................................................121

B.      Defendants Try to Staunch the Adverse Effects on Triterras as the Truth
        Emerges, and the Class Period Ends When They Can Do So No Longer ..........121

C.      Post-Class Period Developments Confirm that Triterras Is in Disarray, As
        Its Independent Auditor and Two Board Members Resign ................................126

D.      Loss Causation and Economic Loss ....................................................................128

E.      A Presumption of Reliance Applies.....................................................................128

F.      The Safe Harbor Does Not Insulate Defendants' Representations.....................129

VIII.   CLASS ACTION ALLEGATIONS ..............................................................................130

IX.     CLAIMS ........................................................................................................................132

A.      FIRST COUNT: For Violations of Section 11 of the Securities Act
        (Against Defendants Triterras (formerly Holdco), Netfin, Maurer, Koneru,
        Tan, Richards, Slowey, Stratton, and MVR) ......................................................132

B.      SECOND COUNT: For Violation of Section 12(a)(2) of the Securities Act
        (Against Defendants Triterras (formerly Holdco), Netfin, Fintech, Maurer,
        Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR).........134

C.      THIRD COUNT: For Violation of Section 15 of the Securities Act
        (Against Defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale,
        Koneru, Tan, Galani, Groh, MVR, and Fintech) ................................................137

D.      FOURTH COUNT: For Violation of Section 10(b) of the Exchange Act
        (Against Defendants Triterras, Netfin, Fintech, Maurer, Rosenberg,
        Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR)............................138

E.      FIFTH COUNT: For Violation of Section 20(a) of the Exchange Act
        (Against Defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale,
        Koneru, Tan, Galani, Groh, MVR, and Fintech) ................................................140

X.      PRAYER FOR RELIEF .................................................................................................141

XI.     JURY TRIAL DEMAND ...............................................................................................142

Court-appointed Lead Plaintiff John A. Erlandson and additional plaintiff James Ian Norris ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation by their counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Triterras, Inc. ("Triterras") and its related entities, press releases, analyst and media reports, and other public reports and information about Triterras and others. Plaintiffs believe additional evidentiary support exists for the allegations set forth herein, which will be developed after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This putative securities class action asserts claims under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") arising out of a web of transactions and relationships between the defendants and other insiders, without adequate disclosure of their conflicts of interest or the risks and adverse developments facing Triterras's business.

2.    Triterras emerged from a transaction involving a special purpose acquisition company ("SPAC"). A SPAC is a shell entity whose sole purpose is to engage in a business combination with an operating entity. SPACs, sometimes also known as blank-check companies, are publicly traded companies that typically must identify and consummate a transaction within 18 to 24 months after their creation. They are established and administered by "sponsors" (generally, private equity firms or other professional investors), which bring them public and identify merger candidates for them in exchange for lucrative financial benefits and ownership interests (and possibly employment) in the surviving entity if a transaction closes. If a transaction does not close, the sponsor must unwind the SPAC and redeem the public investors' shares for cash – an outcome sponsors attempt to avoid at all costs because it harms their credibility and reputation in the market, as well as their prospects and investment opportunities in the future.

3.    In recent months, the use of SPACs has exploded.  Often marketed as a cheaper and faster alternative to an initial public offering for an operating company to go public, SPACs are now increasingly viewed as a way for sponsors and their business associates to supercharge their returns with less disclosure than is typical in going-public transactions – to the detriment of public investors. This activity has attracted the attention of the SEC, which has issued dire warnings about SPACs.

4.    On April 8, 2021, John Coates, Acting Director of the SEC's Division of Corporation Finance, issued a statement in which he first emphasized that, "[o]ver the past six months," the markets have experienced "an unprecedented surge in the use and popularity of [SPACs]."[1]  Industry participants, from journalists to bankers, "are sounding alarms about the surge," he noted.  These "[c]oncerns," he explained, "include risks from fees, conflicts, and sponsor compensation," as well as a "potential for retail participation drawn by baseless hype . . . ."  As others have likewise warned, conflicts of interest are especially pervasive in SPAC transactions because the sponsor's principal (and usually sole) interest is in closing a deal before the clock runs out and a wind down must occur. Thus, historically, 90% of SPACs have consummated a transaction after formation.

5.    This action involves all of those risks: the establishment of a SPAC in furtherance of an ostensibly prearranged transaction, orchestrated by friends and business associates who solicited investors without disclosing pervasive conflicts of interest or the problems ravaging a related party – operated by insiders – that until then had procured almost all of the acquired company's customers. That related party was mired in millions of dollars of liabilities and forced to the brink of bankruptcy only four weeks after the transaction closed, jeopardizing the entire business.  And that party shared overlapping management with the acquired entity, which had just 17 employees, belying the arm's-length portrayal of the business arrangement.

---

[1]    https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

6.      In late June 2020, as the upsurge in SPACs was beginning, Netfin Acquisition Corp. ("Netfin"), a publicly traded SPAC established by two professional investors, defendants Richard Maurer and Marat Rosenberg, identified the operations of two privately-held companies to acquire in a transaction worth almost $1 billion: Triterras Fintech Pte. Ltd. ("Fintech"), the operator of a global online commodities trading platform called Kratos; and Fintech's sister company, Triterras Holdings Pte. Ltd. ("Triterras Holdings"), whose operations included physical commodities trader Rhodium Resources Pte. Ltd. ("Rhodium").

7.      Incidentally, Maurer's longtime business partner, defendant Srinivas Koneru, founded Fintech and Rhodium, and those entities did substantial business with Maurer's commodities trader, Longview Resources Group ("Longview"). As was later revealed, however, Maurer and Koneru had formed numerous corporate entities together – many in Georgia, where Maurer and Koneru have ties – and they have done business with each other at least since 2004. Given their lengthy relationship and Fintech's dependence on Rhodium to source nearly all users of its Kratos platform, Maurer and Koneru knew that a transaction involving Fintech and Rhodium would require extensive disclosure about those entities and their financial condition – even more disclosure than a transaction involving only Fintech.

8.      In hindsight, it is unsurprising that after setting market expectations on an acquisition of Fintech and Rhodium, Netfin changed course. A month after announcing the transaction, Netfin said it would not acquire Rhodium, but would instead acquire Fintech only – a move it described as necessary to prevent investor confusion about Netfin's objective of operating a financial technology ("fintech") commodities trading platform, without exposing the business to the complexity or risk of Rhodium's physical commodities trading business. Exploiting that change, defendants neglected to disclose not only Rhodium's dire financial condition and mounting exposure to millions of dollars in liabilities on commodities transactions, but also its overlapping management with Fintech.

9.      With the revised transaction structure in place, the individual defendants – directors and officers of Netfin and Fintech – moved forward with soliciting Netfin investors to vote in favor of approving the transaction.  To do so, these and other defendants prepared and filed with the SEC a registration statement on Form F-4, including a joint proxy statement and prospectus (collectively, the "Materials"), which described the background of the proposed transaction, provided detail on the directors, officers, and financials of Netfin and Fintech, and disclosed potential conflicts and related party transactions.  By then, however, Malaysia's largest bank, Malayan Banking (or "Maybank"), had sued Rhodium abroad for $3.16 million – a fact not disclosed to Netfin investors (or prospective Triterras investors).  On October 29, 2020, after several amendments, the SEC declared the Materials effective and Netfin subsequently disseminated them to investors.

10.     On November 10, 2020, Netfin and Fintech jointly issued a press release announcing shareholder approval and the close of the transaction, as well as the successor entity's name change to "Triterras, Inc."  On December 17, 2020, Triterras disclosed that Rhodium (now called Antanium Resources Pte. Ltd.) had received a statutory demand for payment weeks earlier (an amount Triterras later confirmed was $5 million), that creditors could force Rhodium into bankruptcy in the absence of payment, and that Rhodium would try to shield itself from creditors while it restructured its debts.  Also on December 17, 2020, an investor report exposed further information, not disclosed in the Materials or previously publicized, about Maurer's ties to Koneru and facts which suggested that the transaction between Netfin and Fintech was pre-arranged.

11.     In response to this news, the trading price of Triterras's securities plummeted, with its Class A common stock falling by $4.11 (or 31%) to close at $9.09 and its warrants down by $1.11 (or 35%) to close at $2.05, on December 17, 2020 – on extraordinary volume.  They declined further – with the stock closing at $8.45 (trading as low as $8.08) and the warrants at $1.80 – on December 18, 2020, as the market digested the information.  But other adverse revelations were looming.

12.     On January 14, 2021, investor Phase 2 Partners LLC ("Phase 2") issued a report that exposed additional undisclosed relationships between the directors and officers of Netfin, Fintech, and Rhodium.  Additionally, the report analyzed trading data which suggested that defendants had overstated Fintech's number of customers, while misrepresenting and omitting material information about Kratos's transaction volume and understating Fintech's (now, Triterras's) reliance on related parties Longview and Rhodium.

13.     On January 15, 2021, in response to this news, the trading price of Triterras's Class A common stock declined by $2.30 (or 21%) to close at $8.08 per share, while the warrants dropped by $0.68 (28.7%) to close at $1.69 per warrant – again, on extraordinary volume.

14.     The following chart shows the trading price and volume of the Class A stock from June 29, 2020 to January 15, 2021, including the substantial declines in December 2020 and January 2021 in response to the adverse revelations described above:



15.     Although Triterras's management tried to staunch the bleeding and issued a partial response to Phase 2's report, Triterras later disclosed that KPMG LLP had resigned as its auditor – an act necessary to further separate its operations from Rhodium's – and announced an independent investigation of the Phase 2 revelations.  Shortly thereafter, two securities analysts who had covered Triterras since late 2020 downgraded their ratings and removed their price targets for its shares.  By then, however, investors had already suffered substantial damages due to defendants' misconduct. In the wake of these events, two independent directors charged with supervising Triterras's internal investigation resigned – leaving just one Audit Committee member remaining – evidently based on a disagreement as to how to handle the situation and continuing fallout.

16.     This action seeks to provide a remedy for these investors, asserting claims against Triterras, its related entities, and certain of their officers and directors under: (i) Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of those who bought or acquired Triterras securities pursuant or traceable to the Materials, including purchasers who were successfully solicited by any defendant; and (ii) Sections 10(b) and 20(a) of the Exchange Act on behalf of those who bought or acquired the securities at issue from June 29, 2020 to January 14, 2021, inclusive ("Class Period"), and who were damaged thereby.

## II.    JURISDICTION AND VENUE

17.     The claims alleged arise under: (i) Sections 11, 12(a)(2), and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o]; and (ii) Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b), 78n(a), and 78t(a)], and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 [17 C.F.R. §240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1331.

19.    Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §1391(b), (c), and (d), and personal jurisdiction exists over each of the defendants.  Among other things:

a.    Defendants conducted the transaction in this District, drafted the Materials in part in this District, disseminated the misleading statements at issue in this District, and solicited and otherwise communicated investors in this District.  Netfin and Fintech, at the direction and with the consent of their respective officers and directors, also engaged New York-based professionals for the transaction.  These professionals included the law firms of: (i) White & Case LLP ("W&C"), which Netfin engaged, located at 1221 Avenue of the Americas, New York, New York 10020, where Netfin held its extraordinary general meeting of shareholders for the transaction; (ii) Winston & Strawn LLP, which Netfin also engaged, located at 200 Park Avenue, New York, New York 10166, where the closing and consummation of the transaction took place; and (iii) Milbank LLP, which Fintech engaged (and which continues to represent Triterras), located at 55 Hudson Yards, New York, New York 10001.

b.    Certain defendants are based in, or have extensive connections to, New York.  Before the transaction closed, Netfin's principal executive offices were located at 445 Park Avenue, 9th Floor, New York, New York 10022, where other defendants and related parties were also based, including Netfin Merger Sub ("Merger Sub").  The Materials directed investors to contact Netfin at that address, and also listed Rosenberg's Netfin email address – marat.rosenberg@netfinspac.com – as a point of contact.  Additionally, certain defendants personally met in New York in furtherance of the transaction.  As the Materials indicate, the "Netfin Team," defined as Maurer, Rosenberg, and Vadim Komissarov, regularly met in New York to facilitate the transaction with various Fintech representatives, including Koneru.  These meetings took place in New York City over an aggregate of several weeks.

c.     Netfin's transfer agent, Continental Stock Transfer & Trust Company, was and is based in New York, with offices at 1 State Street, 30th Floor, New York, New York 10004.

d.     Maurer is Triterras's U.S. agent for service of process; designates 445 Park Avenue, 9th Floor, New York, New York 10022, as the address for service; and signed each version of the Materials – Amendment No. 1 (October 1, 2020), Amendment No. 2 (October 19, 2020), and Amendment No. 3 (October 26, 2020) – in New York, New York, as his signature pages indicate. He also signed Netfin Holdco's ("Holdco") Form F-4 registration statement (August 28, 2020), as its officer/director and duly authorized U.S. representative, in New York City.

e.     The Business Combination Agreement, dated as of July 29, 2020, which set forth the terms of the transaction and was entered into by Netfin, Netfin, Merger Sub, MVR Netfin LLC ("MVR"), IKON Strategic Holdings Fund ("IKON"), and Symphonia Strategic Opportunities Limited ("SSOL"), was governed by New York law and provided that the parties thereto irrevocably submitted to the exclusive jurisdiction of the New York federal and state courts (as the Materials indicated), providing, in pertinent part, as follows:

i.     *Section 11.5* ("Governing Law"): "This Agreement, and any claim, action, suit, investigation or proceeding of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory . . . that may be based upon, arising out of or related to this Agreement, any Ancillary Document or the negotiation, execution or performance of this Agreement, any Ancillary Document or the transactions contemplated hereby or thereby, shall be construed in accordance with and governed by the laws of the State of New York . . . ."

ii.     *Section 11.6* ("Jurisdiction"): "Any claim, action, suit, investigation or proceeding of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory . . . that may be based upon, arising out of or related to this Agreement . . . or the transactions contemplated hereby brought by any other party or its successors or assigns shall be

- 8 -

brought and determined only in federal and state courts located in the State of New York, and each

of the parties hereto irrevocably submits to the exclusive jurisdiction of each such court, for itself

and with respect to its property, generally and unconditionally . . . [and] waives any objection it may

now or hereafter have to personal jurisdiction, venue or to convenience of forum . . . ."  "The parties

hereto irrevocably agree that venue would be proper in any of the courts in New York . . . and hereby

irrevocably waive any objection that any such court is an improper or inconvenient forum for the

resolution of such suit, action or proceeding."

20.    Accordingly, the situs of this action lies within this District, defendants' tortious acts

occurred in this District and caused injury to securities purchasers in this District, and defendants

and proposed class members would foreseeably expect any case or controversy stemming from the

transaction, or relating to events that transpired before or after it, to be adjudicated in this District.

## III.    PARTIES

### A.    Plaintiffs

21.    As reflected in the prior Certification (ECF No. 12-2) and the attached Certification,

Plaintiffs purchased Triterras securities pursuant and/or traceable to the Materials and based on false

and misleading statements and omissions issued during the Class Period, and were damaged thereby.

### B.    Corporate Defendants

22.    Defendant Triterras is a Cayman Islands holding company based in Singapore which

conducts substantially all of its operations through Fintech, a wholly owned subsidiary that operates

the online commodities trading platform known as Kratos.  Netfin is also a wholly owned subsidiary

of Triterras, and Triterras is Holdco's successor and thus responsible for any disclosure deficiencies

in any of the materials that Holdco issued for the transaction.  The transaction resulting in Triterras's

formation closed on November 10, 2020 in New York, New York, and the following diagram from

Triterras's November 16, 2020 Form 20-F depicts Triterras's organizational structure thereafter:

23.    Defendant Fintech was incorporated and is based in Singapore.  Founded by Koneru in 2018, Fintech facilitates commodities trading, trade finance, and logistics solutions primarily for small and medium sized enterprises ("SMEs") via its blockchain-enabled platform, Kratos, which launched in June 2019.  As the Materials note, Kratos "maintains a presence in key trading centers across the world, including Singapore, the U.K. and the U.S."[2]

24.    Defendant Netfin is a Cayman Islands shell company and wholly owned subsidiary of Triterras.  Incorporated on April 24, 2019, Netfin is a SPAC that defendants Maurer, Rosenberg, and Komissarov formed to effectuate a business combination with an operating entity; their entity, MVR, was Netfin's sponsor.  As the Materials indicate, Netfin closed its initial public offering ("IPO") in

---

[2]    All quotes attributed to the Materials are from the October 26, 2020 Form F-4 registration statement, proxy statement and prospectus (Amendment No. 3), which the SEC declared effective on October 29, 2020.  Unless noted herein, information in that version of the Materials is substantially identical to the information disclosed in other versions of the Materials, including the definitive proxy statement and prospectus on Schedule 14A, dated October 29, 2020.

August 2019, after which its units, Class A shares, and warrants publicly traded on the Nasdaq under

the symbols "NFINU," "NFIN," and "NFINW," respectively:

> On August 2, 2019, Netfin closed its IPO of 25,300,000 units, including the exercise of the over-allotment option to the extent of 3,300,000 units, with each unit consisting of one Class A Share and one warrant, with each warrant entitling the holder thereof to purchase one Class A Share at a purchase price of $11.50 commencing upon the later of (i) 30 days after Netfin's completion of a business combination or (ii) August 2, 2020. The units in the IPO were sold at an offering price of $10.00 per unit, generating total gross proceeds of $253,000,000. Simultaneously with the consummation of the IPO, Netfin consummated the private placement of the private placement units, generating total gross proceeds of $6,810,000. A total of $253,000,000, was deposited into the trust account and the remaining net proceeds of the offerings became available to be used as working capital to provide for business, legal and accounting due diligence on prospective business combinations and continuing general and administrative expenses. The IPO was conducted pursuant to a registration statement on Form S-l (Reg. No. 333-232612) that became effective on July 30, 2019. As of October 12, 2020, there was approximately $257,260,000 held in the trust account.

25.     Defendant MVR is a limited liability company incorporated in Nevada in November

2018.  Its managers are Maurer and Rosenberg, who have voting and investment discretion over the

ordinary shares MVR holds.  Rosenberg, Komissarov, and an entity owned and controlled by Maurer

are MVR's members, and are entitled to distributions of securities MVR holds.  MVR was Netfin's

sponsor and representative, empowered to contract on behalf of Netfin and Netfin's related entities,

Holdco and Merger Sub.  MVR's name is a combination of the first initial of the first names of each

of Rosenberg (Marat), Komissarov (Vadim), and Maurer (Richard) – a naming convention Maurer

and Koneru used for various entities they formed and operated together.

### C.     Netfin Individual Defendants

26.     Defendant Maurer formed Netfin in April 2019 and was its Chief Executive Officer

("CEO") and a director until the transaction closed.  He was also Netfin's, and now is Triterras's,

registered agent in the U.S., based in New York.  In November 2006, he formed Longview, a

commodities trading group in Hong Kong with operations also in Singapore, Malaysia, Australia, the

U.K., and the U.S.  Longview did and continues to do a substantial amount of business with Fintech.  As detailed herein, Maurer has also engaged in extensive business with Koneru, much of which the Materials did not disclose.  Maurer signed the October 1, 2020 draft Materials (Amendment No. 1), October 19, 2020 draft Materials (Amendment No. 2), and October 26, 2020 Materials (Amendment No. 3, effective October 29, 2020), in New York City in his capacities as President and a director of Holdco, as well as Principal Executive Officer and Principal Financial and Accounting Officer of Holdco and as Holdco's authorized representative in the U.S.  He also signed a Consent of Director Nominee, dated August 28, 2020 and attached to the August 28, 2020 Materials, providing, in full, as follows:

> Pursuant to Rule 438 promulgated under the Securities Act of 1933, as amended, I hereby consent to be named in the Registration Statement on Form F-4 of Netfin Holdco (Registration No. 333-232612), and any amendments or supplements thereto, including the prospectus contained therein, as an individual to become a director of Triterras, Inc., to all references to me in such Registration Statement and to the filing of this consent as an exhibit to such Registration Statement and any amendment or supplement thereto.

27.    Defendant Rosenberg assisted in forming Netfin and served as its President and one of its directors.  He is a professional investor based in Texas who has investment interests around the U.S., and, indeed, the world.  He has worked alongside investor Timothy Halter, and had occupied various management positions at Halter's various entities, for decades.  In that capacity, Rosenberg has been involved in orchestrating scores of reverse mergers and other business combinations using SPACs for decades.  Rosenberg has typically invested in those businesses alongside or as a result of his interest in Halter's various entities, using River Green Capital, LLC and similarly named entities (together, "River Green," unless noted) as his personal investment vehicle.  As detailed herein, Rosenberg also has extensive ties to defendants Komissarov, Gerald Pascale, and James H. Groh not disclosed in the Materials.

28.    Defendant Komissarov assisted in forming Netfin and served as one of its directors. He is CEO of VK Consulting Inc., a financial advisory firm he founded in March 2015 whose office is located at 77 Water Street, 8th Floor, New York, New York 10005.  He has ties to Maurer and Rosenberg as a founder and member of Netfin sponsor MVR, and has additional ties to Rosenberg given their investments in and positions at Trident Acquisitions Corp. ("Trident"), a publicly traded SPAC formed on March 17, 2016: Komissarov has served as Trident's CEO, Chief Financial Officer ("CFO"), Secretary, Treasurer, and a director; and Rosenberg was a Trident director and became its Chairman on November 19, 2020, only several days after the Netfin/Fintech transaction closed.

29.    Defendant Pascale served as Netfin's CFO beginning in April 2019, according to the Materials.  He is also the founder, President, and Managing Member of SC Financial Group, LLC ("SCF"), which he formed in South Carolina in November 2008 and which "specializes in advising both US and international clients on valuation, financial modeling and the responsibilities of public companies."  He has extensive ties to Rosenberg and Groh, not disclosed in the Materials.

### D.    Fintech Individual Defendants

30.    Defendant Koneru founded Fintech in 2018 and co-founded Rhodium in 2012.  He became Executive Chairman of Triterras's Board of Directors and CEO following the completion of the transaction.  He is or was a director of Fintech and Rhodium and also serves on Rhodium's risk committee.  He signed a Consent of Director Nominee, dated August 28, 2020, described herein. According to Netfin's July 2020 Investor Presentation, Koneru is a U.S. citizen.  According to the November 24, 2020 Schedule 13D jointly filed on behalf of Koneru and his investment vehicles, IKON and SSOL, "[t]he principal business of IKON and SSOL is to serve as investment holding vehicles for Mr. Koneru," "[t]he sole director of IKON is Srinivas Koneru and its sole shareholder is SSOL," and "SSOL is wholly beneficially owned by Srinivas Koneru[.]"  Thus, Koneru signed a Joint Filing Agreement on November 24, 2020 on behalf of himself, IKON, and SSOL, which

allowed them to file a Schedule 13D and amendments thereto with the SEC "without the necessity of filing additional joint filing agreements."

31.     Defendant Groh is Triterras's Executive Vice President, a position he has held since the close of the transaction.  However, Groh's personal LinkedIn page indicates he has held this position for Fintech since July 2020.  Before that, Groh managed Fintech's investor relations office, a position based in Georgia as of June 1, 2020 – although his LinkedIn page indicates that Fintech hired him as Senior Vice President Investor Relations in May 2020, based in Woodstock, Georgia. Groh founded and operated his own financial consulting firm, Heritage Management Consultants, Inc. ("Heritage"), which purportedly rendered financial advisory and consulting services for foreign companies seeking to go public in the U.S.  Groh was involved in numerous transactions with Rosenberg and Halter over the years, not only through Heritage but also as an executive officer of Halter's entities.  As detailed herein, Groh has extensive ties to Rosenberg and Pascale.

32.     Defendant Alvin Tan became the CFO and a director of Triterras following the close of the transaction.  His personal LinkedIn page indicates he is also Triterras's Controller, and that he has been an accounting and finance professional at "Triterras" (presumably Fintech) in Singapore since 2016.  However, a Rhodium presentation from 2018, which features a picture of Tan and a quote from him, indicates he is also CFO and Group Controller of Rhodium – a fact not disclosed in the Materials.  Tan signed a Consent of Director Nominee, dated October 19, 2020 and attached to the October 19, 2020 draft Materials (Amendment No. 2), identical to the August 28, 2020 Consent of Director Nominee described herein.

33.     Defendant John A. Galani became the Chief Operating Officer ("COO") of Triterras following the close of the transaction.  The Materials indicate "Galani has over 20 years' experience in trade, trade finance and the build out of platforms."  As with Tan, however, the 2018 Rhodium presentation features a full-page picture of Galani and a quote from him, indicating he is COO of

Europe and Middle East for Rhodium – a fact not disclosed in the Materials.  His personal LinkedIn page indicates he has been COO of "Triterras" (presumably Fintech) since July 2020, and has served as Rhodium's COO for Europe and Middle East in Dubai from October 2015 until March 2017 and in London from April 2017 until November 2020.

### E.    Triterras Director Nominee Defendants

34.    Defendant Matthew Richards became a Triterras director following the close of the transaction.  According to the Materials, he founded and is managing director of the Watiga group of companies, based in Singapore, which render legal, corporate, and other professional services.  He signed a Consent of Director Nominee, dated August 28, 2020, described herein.

35.    Defendant Vanessa Slowey became a Triterras director following the close of the transaction.  According to the Materials, she "has over 25 years of multinational experience with proficiency in start-ups, mergers and acquisitions, transformation and digitalization."  Until 2018, she was CEO – Caribbean and Latin America for Digicel, and before that, Digicel's CEO – Asia Pacific.  Slowey signed a Consent of Director Nominee, dated August 28, 2020, described herein.

36.    Defendant Kenneth Stratton became a Triterras director following the close of the transaction.  According to the Materials, he is CEO of Asia Pacific FI Training Pte. Ltd., based in Singapore, a position he has held since March 2017; and, before that, from March 2013 to March 2015.  Stratton signed a Consent of Director Nominee, dated October 26, 2020 and attached to the October 26, 2020 Materials (Amendment No. 3, effective October 29, 2020), identical to the August 28, 2020 and October 19, 2020 Director Nominee Consents described herein.[3]

---

[3]    Martin Jaskel became a Triterras director following the close of the Transaction and was Chairman of Netfin from April 2019.  He signed a Consent of Director Nominee, dated August 28, 2020, described herein.  According to a January 5, 2021 press release attached to Triterras's January 19, 2021 Form 6-K, he is deceased.  Accordingly, he is not named herein as a defendant.

## IV.    SUMMARY OF ACTIONABLE STATEMENTS AND OMISSIONS

37.    As detailed herein, in connection with the transaction and otherwise during the Class

Period, defendants made materially incomplete and misleading statements, actionable under both the

Securities Act and the Exchange Act, by:

a.    describing the background of officers and directors of Netfin and Fintech and

their potential conflicts of interest without disclosing facts about the extensive personal and business

relationships between many of those insiders, certain of those insiders' ties to Rhodium, and the full

extent of conflicts of interest in play;

b.    representing that Netfin had not identified a transaction partner before its IPO,

when undisclosed facts about the relationships between officers and directors of Netfin and Fintech

strongly suggest that the transaction was prearranged or, at least, preconceived;

c.    disclosing Fintech's reliance on Rhodium and the general risks and conflicts

of interest arising from that relationship, without revealing Rhodium's overlapping management

with Fintech and its financial difficulties and liabilities – including that Maybank sued it for millions

of dollars just two months before the transaction closed – or the impact those issues could have on

Fintech and, later, Triterras;

d.    detailing the usage and transaction volume of the Kratos platform, without

forthrightly revealing the actual contribution related parties Longview and Rhodium continued to

make to transaction volume; and

e.    extolling the prospects, opportunities, and current conditions of trade finance

and commodities trading without divulging adverse industry developments that had occurred well

before the transaction and persisted during the Class Period, including that Rhodium was adversely

impacted by the COVID-19 pandemic and a lack of trade finance funding before December 17, 2020

(when Triterras disclosed it).

38.    In public statements that are now actionable under Section 10(b) of the Exchange Act, defendants also: (i) misrepresented their true reasons for altering the transaction structure to exclude Rhodium from any acquisition, when they sought to avoid their disclosure obligations by limiting the transaction to Fintech; (ii) concealed information about Rhodium's dire financial condition under the false pretense that Fintech and Rhodium were separate entities with separate management, when they were privy to information about Rhodium in real-time; (iii) fabricated reasons why Rhodium chose not to satisfy significant liabilities in December 2020, when the fact was that it could not pay the amounts owed; and (iv) withheld and inaccurately portrayed information about Kratos's market acceptance and financial performance, given that insiders and their business affiliates accounted for most of the transactions conducted on the platform.

## V.    ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Many of the Individual Defendants Have Personal and Professional Ties to Each Other and Business Associates, Raising Conflicts of Interest

39.    By and large, the individual defendants have extensive personal and professional ties, with several having worked together in other business ventures – sometimes for decades – and others having close business associates in common.  In either case, full disclosure of these connections was necessary to ensure the accuracy of the description of the background of the officers and directors, and the complete and non-misleading portrayal of conflicts of interest, in the Materials and other filings during the Class Period.  Disclosure was particularly important here because, as of June 2020, Fintech had only 17 employees, magnifying the importance of these inherent conflicts of interest.

### 1.    Maurer and Koneru

40.    After prodding by the SEC during the comment period (detailed below), defendants ultimately disclosed the following affiliations between Maurer and Koneru in the text of a paragraph included in the "Background of the Business Combination" section of the Materials:

Mr. Koneru was known to Mr. Maurer because of previous business affiliations, including as a 10% minority shareholder of Exxova, Inc., an IT-services business founded by Mr. Koneru in 2005 which was subsequently sold in 2010. In addition, one of Mr. Maurer's ventures, Longview Resources Group, was then an existing customer of Fintech and remains a customer of Fintech as of the date of this proxy statement/prospectus, accounting for 5.2% and 9.4% of Fintech's revenue for the fiscal year ended February 29, 2020 and the six months ending August 31, 2020, respectively.

41.    But information later emerged which revealed that the length and magnitude of that relationship was much greater than portrayed in the Materials and other statements during the Class Period. In its January 14, 2021 report, for example, Phase 2 traced that relationship back to 2004 and outlined other connections through the close of the transaction:[4]



42.    A comprehensive review of information from various sources reveals the following additional detail regarding these and other entities Maurer and Koneru co-founded, or in which they were involved, in the nearly 20-year period before the transaction closed:

---

[4]    The Phase 2 report is available here: https://phase2partners.egnyte.com/dl/bZMK5uwx27/.

a.    *Daymar Holdings, LLC*: On May 2, 2003, Daymar was formed in Georgia. Although comprehensive records are unavailable for this entity, information suggests that Koneru became CEO and Maurer became CFO and Secretary, and that Daymar had an address at some point of 1121 Alderman Drive, Suite 201, Alpharetta, Georgia 30005. It appears to have been dissolved on May 9, 2015.

b.    *EXXOVA, Inc. f/k/a Solitus Technology Partners, Inc.*: On January 10, 2005, Solitus, a corporation, was formed under Georgia law; the Phase 2 report indicates that Koneru and Maurer co-founded it. Solitus's Articles of Incorporation lists its principal place of business as 5490 McGinnis Village Place, Suite 212, Alpharetta, Georgia 30005. Its 2007, 2008, and 2009 Corporation Annual Registration lists Koneru as CEO, CFO, and Secretary, with an address of 2050 Marconi Drive, Suite 300, Alpharetta, Georgia 30005 – the same address at which Maurer registered and operates Longview, a Georgia corporation formed on July 24, 2016. On January 26, 2009, Maurer, who identified himself as Solitus's Chairman, filed a Certificate of Amendment changing Solitus's name to EXXOVA, which Maurer signed on January 23, 2009. EXXOVA's 2009 Corporation Annual Registration also lists Koneru as CEO, CFO, and Secretary, while its 2010 and 2012 Certificate of Amendment reflects that Maurer was CFO and Secretary and Koneru was CEO; in 2012, its address was listed as 1121 Alderman Drive, Suite 201, Alpharetta, Georgia 30005. On February 15, 2010, Georgia's Secretary of State issued a Certificate of Merger, reflecting that EXXOVA and another Georgia corporation, Resonance Holdings, Inc., had merged, with EXXOVA emerging as the surviving entity. Koneru signed the Certificate as Co-President and Secretary of Resonance, and Maurer and Koneru signed it respectively as Chairman and Secretary of EXXOVA. On May 9, 2015, Georgia's Secretary of State notified EXXOVA that it would administratively dissolve EXXOVA unless EXXOVA filed an annual registration for the entity. The dissolution was effectuated on December 31, 2015 when EXXOVA failed to file such registration.

- 19 -

c.    *EXXOVA Worldwide Corp. ("EXWW")*: On September 27, 2010, Koneru and Maurer established EXWW, a corporation formed under Delaware law.  On January 5, 2012, Maurer requested, and the Georgia Secretary of State granted, authority to do business in Georgia.  In support of the request, Maurer signed and submitted an Application for Certificate of Authority for Foreign Corporation, listing his address as 1121 Alderman Drive, Suite 201, Alpharetta, Georgia 30005, and identifying himself as CFO and Secretary of the entity and Koneru as CEO.  On May 9, 2015, Georgia's Secretary of State notified EXWW that it would administratively revoke EXWW's authority to transact business in Georgia unless EXWW filed an annual registration.  After notice on October 7, 2016, the revocation was effectuated on December 7, 2016.

d.    *S & R Capital Management, LLC (n/k/a Bolt-Hole Capital Management LLC) ("SRCM")*:  On or about January 24, 2013, Maurer and Koneru formed SRCM, a Georgia limited liability company, with Maurer as Chairman, Koneru as President, and a principal office at 2050 Marconi Drive, Suite 300, Alpharetta, Georgia 30005.  Consistent with Maurer's naming convention for other entities (such as MVR), SRCM's name is composed of the first initials of Koneru's and Maurer's names: Srinivas and Richard, respectively.  Maurer later changed the name of that entity to Bolt-Hole Capital Management LLC.

e.    *Rhodium Resources USA, Inc. (n/k/a The Bolt-Hole Group, Inc.) ("Rhodium Ga.")*:  On November 15, 2011 – about two years before Rhodium Ga. emerged – Rhodium, which Koneru co-founded, was incorporated in Singapore.  On January 9, 2014, Maurer, as "incorporator," signed the similarly named Rhodium Ga.'s Articles of Incorporation, effective November 23, 2013, which he filed with Georgia's Secretary of State.  The document listed Maurer as Rhodium Ga.'s registered agent and listed his address, and Rhodium Ga.'s principal place of business, as 2050 Marconi Drive, Suite 300, Alpharetta, Georgia 30005.  Rhodium Ga.'s 2014 Corporation Annual Registration, which Maurer signed and filed with Georgia's Secretary of State on April 24, 2014,

listed his title as "Incorporator" as well as Secretary and Koneru as CEO and CFO. Rhodium Ga.'s 2015 Corporation Annual Registration, which Maurer signed and filed on February 3, 2015, continued to list Koneru as CEO, but listed Maurer as CFO, Secretary, and Incorporator – titles that remained the same in the 2016 Corporation Annual Registration. However, in the 2017 Corporation Annual Registration, which Maurer signed and filed on July 18, 2017, Maurer became CEO, CFO, and Secretary, and Rhodium Ga.'s address changed to 12600 Deerfield Parkway, Suite 100, Alpharetta, Georgia 30005 – the address Maurer used as Netfin Holdings, Inc.'s principal place of business when registering that entity to do business in Georgia in December 2020. Additionally, effective July 18, 2017, Maurer changed Rhodium Ga.'s name to The Bolt-Hole Group, Inc.

      f.    *Saarika Holdings, LLC*: On August 22, 2019, Koneru and Maurer established Saarika in Georgia. Saarika's Articles of Organization, which Maurer signed and electronically filed with Georgia's Secretary of State on August 22, 2019, identifies Koneru and Maurer as Saarika's "organizers" and Koneru as its registered agent, and lists its principal place of business as 12600 Deerfield Parkway, Suite 100, Alpharetta, Georgia 30004 – the address at which Maurer registered NetFin Holdings, Inc., a Delaware entity formed on December 19, 2018, to do business in Georgia as of January 19, 2021. On August 7, 2020, Georgia's Secretary of State notified Koneru it would administratively dissolve Saarika unless Saarika filed an annual registration; dissolution occurred on October 22, 2020 when Saarika failed to file such registration.

    43.    Other information suggests that Maurer and Koneru also planned to form Triterras years before the transaction took place. Not only did Maurer and Koneru form Rhodium Ga. in late 2013, but Maurer also registered the "triterras.com" domain name in early 2013 – and associated his address at 2050 Marconi Drive, Suite 300, Alpharetta, Georgia 30005, with the registration. The information associated with the registration of that domain name has since been anonymized through

the use of a service designed to conceal such registration data, but the following snapshot remains

available online:



**Richard Maurer registered "triterras.com"**

Contact Email: Maurer.Rick@gmail.com
WhoisSever: whois.godaddy.com
Create Date: 09-feb-2013
Update Date: 09-feb-2013
registrar Name: GODADDY.COM, LLC

Registrant Address: 2050 Marconi Drive|Suite 300
Alpharetta Georgia 30005
Registrant Country: UNITED STATES

44.     The domain name registration data lookup database (known as WHOIS), operated by

the Internet Corporation for Assigned Names and Numbers (or ICANN), confirms that triterras.com

was registered on February 9, 2013 as the above snapshot shows, and that its registration information

is now "private" and linked to an organization called Domains By Proxy, LLC.  Domains By Proxy

is affiliated with GoDaddy.com, LLC, which processed the initial registration.

45.     Maurer also registered the domain name "koneruholdings.com" in February 2013 and

again associated his address in Georgia with the registration, as the following snapshot indicates:



**Richard Maurer registered "koneruholdings.com"**

Contact Email: Maurer.Rick@gmail.com
WhoisSever: whois.godaddy.com
Create Date: 22-feb-2013
Update Date: 22-feb-2013
registrar Name: GODADDY.COM, LLC

Registrant Address: 2050 Marconi Drive|Suite 300
Alpharetta Georgia 30005
Registrant Country: UNITED STATES

46.     The identifying information on these snapshots – such as Maurer's email and business

address and the registrar used (GoDaddy.com, LLC) – are consistent with other records reflecting his

registration of other domain names, such as "trilocals.com" and "consultants1st.com."  Bolstering

the reliability of this information is the fact that Maurer formed Consultants 1st, LLC in Georgia in

2013 – the year in which he appears to have registered the domain bearing that name.  Koneru also

operates an entity called Koneru Holdings Ltd., a Mauritius based holding company that did business

in India (and elsewhere), as reflected in a September 8, 2015 ruling of the Competition Commission

of India concerning corporate acquisitions he planned to make.

47.    Aside from this unbroken chain of direct connections between Maurer and Koneru, Maurer and Koneru forged a web of relationships with other individuals and entities with converging interests that exemplifies their intimate and longstanding personal and business ties.  The following page from the Phase 2 report illustrates some of these ties:



48.    Among the connections above which are most relevant: (i) James Cheer Chua Boon is involved in Longview (Maurer's entity) and Triterras (Koneru's entity); and (ii) Chong Sook Yee is involved in Longview and "Puissant International," the latter of which is tied to Koneru and a related party of Triterras.  In fact, Fintech's financial statements for the fiscal years ended February 28, 2019 and February 29, 2020, which are part of the Materials, disclose, without explanation, that Puissant International Pte. Ltd. is a related party "under common control" alongside Rhodium.  As its website confirms, SSOL (which Koneru beneficially owns) has or had investments in Puissant International Pte. Ltd., as well as Rhodium, Triterras Asia Pte. Ltd., and Arkratos Blockchain Solutions Pte. Ltd. (f/k/a Fintech):



49.     According to SGP Business.com, a website dedicated to cataloguing information on

Singapore businesses, Puissant International is a Singapore company once known as PIPL Holdings

Pte. Ltd. whose address is 9 Raffles Place, #23-04, Republic Plaza, Singapore 048619 – the address

of Triterras's principal executive office and headquarters.  Additionally, according to the September

8, 2015 ruling of India's Competition Commission (referenced above), PIPL and Puissant Holdings

Pte. Ltd. were wholly owned subsidiaries of Koneru Holdings.

50.     As detailed below, the Materials and other Class Period statements by defendants did

not reveal these connections, and the conflicts of interest naturally arising from them, adequately –

or, in most cases, at all.

### 2.     Rosenberg, Pascale, and Groh

51.     Defendant Rosenberg, Pascale, and Groh also have deep personal and professional

ties.  They have worked together and invested alongside each other for nearly two decades and share

two important business associates – Timothy P. Halter and David Brigante – with whom they have

done, and presumably still do, a substantial amount of business.

52.     As the Materials indicate, Rosenberg has a lengthy history with firms under the Halter

umbrella.  From January 2002 to April 2018, he was the Senior Managing Director and Principal of

Halter Financial Group, Inc. ("HFG"), and is currently the Managing Partner of HFG Partners, LLC. But Rosenberg has also been integrally involved in numerous other entities associated with Halter, and often invested (or invests) alongside Halter as a limited partner in those entities or otherwise. As the Materials indicate, "Rosenberg has brought over 50 companies public" – many times, although not mentioned in the Materials, using a SPAC to do so. Halter is a prolific promoter of going-public reverse-mergers involving little known private Chinese companies – activities in which Rosenberg has frequently participated. HFG registered the "Alternative Public Offering" or "APO" service mark, promoting "services [that] allow privately held companies to go public via the reverse merger process and simultaneously complete a private capital raising transaction," and also once operated the site reversemerger.com

53.    Rosenberg is the sole member of River Green, which is a limited partner of Halter Financial Investments, L.P ("HFI"). Brigante is the sole member of Bellfield Capital Management, LLC, which, in turn, is the sole general partner of Bellfield Capital partners, L.P. – an entity which is also a limited partner of HFI. HFI's other limited partners are TPH Capital, L.P. – a Halter entity – and Colhurst Capital, L.P. – an entity founded and operated by George L. Diamond. These individuals have been involved, at a minimum, in the following Halter entities:

|  | Entity Name | Members/Directors | Document | Date |
|---|---|---|---|---|
| 1. | Halter Financial Investments GP, LLC ("HFI GP") | TPH Capital, LP<br>Bellfield Capital Partners LP<br>River Green Capital, LLC<br>Colhurst Capital, LP | Articles of Incorporation, filed with Texas Secretary of State | 8/8/05 |
| 2. | HFG GP, LLC ("HFG GP")[5] | Same as directly above. | Articles of Organization, filed with Texas Sec. State | 8/8/05 |
| 3. | Halter USX India, Inc. | Timothy P. Halter<br>George L. Diamond<br>David F. Brigante<br>Marat Rosenberg | Articles of Incorporation, filed with Texas Sec. State (Incorporator: Diamond) | 8/10/05 |
| 4. | WLT Brothers Holdings, Inc. ("WLT") | Same as directly above. | Certificate of Formation, filed with Texas Sec. State | 5/2/07 |

---

[5]    HFG GP's corporate registration was forfeited as of February 28, 2020.

54.     All of these individuals also had executive or other roles at these Halter entities.  For example, for: (i) HFI GP and HFG GP (2006-2019), Halter was Chairman (listed as CEO in 2019), Brigante was President/Treasurer, Rosenberg was Manager/Director, and Diamond was Secretary; (ii) WLT (2008-2013), Halter was Chairman, Brigante was President, Diamond was Secretary, and Rosenberg was Managing Director; and (iii) Halter USX India, Inc. (latest, as of 2016), Halter was President/Director, Brigante and Rosenberg were directors, and Diamond was Secretary.

55.     Additionally, these individuals operated or invested in numerous entities together, as the following sample of HFI's ownership interests from 2005 to 2011 – and the equivalent beneficial ownership interests of each of its limited partners – confirms:

|   | Entity Name | Description | Document | Date |
|---|---|---|---|---|
| 1. | TS Electronics, Inc. (later, China Pharma Holdings Inc.) | Reflecting HFI's ownership of 1,828,170 shares (73.1%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 10/4/05 |
| 2. | Nevstar Gaming and Entertainment Corp. (later, Golden Elephant Glass Technology Inc.) | Reflecting HFI's ownership of 75,000,000 shares (59.7%). | Same as above. | 10/11/05 |
| 3. | Las Vegas Resorts Corp. (later, Winner Medical Group Inc.) | Reflecting HFI's ownership of 1,070,000 shares (68.5%). | Same as above. | 11/4/05 |
| 4. | Zeolite Exploration Company (later, ShengdaTech Inc.) | Reflecting HFI's ownership of 4,950,000 shares (78.8%). | Same as above. | 11/30/05 |
| 5. | MGCC Investment Strategies Inc. (later, Wonder Auto Technology Inc.) | Reflecting HFI's ownership of 20,000,000 shares (86.4%) after close of stock purchase agreement. | Schedule 14F1, noting Halter, Brigante, Diamond, and Rosenberg are owners. | 12/19/05 |
| 6. | Robcor Properties, Inc. (later, Redpoint Bio Corp.) | Reflecting HFI's ownership of 12,900,000 shares (50.8%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 5/9/06 |
| 7. | RTO Holdings Inc. (later, Orion Ethanol Inc.) | Reflecting HFI's ownership of 1,346,000 shares (97.2%). | Same as above. | 6/22/06 |
| 8. | Concept Ventures Corp. (later, China Ritar Power Corp.) | Reflecting ownership of HFI and HFI GP of 1,100,000 shares (78.6%). | Form 8-K, noting Halter, Brigante, Diamond, and Rosenberg are owners. | 7/7/06 |
| 9. | BTWC VII, Inc. (later, Whitehall Jewelers Holdings Inc.) | Reflecting HFI's ownership of 350,000 shares (70%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 10/31/06 |
| 10. | BTHC VI, Inc. (later, Athersys Inc.) | Reflecting HFI's ownership of 350,000 shares (70%). | Same as above. | 10/31/06 |
| 11. | Sutor Technology Group Ltd. | Reflecting HFI's ownership of 135,000 shares (90% voting power). | Form 10-QSB, disclosing limited partners of HFI. | 11/3/06 |

| | Entity Name | Description | Document | Date |
|---|---|---|---|---|
| 12. | BTHC X, Inc. | Reflecting HFI's ownership of 350,000 shares (70%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 11/21/06 |
| 13. | BTWC VIII, Inc. (later, THT Heat Transfer Technology Inc.) ("THT") | Reflecting HFI's ownership of 350,000 shares (70%). | Same as above. | 11/30/06 |
| 14. | Point Acquisition Corp. (later, China Gengsheng Minerals, Inc.) | Reflecting HFI's ownership of 1,270,400 shares (80%). | Same as above. | 1/3/07 |
| 15. | Marketing Acqusition Corp. (later, USA Zhimingde International Group Corp.) | Reflecting HFI's ownership of 60,000,000 shares (71.4%). | Same as above. | 3/20/07 |
| 16. | Energroup Technologies Corp. (later, Energroup Holdings Corp.) | Reflecting HFI's ownership of 11,200,000 shares (83%). | Form 8-K, noting Halter, Brigante, Diamond, and Rosenberg are owners. | 5/23/07 |
| 17. | BTHC XIV, Inc. | Reflecting HFI's ownership of 350,000 shares (70%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 9/11/07 |
| 18. | Fashion Tech International, Inc. (later, China Nutrifruit Group Ltd.) | Reflecting HFI's ownership of 1,005,200 shares (87.5%). | Form 8-K, disclosing limited partners of HFI. | 10/3/07 |
| 19. | Gourmet Herb Growers, Inc. (later, Hong Kong Winalite Group Inc.) | Reflecting HFI's ownership of 11,200,000 (87.5%). | Form 8-K, disclosing limited partners of HFI. | 10/11/07 |
| 20. | New Paradigm Productions, Inc. (later, China Marine Food Group Ltd.) | Reflecting HFI's ownership of 25,137,574 shares (87.5%). | Form 8-K, disclosing limited partners of HFI. | 12/25/07 |
| 21. | Sunset Suits Holdings, Inc. | Reflecting HFI's ownership of 1,000,000 shares (8%). | Form S-1, disclosing limited partners of HFI. | 7/3/08 |
| 22. | Latin America Ventures, Inc. (later, Chile Mining Technologies Inc.) | Reflecting HFI's ownership of 400,000 shares (20%). | Form 10-K, disclosing limited partners of HFI. | 1/20/09 |
| 23. | SMSA El Paso II Acquisition Corp. (later, Resource Holdings Inc.) | Reflecting HFI's ownership of 400,000 shares (80%). | Schedule 13D, signed by Halter, Brigante, Diamond, and Rosenberg. | 4/15/09 |
| 24. | SMSA Palestine Acquisition Corp. (later, Asia Green Agriculture Corp.) | Reflecting HFI's ownership of 400,000 shares (80%). | Same as above. | 4/15/09 |
| 25. | SMSA Humble Acquisition Corp. | Reflecting HFI's ownership of 400,000 shares (80%). | Same as above. | 1/21/11 |
| 26. | SMSA Treemont Acquisition Corp. | Reflecting HFI's ownership of 400,000 shares (80%). | Same as above. | 1/21/11 |
| 27. | SMSC Katy Acquisition Corp. (later, Enerpulse Technologies Inc.) | Reflecting HFI's ownership of 400,000 shares (80%). | Same as above. | 1/21/11 |
| 28. | SMSA Shreveport Acquisition Corp. | Reflecting HFI's ownership of 415,960 shares (80%). | Same as above. | 3/28/11 |
| 29. | SMSA Dallas Acquisition Corp. | Reflecting HFI's ownership of 400,000 shares (80%). | Same as above. | 5/25/11 |

56.     Defendants Groh and Pascale were also involved as executives or consultants in the entities in which Halter – and, by extension, Rosenberg and Brigante – invested.  In fact, Groh has extensive connections to the Halter group: he was a registered securities broker with Halter Financial

Securities, Inc. ("HFS"), in Greenwich, Connecticut, from October 2007 until August 2012; and was an Executive Managing Director at WLT, in Hilton Head, South Carolina. Additionally, Groh was a Managing Partner at the Hao Financial Group, which engaged in cross border initiatives between U.S. and China associated with HFG China, a Halter-affiliated entity. As detailed further herein, the Materials do not disclose any of this information, indicating only that Groh "assisted over twenty companies in achieving their public listing goals in the US as an advisor or investment banker" and that he "previously held FINRA Series 7, 63 and 24 licenses."

57.    According to Financial Industry Regulatory Authority ("FINRA") records, however, Groh obtained his securities licenses during his tenure at HFS, passing the General Securities Representative Examination (Series 7) on October 18, 2007, the Uniform Securities State Law Examination (Series 63) on October 25, 2007, and the General Securities Principal Examination (Series 24) on November 14, 2007. FINRA records also indicate that WLT was HFS's majority shareholder; Halter, Brigante, Diamond, and Rosenberg held interests in HFS through WLT and thus were HFS's sole equity holders; and Groh was a Managing Director of HFS. Yet Groh apparently did not render investment advice, instead dedicating efforts to facilitating transactions with entities in which Halter, Brigante, Diamond, and Rosenberg invested. Groh also invested alongside these individuals, receiving securities as compensation for "consulting" services he provided via Heritage, a South Carolina company he incorporated in May 2005 and dissolved in December 2015.

58.    Pascale also provided consulting services via Heritage, an experience so formative he describes it to this day on the website of his own financial consultancy, SCF:

> Gerry [Pascale] spent 3 years responsible for managing and completing all of the finance activities with Heritage Management Consultants. In this role he specialized in providing finance and SEC support throughout the entire process of listing on a US exchange. This role included developing business plans, reviewing financial

statement preparation, preparing financial projections and budgets and preparing and
making presentations to US investors.[6]

59.    Among the entities tied to Halter, Brigante, Diamond, and Rosenberg in which Groh

or Pascale were involved are the following:

| | Entity Name | Description | Document | Date |
|---|---|---|---|---|
| 1. | China Bak Battery, Inc. (Halter took the company public in a reverse merger) | Indemnification Agreement, describing consulting agreement with Heritage and Groh. | Form 10-KSB, with attached Indemnification Agreement, dated July 25, 2005. | 12/30/05 |
| 2. | Winner Medical Group Inc. | Listing Heritage and Groh, which provided consulting services, as agents for service on behalf of the company; noting Halter resigned as CEO and sole director after a reverse acquisition. | Form SB-2, noting HFG International, Ltd. ("HFGI") advisory agreement, dated July 2005, which ultimately resulted in a share exchange pursuant to which related entity HFI exited its investment. | 2/27/06 |
| 3. | Winner Medical Group Inc. | Describing Consulting Agreement with Heritage, entered into in December 2005, which provided for payment of $175,000 and a warrant to purchase 200,000 shares of common stock. | Form SB-2, listing Consulting Agreement with Heritage, dated December 25, 2005. | 4/7/06 |
| 4. | MGCC Investment Strategies, Inc. (later, Wonder Auto Technology Inc.) | Consulting Agreement, signed by Groh as President of Heritage, in payment of $175,000; HFGI's advisory agreement entitled it to substantial interests. | Form 8-K, with attached Consulting Agreement with Heritage, dated April 22, 2006; and advisory agreement with HFGI, dated March 15, 2006. | 6/23/06 |
| 5. | Bronze Marketing, Inc. (later, Sutor Technology Group Ltd.) | Consulting Agreement, signed by Groh as President of Heritage and by Halter as President of company, in payment of 5,000 shares of Series A convertible preferred stock. | Form 8-K, with attached Consulting Agreement, dated January 8, 2007. | 1/9/07 |
| 6. | Concept Ventures Corporation (later, China Ritar Power Corp.) | Consulting Agreement, signed by Groh as President of Heritage and by Halter as CEO of company, in payment of 50,000 restricted shares. | Form 8-K, with attached Consulting Agreement, dated January 19, 2007. | 1/22/07 |
| 7. | Point Acquisition Corp. (later, China Gengsheng Minerals Inc.) | Consulting Agreement, signed by Groh as President | Form 8-K, with attached Consulting Agreement | 4/27/07 |

---

[6]    http://scfinancialllc.com/contact_us.

| | Entity Name | Description | Document | Date |
|---|---|---|---|---|
| | | of Heritage; Halter also entered into advisory agreements, through HFGI. | (with Heritage), dated January 19, 2007. | |
| 8. | Millennium Quest, Inc. (later, American Lorain Corp.) ("MLQT") | Consulting Agreement, signed by Groh as President of Heritage and Halter as President of MLQT, in payment of 1,642,000 restricted shares. | Form 8-K, with attached Consulting Agreement, dated April 24, 2007. | 4/25/07 |
| 9. | China Gengsheng Minerals Inc. | Noting HFI owned 609,792 shares, and Heritage owned 50,000 shares, before offering. | Form S-1/A, listing four consulting agreements with Heritage and two advisory agreements with HFGI. | 9/28/07 |
| 10. | American Lorain Corp. (later, Planet Green Holdings Corp.) | Noting Heritage owned 50,000 shares, and HFI owned 626,397 shares, before an offering. | Form S-1/A, listing Consulting Agreement with Heritage, dated March 8, 2007. | 10/26/07 |
| 11. | BTHC VII, Inc. (later, THT) | Noting Pascale, as Chairman, President, CFO, and Secretary, was responsible for funding the company, managing its operations, and identifying an acquisition target. | Form 8-K, listing Pascale's ownership of 2,815,000 shares (90%) and HFI's ownership of 218,750 shares (7%), and noting HFI had controlled the company. | 2/13/09 |
| 12. | SMSA El Paso II Acquisition Corp. (later, Resource Holdings Inc.) | Noting Pascale, as Chairman, President, CFO, and Secretary, was responsible for funding the company, managing its operations, and identifying an acquisition target. | Form 8-K, listing Pascale's ownership of 4,500,000 shares (90%) and HFI's ownership of 400,000 shares (8%), and noting HFI had controlled the company. | 8/11/09 |
| 13. | Latin America Ventures, Inc. (later, Chile Mining Technologies Inc.) | Noting that after a reverse acquisition in May 2010, Pascale became a director. At that time, HFI owned 10.52% of its common stock. | Form 8-K. | 5/14/10 |
| 14. | Asia Green Agriculture Corp. ("AGAC") | Proposed short-form merger between AGAC and AGF Industrial Ltd. to effectuate going-private transaction. | Schedule 13E-3, listing HFI as an investor alongside Groh and Heritage, among others. | 6/25/14 |

60.    Ties also run strong between Groh, Pascale, and Brigante.  As the following snapshot of its website indicates, Bellfield Advisors lists all three individuals as principals, and even provides Groh's email address – jim.groh@bellfieldadvisors.com – as the contact person for the entity:[7]

---

[7]    https://www.bellfieldadvisors.com/.  The website has a 2018 copyright designation.



61.     Bellfield Advisors offers services designed to facilitate an expedited public listing as opposed to an initial public offering, describing itself as "Expedited Public Listing Experts" and "an outsourced, interim resource that enables our clients to achieve a very specific set of objectives." Its name is apparently derived from the names of Brigante's Bellfield Capital investment entities – the entities he used to invest alongside Halter, Rosenberg, and Diamond in HFI when Groh and Pascale performed various consulting and operational roles for the companies in which HFI invested.

62.     On the Bellfield Advisors site, Groh provides the following background on his career, which further confirms his strong ties to the Halter group of entities (and thus Rosenberg):

> In 2005 Mr. Groh managed his own consulting business, Heritage Management Consultants, which provided contractual executive management services to companies making the transition from private ownership to a public listing in the US financial markets. In 2007, he joined Halter Financial Securities, Inc. (formerly WLT Brothers Capital, Inc.) as a principal managing their investment banking practice and held FINRA Series 7, 24, and 63 licenses.[8]

63.     According to his LinkedIn page, Groh was associated with Bellfield Advisors in Woodstock, Georgia from August 2018 to May 2020, although Bellfield Advisors' site, as noted, continues to list him as the sole contact for the firm. Only several months earlier, in January 2018,

---

[8]      https://www.bellfieldadvisors.com/jim-groh-bio.

Rosenberg registered River Green to do business in Georgia, and filed an annual registration in 2019 to continue doing business there.  On June 1, 2020, Fintech announced the hiring of Groh to lead its new U.S. investor relations office in Georgia – incidentally, where Maurer is also based.

64.    Among the information Pascale provides on the Bellfield Advisors site is an account of his involvement in companies associated with the Halter group of entities (and thus Rosenberg), as the following excerpt demonstrates:

> Gerry was an Independent Director with Sutor Technology Group (Nasdaq: TOR) and served as the Audit Committee Chairman.  During the five years he held this position, Mr. Pascale worked closely with the management team to increase the experience of the accounting and finance staff, strengthen the overall internal and financial controls and strengthen the financial reporting.  During his tenure, Mr. Pascale provided oversight to facilitate the Company's growth both organically and through acquisitions.
>
> Gerry also served as Chief Financial Officer of Chile Mining Technologies, headquartered in Santiago, Chile while publicly listed in the US.[9]

65.    As the Materials indicate, Pascale became Netfin's CFO in April 2019, at the same time that he, Groh, and Brigante were principals at Bellfield Advisors and shortly before Fintech recruited Groh to run its U.S.-based investor relations office.

66.    Accordingly, Rosenberg, Groh, and Pascale have lengthy personal and professional relationships and ties to other business associates that the Materials did not disclose, but which gave rise to myriad conflicts of interest of which investors were unaware until the Class Period ended.

### 3.    Koneru, Tan, and Galani

67.    Defendants Koneru, Tan, and Galani also have close professional relationships that the Materials did not disclose.  As detailed herein, the Materials indicate that Koneru co-founded and

---

[9]    https://www.bellfieldadvisors.com/gerry-pascale-bio.

controls Rhodium – a Fintech affiliate – but fail to disclose Tan and Galani held executive positions at Rhodium, where Koneru is also a director.

68.    The Materials indicate that Tan was slated to serve as Triterras's CFO.  In describing his background, the Materials stated that "Tan has over 20 years of financial experience in several leading commodity trading firms," emphasizing his 15-year tenure with entities under the Cargill umbrella and elsewhere.  But his LinkedIn profile indicates that he was an accounting and financial professional at Triterras (presumably, Fintech) since 2016, while Rhodium's website and other sources describe him as a Global Head and indicate that he was (and possibly still is) Rhodium's CFO and Group Controller.  The following snapshot of Rhodium's materials, issued to promote its business, prominently features Tan:[10]



69.    The Materials disclosed selective information on Galani also.  Although he was slated to serve as Triterras's COO, the Materials stated that "Galani has over 20 years' experience in trade, trade finance and the build out of platforms," highlighting his experience with entities before joining

---

[10]    Tan signed three service agreements with Fintech as CFO of various Rhodium entities, and those agreements are attached to the October 1, 2020 draft Materials (Amendment No. 1).  Without any explanation in the text of the Materials, however, the agreements would at best confuse investors as to Tan's involvement at Rhodium while also employed at Fintech.

Fintech.  His LinkedIn profile, however, discloses his position as COO of Triterras from July 2020 to the present and as Rhodium's COO – Europe and Middle East (first in Dubai and then London) from October 2015 to November 2020.  Additionally, Rhodium's website and other sources describe Galani as a Global Head and indicate that he was (and possibly still is) its COO.  This snapshot from Rhodium's promotional materials prominently features Galani:



70.    As detailed below, Rhodium's ongoing relationship with Koneru, Tan, and Galani undermined the Material's description of the non-compete provisions of the employment agreements that Triterras envisioned for these executives, which would prohibit "any business . . . in the same field of commercial activities as Holdco" (later, Triterras), as follows:

> During the term of employment and for 6 months thereafter, each employee is subject to a non-compete whereby such employee may not engage in any business or entity in the same field of commercial activities as Holdco, in any instance, anywhere Holdco conducts its commercial activities.

71.    Accordingly, Koneru, Tan, and Galani have extensive relationships that the Materials did not disclose, which gave rise to troubling conflicts of interest of which investors were unaware until the Class Period ended.

### 4.    Rosenberg and Komissarov

72.    Defendants Rosenberg and Komissarov also have strong ties to each other.  As the Materials disclose, they are both members of MVR.  The Materials also state that Komissarov has been a director, President, and CFO of Trident since March 2016.  Yet Rosenberg invested in Trident and became a director and its Chairman on November 18, 2020, eight days after the Netfin/Fintech transaction closed.  Although Netfin's July 11, 2019 Form S-1 disclosed Komissarov's executive roles in Trident and that Rosenberg was an investor, the Materials omitted disclosure of Rosenberg's involvement in Trident.  In doing so, the Materials again failed to disclose information concerning the numerous conflicts afflicting the participants in the transaction.

### B.    The Trade Finance Market Falters as Rhodium Is Sued Over Millions of Dollars and Forced to Restructure Its Debts

73.    By the start of the Class Period, the trade finance market was faltering in the wake of scandals that had increasingly plagued the commodities industry.  These scandals were particularly prevalent (and prolific) in Singapore, where Fintech, Rhodium, Longview, and their related entities operate and Triterras would be based.  Additionally, Rhodium was sued for failing to make millions of dollars in debt payments.  But investors and others not steeped in trade finance and the foreign commodities trading business would have no reason to know any of these developments.

74.    On March 6, 2020, *Reuters* published an article entitled "Banks accuse Singapore commodity trader Agritrade of 'massive' fraud," reporting on the collapse of Agritrade International Pte. Ltd.  According to the article, "[a]t least 20 banks facing losses running into the hundreds of millions of dollars" – including Singapore's United Overseas Bank, Malaysia's Maybank, Dutch bank ING, and Japan's MUFG Bank – "accused the commodities trader of fraud" and "filed cases in Singapore's high court to recover their money . . . ."  Those charges arose in conjunction with the appointment of an interim judicial manager after the High Court rejected Agritrade's "request for a

debt moratorium on $1.55 billion in outstanding liabilities to dozens of creditors, including $983 million owed to secured lenders."

75.     As other reports would confirm, however, Agritrade's fraud and later implosion was not an isolated incident within Singapore's insular commodities trading industry.  According to a September 24, 2020 *S&P Global* article entitled "After Hin Leong: collapse of a Singaporean oil prodigy," the largest recent scandal involved a $3.5 billion fraud whose implications reverberated throughout the industry.  That fraud reportedly sparked "one of the world's largest collapses of an oil trading firm": Hin Leong, whose "founder . . . is inextricably linked with the history of the petroleum trade in Singapore and the Asia-Pacific region," and whose April 17, 2020 bankruptcy filing was the precursor to criminal charges in August 2020.

76.     As the article detailed, the Hin Leong fraud "sh[ook] Singapore's commodity trading community to the core" for "those who had exposure to the company" and for "everyday traders who had dealt with [it] for decades."  Using accounting manipulations and forged documents, Hin Leong "obtained financing from banks through schemes that involved the sale and repurchase of cargo at a loss," "non-existent inventory," and "the sale of the same inventory to multiple parties" – "leading to competing legal claims on the same cargo."  The ruse was exposed "when the coronavirus pandemic stressed out already overextended credit lines used to cover the company's losses," which by then had ballooned to over $3.5 billion.

77.     The following graphic from the article provides a chronology of the Hin Leong fraud, insight into the state of the petroleum trading industry, and an overview of "prominent commodity trading losses over the years":



THE HIN LEONG STORY: RISE AND FALL OF A SINGAPOREAN OIL TYCOON

78.    But fraud in Singapore's commodity industry was not isolated to Hin Leong (or even

Agritrade).  Rather, as the article indicates: "HSBC in May filed an application in Singapore's High

Court to put Zenrock Commodities under judicial management, citing 'suspicious' transactions and

trade practices in its affidavit.  Hontop filed for debt restructuring with the High Court in March

[2020]."  As the article somberly notes, "[b]anks have scaled back significantly from lending to the

commodities sector in 2020, a move accelerated by incidents like Hin Leong."  The following chart

(from a different source) details some of these incidents and the banks that fell prey to them:

| Year | Company | Amount | Banks Including |
|------|---------|--------|-----------------|
| 2020 | Hontop Energy | $473 million | CIMB |
| 2020 | Agritrade | $670 million | ING |
| 2020 | Hin Leong Trading | $3.5 billion | HSBC +22 banks |
| 2020 | Zenrock Commodities | $166 million | HSBC |
| 2019 | Coastal Oil | $354 million | OCBC, DBS, UOB |
| 2019 | Inter-Pacific Petroleum | $168.5 million | SocGen |

79.    As a result of these incidents, large banks that provided trade financing significantly

reduced or eliminated their business in Singapore and elsewhere.  In or about July 2020, Societe

Generale began restricting financing by closing its trade finance desk in Singapore, dismissing front

office workers there, servicing large trading clients from Hong Kong, and discontinuing its business

with small and medium-sized commodities trading firms in Singapore.  By August 2020, ABN Amro

chose to discontinue funding commodities transactions, electing to deploy its capital elsewhere.  And

while BNP Paribas had pulled back on trade financing since 2014, by September 2020 it had stopped

funding new transactions, placed its operations under review, and planned to exit the business – a

drastic change for a trade finance lender which was once responsible for half of some commodities

firms' funding.  Other big banks, including ING, also tightened funding in Singapore and elsewhere,

severely constricting the availability of financing for commodities transactions.

80.     Also in September 2020, Maybank sued Rhodium over $3.16 million in unpaid debts

for four bills of exchange drawn by Intra Asia Trading.  An article reporting on this news described

Maybank's litigation as another in a series of developments reflecting the "global wave of upheaval

among commodities traders" and its continuing adverse impact on commodities lending:

> A global wave of upheaval among commodities traders have hit banks this year,
> forcing them to turn to the courts to reclaim loans.  The moves have battered the
> close-knit trading community in Singapore, one of the world's most important hubs,
> and exposed the risks to banks that finance the opaque business of moving raw
> materials around the planet.

81.     Only three months later, in December 2020, Rhodium was forced to seek bankruptcy

protection to restructure its debts under Singapore's Insolvency, Restructuring and Dissolution Act

("Insolvency Act"), when a creditor sought to recover $5 million it lent to fund certain commodities

purchases.  In a December 17, 2020 article entitled "Triterras Plunges as Creditor Pushes Key Client

to Restructure," *Bloomberg* reported that Rhodium's financial troubles signaled a continuing trend of

adverse developments in the industry that began before the Class Period and had caused banks to

cease providing financing:

> [Rhodium] is under pressure from creditors just as a series of frauds and scandals in
> Asia and the Middle East have rocked the commodities trade finance sector as a
> whole.  That includes the collapse of Singapore stalwart Hin Leong that left some 23
> banks on the hook for as much as $3.5 billion in losses.
>
> Some of the biggest banks in the sector including BNP Paribas SA and ABN Amro
> have scaled back or pulled out of the sector altogether.  Societe Generale SA
> shuttered its commodity trade finance activities in Singapore.

82.     As detailed herein, neither the Materials nor any Class Period disclosures described:

(i) the contracting nature of the trade finance and commodities trading industries, including instances

of fraud that occurred before the transaction which prompted the banks' universal response to tighten

financing (or discontinue it entirely); (ii) Fintech and Koneru's ties to former Agritrade CEO Ng

Xinwe, who advised on developing the Kratos platform (revealed on page 15 of the Phase 2 report);

and (iii) Rhodium's precarious financial condition, which pre-dated the transaction and required it to

restructure its debts under the Insolvency Act after the transaction.

### C.  Kratos's Failed Initial Coin Offering Requires Koneru and His Team to Shift Their Focus to Orchestrating a Friendly Transaction with Maurer

83.     Koneru co-founded commodities trader Rhodium in 2012, providing seed funding for

its operations.  A promotional pamphlet Rhodium produced indicates that it generated barely $100

million in revenue the year of its founding, but that revenue reached nearly $2 billion in 2017-2018.

Among the commodities Rhodium trades, in order of metric tons for 2017-2018, are coal, grains and

oil seeds, metals, and non-ferrous materials.  The pamphlet said Rhodium had at its disposal over $1

billion in financial lines to fund trading activities.  Koneru is and has been a director of Rhodium and

a member of its risk committee.

84.     In 2018, Koneru founded Fintech (then known as Arkratos Blockchain Solutions Pte.

Ltd.).  Immediately, Fintech launched plans to solicit public investors to fund the development of

Kratos, a blockchain-enabled commodities trading platform, with an initial coin offering ("ICO") of

so-called Kratos tokens.  At that time, Kratos was in its pilot stage; Fintech would not develop the

modules necessary to enable Kratos users to identify commodities transactions, or secure funding for

those trades, until early 2020.  Still, Koneru and his team pressed forward with the ICO, describing

its terms in a March 7, 2018 promotional "whitepaper":

> A total of 300 Million KRATOS Tokens will be produced, of which around 55% (i.e. 165 Million) will be available for sale during the Pre-ICO Period & the ICO Period. The tokens can be purchased using Ethereum.  The purchase price per KRATOS Token during the ICO Period is equivalent to 0.001 ETH. In other words, 1000 KRATOS Token will be given in exchange for 1 ETH.

> During the Pre-ICO Period, we will sell a maximum of 80 Million KRATOS Tokens. The KRATOS Tokens will be sold at a 20% discount during the Pre-ICO Period.

85.    According to information about the ICO, Kratos was financed with $5 million in seed funding and sought to raise a minimum of $5 million (soft cap) and a total of $55 million (hard cap). The ICO was to commence in September 2018 (with presales beginning in July 2018), and close in November 2018 (with presales ending in August 2018), after which the tokens were supposed to list for public trading.  By some accounts, enough tokens were sold to reach the soft cap; soon, however, the project went dark and purchasers complained that their tokens were worthless and that the ICO was a fraud.  There is now barely a trace of the ICO (or tokens), suggesting that it failed – and that a nearly successful effort was undertaken to erase any mention of it.

86.    Even so, the ICO whitepaper – which is now not available on Triterras's, Rhodium's, or even Kratos's website – tacitly confirmed the close relationship between Maurer and Koneru back then: it describes Longview as just one of two "early adopters" of Kratos (Rhodium was the other). It also confirmed the close relationship between Fintech and Rhodium, disclosing that "the CEO and the employees within Rhodium have been advising ARKRATOS on the build out of the KRATOS platform" and "the formulation of a new trade finance fund" "meant to represent one of the potential sources of financing for high-quality trades on KRATOS' token curated list of high-quality trades."

87.    In January 2020, seemingly in an attempt to distance itself from the ICO, "Arkratos" changed its name to "Triterras Fintech Pte. Ltd."  It also tried to carefully curate its online image, erasing virtually any sign that it had pursued the sketchy ICO.  Today, information about the ICO is scarce and available only from sources outside of Triterras's control.  Every website that Fintech had created about the ICO is gone, and all of the information it had made publicly available – including presentations – is nowhere to be found unless preserved by a third party.

88.    In June 2019, Kratos launched a trade discovery module, followed by a trade finance module in February 2020.  The modules allowed users to identify purchasers and sellers of physical

commodities and offered financing for the trades, providing two revenue streams for Kratos: a fee from the party who initiates a trade (now equal to 0.30% of transaction value) (trade discovery); and a fee from the buyer who obtains financing (from a third party) for its purchase (now equal to 1.3% of the amount financed) (trade finance).

89.    Kratos soon claimed that an influx of trading activity translated into huge transaction volumes, especially for a nascent venture serving SMEs (as Kratos did).  In Fintech's 2019 fiscal year ended February 29, 2020, the trade discovery module was live for about 8 months and Fintech had just rolled out the trade finance module.  Yet Fintech reported $3.6 billion in transaction volume and $180 million in trade finance volume, yielding transaction fees of $14.5 million and trade finance fees of $2.4 million.  Fintech's projected performance was also impressive: for fiscal year 2020, transaction volume would double to $7.8 billion (with fees up by 60%, to $23 million), and trade finance volume would increase by 1300% to $2.5 billion (with fees rising by 1275%, to $33 million).

90.    The following excerpt from the Materials sets forth these figures, as well as Fintech's estimates for fiscal years 2021 through 2023, which the Materials indicate were provided to Netfin's team on July 16, 2020:

| ($ in millions) | (audited) | FY19[2] | FY20E | FY21E | FY22E | FY23E |
|---|---|---|---|---|---|---|
| **Revenue Build-Up** | | | | | | |
| **Transaction Volume** | N/A[3] | $3,614.6 | $ 7,779.1 | $ 16,977.4 | $ 28,994.4 | $ 37,429.1 |
| Transaction Fee | N/A[3] | 0.40% | 0.30% | 0.30% | 0.25% | 0.25% |
| **Transaction Fees** | N/A[3] | $ 14.5 | $ 23.3 | $ 50.9 | $ 72.5 | $ 93.6 |
| | | | | | | |
| **Trade Finance Volume** | N/A[3] | $ 179.1 | $ 2,541.3 | $ 5,664.8 | $ 9,693.7 | $ 12,511.0 |
| Trade Finance Fee | N/A[3] | 1.32% | 1.30% | 1.25% | 1.25% | 1.20% |
| **Trade Finance Fees** | N/A[3] | $ 2.4 | $ 33.0 | $ 70.8 | $ 121.2 | $ 150.1 |

91.    Accordingly, based on its internal assessment of future financial performance, Fintech was ostensibly poised for success without a business partner and had no need to go public or raise capital despite the outcome of its ICO.  Under Koneru's guidance, Fintech nevertheless positioned

itself for a transaction involving Netfin, a SPAC that Maurer, Rosenberg, and Komissarov formed in April 2019 – after the ICO and two months before Kratos introduced the trade discovery module.

> **D.**    **Netfin Goes Public with Plans to Acquire the Operations of a Financial Technology Company in the Trade Finance Space**

92.    On April 30, 2019, MVR paid $25,000 to Netfin in exchange for 6,325,000 founder shares ($0.004 per share) ("Class B" shares).  MVR transferred 65,000 Class B shares to Pascale and directors Will O'Brien and Jaskel, at the same per share price, with Pascale receiving 15,000 shares. MVR's Class B shares would give it control of 20% of Netfin's issued and outstanding shares upon the close of Netfin's anticipated IPO, after the Class B shares converted into Class A shares.  MVR also committed to purchase 615,000 private placement units for $6,150,000 (or $10 per unit), subject to an upward adjustment if the IPO underwriters exercised in full their overallotment option.

93.    On May 21, 2019, Netfin filed with the SEC a draft registration statement on Form S-1, with a prospectus (the "Form S-1"), on a confidential (non-public) basis.  The Form S-1 indicated that Netfin would offer 22 million units in the IPO at $10 per unit (consisting of one Class A share and one redeemable warrant), and had 24 months thereafter to consummate a transaction or it would have to redeem all of the public shares and MVR's interests would be "worthless."  In a paragraph on the second page of the filing, Netfin made no secret that it had already set its sights on identifying a target in the fintech space that specialized in trade finance:

> While we may pursue an initial business combination target in any business or industry, we intend to focus our search for targets in the financial technology, technology and financial services industries (collectively, "fintech"), including those engaged in commercial, online and mobile banking and payments, trade finance and telecommunications, that offer a differentiated technology platform and product suite for interfacing with the financial services sector.

94.    Given insiders' substantial interests in Netfin both pre and post-IPO and the conflicts of interest those insiders faced, the Form S-1 disclosed that public investors would experience 93.1% in dilution yet contribute 97.3% in total consideration, as compared to 0.01% in total consideration

from initial shareholders and 2.72% from private placement unitholders. The Form S-1 also set forth information about the professional experience of Netfin's directors and officers so public investors could understand whether those insiders were well equipped to identify a viable transaction that was within the investors' best interests.

95.    For example, the Form S-1 disclosed Komissarov's involvement in Trident – a SPAC that went public in June 2018 – as well as Rosenberg's roles "as an Advisor and investor in TDAC" (an acronym for Trident).  Based on those references to the Trident SPAC, the Form S-1 represented: "We believe that potential investors and sellers of target businesses will view the fact that members of our management team have [sic] previous experience with special purpose acquisition companies as a positive factor."

96.    Even then, however, the staff of the SEC Division of Corporation Finance impressed upon Netfin the importance of fully disclosing insiders' professional experience and relationships. In a June 18, 2019 letter to Maurer, SEC staff directed Netfin to identify directors other than O'Brien with "Silicon Valley / fintech experience" or management with "previous experience" with SPACs. In response, Netfin's lawyers at Winston confirmed in a June 24, 2019 letter that Netfin had revised the disclosures accordingly, noting "Komissarov and Rosenberg have worked on only one other special purpose acquisition company, Trident . . . ."  Amendment No. 1 to the Form S-1, filed confidentially with the SEC on June 24, 2019, contained these revisions – although it appears, that Rosenberg has in fact been involved in numerous transactions with Halter involving blank check companies and SPACs.

97.    On July 11, 2019, Netfin publicly filed with the SEC its Form S-1, which contained the revisions from Amendment No. 1.  Thereafter, on July 19, 2019, Netfin filed Amendment No. 1, which revised and supplemented aspects of the July 11, 2019 public Form S-1.  The SEC declared

the amended public version of the public Form S-1 effective on July 30, 2019, and Netfin issued its final prospectus the following day.

98.     On August 2, 2019, Netfin completed its IPO of 25.3 million units, which included 3.3 million units as a result of the underwriters' exercise of their over-allotment option in full.  The IPO generated gross proceeds, before expenses, of $253 million.  Concurrently, Netfin completed the private placement of 681,000 warrants (each exercisable to purchase one share of Class A stock for $11.50 per share), which it sold to MVR at $10 per warrant for gross proceeds, before expenses, of $6,810,000.

99.     Given the date of the IPO, Netfin had to close a business combination by February 2, 2021 or it would be forced to redeem the public's shares and unwind.  Little did the investing public then know that Maurer and others likely had contemplated a business combination with Fintech long before Netfin's IPO given the extensive relationships between insiders at Netfin and Fintech.

### E.     Three Days after the IPO and Six Months before the De-SPAC Deadline, Maurer and Koneru Begin Pursuing a Transaction Involving Fintech

100.     The Materials indicate that on August 5, 2019, three days after Netfin's IPO, Maurer called Koneru "to discuss a potential transaction between Triterras Asia and Netfin."  In response, Koneru sent materials on Triterras Asia to Maurer and invited him, Rosenberg, and Komissarov to visit Triterras Asia headquarters in Singapore.  Underscoring the seriousness of discussions, Triterras Asia engaged Milbank the following day "as counsel for a potential transaction with Netfin."

101.     From August 12 until around September 28, 2019, Maurer, Rosenberg, Komissarov and others met with Koneru and others in Singapore and New York to discuss a potential transaction, Milbank established a data room to facilitate due diligence, and Netfin engaged Winston as counsel. During this period, Koneru and Maurer established Saarika (discussed above) in Georgia – an entity (and development) the Materials do not mention.

102.    On October 1, 2019, Netfin, Triterras Asia, Koneru, Triterras Holdings, and TAPL Investments Ltd. signed a letter of intent concerning Netfin's potential acquisition of Triterras Asia (and certain of its subsidiaries) for $1.3 billion.  The letter of intent imposed a period of exclusivity through December 30, 2019.

103.    On November 14, 2019, Winston sent a draft of the business combination agreement to Milbank.  Discussions also took place about a potential private placement by Netfin, and the period of exclusivity was extended through February 29, 2020.

104.    In early January 2020, Netfin's representatives – including Maurer, Rosenberg, and Komissarov – visited Triterras Asia's headquarters, interviewed its management, and reviewed the "assumptions and projections of Triterras Asia's financial model."  Until March 6, 2020, road show meetings took place and Netfin and Triterras Asia purportedly contacted 53 investors.  According to the Materials, however, Netfin and Triterras Asia abruptly abandoned the private placement and "postpone[d]" the business combination on March 10, 2020 "with the onset of COVID-19 . . . ."

105.    Talks resumed a month later, on April 30, 2020, when, according to the Materials, Koneru updated Rosenberg and Komissarov on Triterras Asia's business results.  Triterras Asia later sent an updated financial model to Netfin, which Rosenberg, Komissarov, and others on the Netfin team discussed on a call with Groh and others on behalf of Triterras Asia.  Shortly before that call, on June 1, 2020, Fintech hired Groh to manage its U.S. investor relations office in Georgia, where Maurer is based and Koneru has formed and operated many businesses with Maurer.  Additionally, as detailed herein, Groh is a longtime associate of both Brigante and Netfin CFO Pascale and has been involved in numerous entities in which Netfin President Rosenberg has also been involved.

106.    In late June 2020, Netfin hired W&C "as counsel for filing and regulatory approval procedures" regarding a potential business combination.  Netfin and Koneru also discussed a revised

transaction with an earnout provision offering Koneru and his personal investment entities (IKON and SSOL) the following substantial benefits:

> (i) 5 million shares if the combined company achieved 90% of fiscal 2020 estimated net income target or the combined company's shares trade above $13.00 for 20 days during any 30-day trading period within one year post business combination; (ii) 5 million shares if the combined company achieves 90% of fiscal 2021 estimated net income target or the share price exceeds $15.00 for 20 days during any 30-day trading period within two years after the business combination; and (iii) 5 million shares if the combined company achieves 90% of fiscal 2022 estimated net income target or the share price exceeds $17.00 for 20 days during any 30-day trading period within three years after the business combination.

107.    On June 27, 2020, Netfin and the other parties to the October 1, 2019 letter of intent signed a new letter of intent for Netfin's acquisition of Rhodium and Fintech.  On June 29, 2020, Netfin issued a press release, filed as an exhibit to a Form 8-K (which Maurer signed), announcing the transaction.  In the press release, Netfin represented that the "transaction contemplates a pre-money equity value of approximately $670 million for Triterras."  The press release prominently featured the following statement from Rosenberg:

> "Triterras fits the ideal criteria for the type of asset we have been seeking in our fintech SPAC mandate," said Marat Rosenberg, president and director of Netfin. "Their business is disrupting a large and growing market with a proprietary fintech platform that makes transactions more cost efficient, secure, faster and scalable. Their successful operating track record and management's deep industry expertise were also major factors in our overall evaluation process. For these reasons, among others, we believe Triterras will deliver very attractive returns for Netfin shareholders. We have enjoyed working with Triterras' founder and highly experienced management team, and we look forward to supporting them in their new growth phase as a public company."

108.    Within two weeks, however, Netfin asked Koneru to revise the transaction such that Netfin would acquire Fintech only, "at a pre-money common equity value of $585 million."  The Materials described the revised transaction, which Netfin shareholders would ultimately vote on, as a "fintech pure-play with a 100% fee-based platform business," claiming it would "mitigat[e] balance sheet exposure in other parts of the Triterras Holdings business" – evidently meaning Rhodium.

109.    On July 16, 2020, Netfin received financial projections for Fintech, a copy of which is purportedly included in the Materials. According to the Materials, Fintech "ha[d] already facilitated US$2.9 billion of total transaction volume growth for the month period ending June 2020" – which "represent[ed] a 70% increase in monthly average Transaction Volumes over the previous year" – and Fintech forecast a 69% fiscal year 2021 EBITDA margin.

110.    Over the next two weeks, Netfin and Fintech memorialized the transaction in writing and began promoting it. On July 28, 2020, Netfin's Board of Directors approved the transaction, and on July 29, 2020, Netfin entered into a business combination agreement with the sellers of Fintech and issued a press release announcing the transaction.

111.    On July 29, 2020, Netfin issued press release, also filed as an exhibit to a Form 8-K (which Maurer signed), announcing the revised transaction. In the press release, Netfin emphasized that the new transaction would eliminate "balance sheet exposure," which prompted revised terms:

> Following Netfin's announcement of a non-binding letter of intent to combine with Triterras Fintech and its affiliate, Triterras Holdings Pte. Ltd. on June 29, 2020, the parties made the strategic decision for Netfin to combine solely with Triterras Fintech and not with its affiliated Rhodium commodity trading business in order to create a standalone, fast-growing fintech pure-play business with a 100% fee-based platform and no balance sheet exposure.

112.    Netfin and Fintech also held a conference call about the transaction early on June 29, 2020, in which Koneru, Groh, and Rosenberg participated. Netfin filed a copy of the call transcript and presentation materials as exhibits to the same Form 8-K to which they attached the press release. In the conference call, Rosenberg emphasized that the revised transaction was purportedly intended to insulate the business from exposure to Rhodium:

> "After signing an LOI to acquire both subsidiaries of Triterras, we decided to complete the binding business combination agreement and merge with Triterras Fintech only, which is the 100% owner of Kratos, and not Triterras Holdings, which included its Rhodium commodity trading business. Our decision was motivated by a desire to combine with a fast growing fintech pure-play, with a 100% fee-based platform and no balance sheet exposure."

113.    Eventually, on August 28, 2020, Netfin and other parties to the business combination agreement amended its terms to change the periods for which the business' financial metrics would be measured for the earnout share consideration, from fiscal years ended February 28, 2020, 2021, and 2022 to fiscal years ended February 28, 2021, 2022, and 2023.

**F.    Investors Approve the Transaction and Acquire Securities Unaware of Defendants' Pervasive Conflicts of Interest, Rhodium's Dire Condition, or Triterras's True Operational Status or Exposure to Rhodium**

114.    To facilitate the Transaction memorialized by the business combination agreement, Netfin planned to form two entities: Holdco and Merger Sub.  Pursuant to that agreement: (i) Holdco would acquire all of Fintech's outstanding equity interests in exchange for $60 million in cash and Holdco's issuance of 51.6 million ordinary shares (valued at $10.17 per share), for a total transaction value of approximately $585 million (and an additional 15 million shares as earnout consideration at certain financial or share price thresholds); (ii) Merger Sub and Netfin would merge, with Netfin continuing as the surviving entity; and (iii) Netfin and Fintech would become wholly-owned direct subsidiaries of Holdco, after which Netfin's security holders and Fintech's sellers would become security holders of Holdco (with each Class A and B share of Netfin exchanged for one ordinary share of Holdco).  Finally, Holdco would change its name to "Triterras, Inc." and list its ordinary shares and warrants on the Nasdaq (under symbols TRIT and TRITW, respectively), effective at the close of the transaction.

115.    On August 28, 2020, Holdco filed a Form F-4 registration statement and prospectus with the SEC, pursuant to which Holdco sought to register securities for, and solicit Netfin investor approval of, the transaction.  These documents are part of the Materials, and provided information on the transaction's background and terms, the formation and operations of both Netfin and Fintech, the background and conflicts of interest of officers and directors (and other insiders) of the entities, and

- 49 -

the financial condition and forecasts of each entity for certain periods, including Fintech's financial statements for the fiscal years ended February 28, 2019 and February 29, 2020.  Maurer signed the Form F-4 as Holdco's President and a director (as its principal executive officer/principal financial and accounting officer), and as its "duly authorized representative in the United States" as required by Section 6(a) of the Securities Act, representing that he signed in all capacities in New York City.

116.    Subsequently, the Form F-4, which is part of the Materials, was amended, as follows: Amendment No. 1 (October 1, 2020); Amendment No. 2 (October 19, 2020); and Amendment No. 3 (October 26, 2020).  These amendments, which also form part of the Materials, were substantially identical in all material respects to other versions of the Materials, but contained certain revisions and additional and updated information.

117.    On August 31, 2020, Netfin filed its preliminary proxy statement and prospectus with the SEC in furtherance of soliciting Netfin investors to approve the transaction and induce investors to acquire securities.  The proxy statement and prospectus were revised, supplemented, and amended in conjunction with and to the same extent as the Form F-4, generally the day after the corresponding Form F-4 amendment, as follows: Amendment No. 1 (October 2, 2020, corresponding to October 1, 2020 Form F-4 Amendment No. 1); Amendment No. 2 (October 20, 2020, corresponding to October 19, 2020 Form F-4 Amendment No. 2); and Amendment No. 3 (October 27, 2020, corresponding to October 26, 2020 Form F-4 Amendment No. 3).

118.    On October 29, 2020, the SEC declared the Form F-4 registration statement effective (as amended on October 26, 2020), Holdco filed with the SEC the final prospectus, and Netfin filed with the SEC the definitive proxy statement and prospectus, all of which together form the Materials. The Materials indicated that holders of Netfin ordinary shares at the close of business on October 12, 2020 were entitled to vote on approving the transaction, explicitly confirming that Netfin's directors were using the Materials to solicit investors:

Netfin is furnishing this proxy statement/prospectus to Netfin's shareholders as part of the solicitation of proxies by the Board for use at the meeting of Netfin's shareholders to be held on November 10, 2020, and at any adjournment or postponement thereof.    This proxy statement/prospectus provides Netfin's shareholders with information they need to know to be able to vote or instruct their vote to be cast at the meeting.

119.    Consistent with the Materials, Netfin issued a press release on October 29, 2020 also announcing the scheduling of the November 10, 2020 meeting at which shareholders would vote on the transaction.  According to the press release (and the Form 8-K to which it was attached, which Maurer signed), Netfin planned to mail notice of the meeting with the definitive proxy statement (*i.e.*, the Materials) on or about October 30, 2020 to Netfin shareholders of record as of the close of business on October 12, 2020.

120.    On November 9, 2020, the day before the scheduled meeting, Netfin issued a press release (later attached to a Form 8-K, which Maurer signed) announcing that holders of less than 3% of its public shares elected redemption – essentially indicating that 97% of its shares were committed to the transaction.  In the press release, Netfin also "remind[ed] its shareholders to vote in favor" of the transaction.

121.    On November 10, 2020, Netfin announced that its shareholders had overwhelmingly approved the transaction, which had closed.  According to its Form 8-K, which Maurer signed, "a total of 21,337,651 (66.05%) of Netfin's issued and outstanding ordinary shares held of record as of October 12, 2020 . . . were present either in person or by proxy, which consisted a quorum."  Of that amount, 20,697,886 shares were voted in favor of adopting the business combination agreement and related steps of the transaction (such as the merger between Netfin and Merger Sub, which resulted in Holdco owning Netfin), while only 638,770 shares were voted against.

122.    As a result of the close of the transaction on November 10, 2020, Netfin's shares and warrants ceased publicly trading that day, it changed its name to Triterras, and Triterras's Class A

shares and warrants began trading on the Nasdaq the following day.  Additionally, because Triterras

was a foreign private issuer (incorporated under Cayman Islands law and based in Singapore), it no

longer had an obligation to file quarterly reports with the SEC (as Netfin had), its annual report was

made on Form 20-F, and its period reports were made on Form 6-K.

123.    According to Triterras's November 16, 2020 Form 20-F, Koneru (through IKON and

SSOL) beneficially owned 51,622,419 ordinary shares of Triterras (61.2% of its outstanding shares),

and Maurer, Rosenberg, and Komissarov (through MVR) together were deemed to beneficially own

8,303,000 shares (or 9.9% of outstanding shares), as of November 11, 2020.

124.    In contrast to these and other insiders (including those named herein as defendants),

however, public investors were unaware of material information about several critical issues ranging

from undisclosed conflicts of interest to the operational condition of Triterras and its close business

partner, Rhodium.  Information on these issues emerged shortly after the transaction closed, causing

substantial investor losses and damage to Triterras, which continues to grapple with the fallout and

the consequences of defendants' nondisclosure – ranging from the resignation of Triterras's auditor

and two directors to a significantly depressed stock price that now arguably reflects its true value.

**G.    After Triterras Goes Public, Investors Learn that Insiders' Conflicts of Interest Tainted the Transaction and Triterras Was Uniquely Exposed to Rhodium's Precarious Financial Condition**

125.    A month after the transaction closed and Triterras went public, material information

publicly emerged which cast doubt on the veracity of information the defendants had disseminated to

the market in the Materials and elsewhere, as otherwise explained herein.  In mid-December 2020,

for example, two issues of paramount important surfaced: *first*, that Rhodium, which had historically

referred substantially all of Triterras's clients, was in financial trouble; and *second*, that Maurer and

Koneru had far more extensive ties than previously represented.

     1.     **Rhodium Tries to Restructure Its Growing Debts After Rejecting a Creditor's $5 Million Demand for Payment, Even as It Is Sued in Other Lawsuits and Owes Millions to Triterras and Others**

126.    Before the market opened on December 17, 2020, Triterras revealed information on Rhodium's precarious financial condition. In a press release dated December 17, 2020 (filed with a Form 6-K after the market closed on December 16, 2020), Triterras disclosed that Rhodium had been impacted by the lack of "trade finance funding" and had received a "statutory demand for payment" from a creditor that caused it to seek to restructure its debts under the Insolvency Act:[11]

> **Singapore, December 17, 2020** – Triterras, Inc. (the "Company") was informed today that a statutory demand for payment from Antanium Resources Pte. Ltd., the company formerly known as Rhodium Resources Pte. Ltd. ("Rhodium") was filed by a creditor of Rhodium on December 1, 2020 pursuant to the Singapore Insolvency, Restructuring and Dissolution Act (the "Act"). Pursuant to Singapore law, Rhodium must respond to this statutory demand within 21 days or a bankruptcy application could be filed by the creditor against Rhodium. Rhodium has informed the Company that its traditional commodity trading business has been adversely impacted by the COVID-19 pandemic and the lack of availability of trade finance funding for commodity trades involving SMEs. Rhodium has informed the Company that today (December 17, 2020, Singapore time) it has sought a moratorium order from a Singapore court which will shield Rhodium from creditor actions while Rhodium prepares a scheme of arrangement pursuant to the Act to restructure its debts and continue its business as a going concern. The Company understands that Rhodium currently expects a scheme of arrangement to be acceptable to the required majority of each class of its creditors and that Rhodium will continue as a client of the Company. The Company looks forward to continuing its productive relationship with Rhodium in the medium term. Rhodium and the Company are each under the control of Mr. Srinivas Koneru, the Company's founder, Executive Chairman and Chief Executive Officer.

127.    In the press release, Triterras also represented that it had "become less dependent on Rhodium's business," claiming revenues from Rhodium accounted for 15.5% of total revenues for the six months ended August 31, 2020 and less than 10% since August 31, 2020. Triterras also said

---

[11]    Because Triterras filed the Form 6-K after hours on December 16, 2020, the SEC assigned a December 17, 2020 filing date to the Form 6-K and it is possible that the Form 6-K was not publicly available until the morning of December 17, 2020.

that Rhodium would honor its obligations, "including payment of accounts receivable and repayment of approximately US$1.7 million of outstanding advances due from related parties as of December 1, 2020," but that user referrals from Rhodium would "be lower than previously expected." Finally, Triterras revealed that Rhodium changed its name to Antanium Resources Pte. Ltd. on December 10, 2020, although the reason for the change was not explained.

128.    Almost immediately, Triterras's management mobilized to take the sting out of this news and what it meant for Triterras. On December 21, 2020, Triterras issued an unusual press release in which it announced that Koneru and other "company insiders . . . intend[ed] to add to their stockholder ownership upon the opening of the trading window" following a business update call scheduled the next day – a call Triterras had originally scheduled for January 5, 2021 (as announced in the December 17, 2020 Form 6-K).

129.    On December 22, 2020, Triterras convened its update call with analysts and investors, evidently to assuage growing concerns over Rhodium's situation and potential impact on Triterras.[12] During the call, Koneru revealed that a lender had demanded $5 million from Rhodium and refused to extend the maturity of the loan after a commodity buyer, which had arranged financing through Rhodium, sought to extend its own payment term to Rhodium. According to Koneru, "Rhodium's main concern was that if [it] . . . pa[id] this one unsecured creditor based on the demand then it could discourage the other lenders from agreeing to ordinary course extensions and cause other lenders to take similar action," and "Rhodium would not have been able to meet all this demand."

---

[12]    In a December 24, 2020 Form 6-K (filed with the SEC four days later), Triterras included: (i) the transcript of its December 22, 2020 update call; (ii) a December 21, 2020 press release on Koneru's plans to purchase shares in the open market; and (iii) a December 22, 2020 press release announcing estimated financial results for the fiscal third quarter of 2020 and reiterating full-year fiscal 2020 guidance (*i.e.*, for the fiscal year ending February 28, 2021).

130.    For the first time, investors learned that Rhodium was subject to millions of dollars in debts it could not repay – a scenario that investors could not have imagined from any of defendants' representations about Fintech or Rhodium before that time.  In truth, by then, Rhodium owed nearly $10 million to creditors, including Triterras: $3.16 million to Maybank; $1.7 million to Triterras; and $5 million to another creditor which preceded its effort to seek protection under the Insolvency Act. Rhodium's precarious financial condition was known to or knowable by defendants given Koneru's control over Rhodium, Fintech's (and later Triterras's) relationship with Rhodium, Tan and Galani's dual employment as senior executives of Rhodium and Triterras, and due diligence that Netfin and its officers purportedly conducted of Fintech, Rhodium, and their businesses before the transaction.

### 2.    Previously Undisclosed Connections Between Maurer, Koneru, and Other Insiders Raise Questions Regarding Their Conflicts of Interest, Formation of the Transaction, and Triterras's Business

131.    On December 17, 2020, details regarding additional connections between Maurer and Koneru and Triterras's business emerged that neither the Materials nor the defendants had previously disclosed.  In a report entitled "Problems at Triterras (TRIT)," The Bear Cave, a market researcher and analyst, revealed troubling information about the relationship between Maurer and Koneru: that Maurer incorporated Rhodium Ga. in 2004 and registered triterras.com in February 2013, years before the transaction.  The report also said that Maurer and Koneru formed Saarika in August 2019, "after the Netfin SPAC approached [Fintech], but before the SPAC deal was announced . . . ."  And the report raised questions about the backgrounds of Rosenberg and Groh (of Netfin and Fintech, respectively), indicating that they were executives of Halter entities and were involved in companies with lackluster performance.

132.    Additionally, the report detailed the results of another analyst's research on Triterras: that one (AlmaStone) of ten potential lenders used the Kratos platform, undermining the likelihood that the platform had in fact gained wide market acceptance, as defendants had represented.  And the

report referenced Triterras's announcement – publicized earlier that day – that Rhodium had filed for protection under the Insolvency Act, casting doubt on Rhodium's financial condition before then and raising concerns about Triterras's reliance on Rhodium (given that Rhodium had historically sourced most Kratos users).

133.    News of the report circulated in the market, as investors and commentators publicized its findings. But more adverse news about Triterras's business – and defendants' conflicts of interest – would soon emerge, all of which called into question the veracity of public disclosures to investors in connection with the transaction and otherwise throughout the Class Period, as explained herein.

134.    On January 14, 2021, Phase 2 published a comprehensive report on Triterras, entitled "Is Triterras (TRIT) the Wirecard of Blockchain?" As shown above, the Phase 2 report extensively detailed previously undisclosed connections between Maurer and Koneru, supporting the conclusion that Netfin's transaction with Fintech was preplanned (contrary to representations in the Materials). The report also exposed relationships between other insiders, including the dual employment of Tan and Galani at Triterras and Rhodium, and further information on Rhodium's dire financial condition. And the report presented an analysis of blockchain data for transactions on the Kratos platform and an assessment of users, revealing troubling aspects of Triterras's business, such as reliance on related parties and interrelated entities to account for (if not inflate) reported transaction volume and users.

135.    *First*, the Phase 2 report exposed additional information about Maurer and Koneru's relationship, identifying entities they formed from December 2004 to August 2019 – including as the transaction between Netfin and Fintech emerged, as reflected in the page of the report reproduced above (entitled "Timeline of Mr. Maurer and Mr. Koneru's business ties & key events"). The report also exposed other less direct, yet likewise previously undisclosed, connections between Maurer and Koneru. On a page entitled "The web of relations tied back to Mr. Maurer and Mr. Koneru," also reproduced above, the report detailed shared connections with others who occupy roles at entities in

which Maurer and Koneru are involved, such as Longview (Maurer) and Puissant (Koneru). Phase 2 ultimately questioned whether the transaction between Netfin and Fintech was "pre-planned."

136.    *Second*, the Phase 2 report revealed that Tan and Galani held (and possibly continue to hold) high-level executive positions at Rhodium and now hold officer-level positions at Triterras, with Tan serving as CFO and Galani serving as COO. In fact, in describing "Triterras Leadership," Triterras's website currently displays headshots of both Tan and Galani included in Rhodium's 2018 presentation, discussed above.[13] The following excerpt from the Phase 2 report shows the pictures side-by-side:



137.    *Third*, the Phase 2 report disclosed Maybank's $3 million lawsuit against Rhodium in September 2020, including it as an entry on the timeline discussed above. As the report indicated, the Materials emphasized Fintech's reliance on Rhodium, but Triterras management downplayed the relationship after announcing that Rhodium intended to seek protection under the Insolvency Act in an effort to restructure its debts.

---

[13]    Groh's headshot on the Triterras website is identical to his on the Bellfield Advisors website.

138.    *Finally*, the Phase 2 report included a comprehensive analysis of transactions on the Kratos platform, concluding that defendants likely overstated Fintech's transaction volume and the nature and number of Kratos's users.[14]

139.    Because transactions on the Kratos platform are recorded on the Ethereum blockchain (thus preserving their integrity), Phase 2 examined this data – including the commodities traded, the contract identifier, and the transaction timestamp – to reconstruct the transactions and identify the trading counterparties.  In fact, the report represented that for "the most recent fully reported period (June 2019 to August 2020)," Phase 2 "captured 93% of transactions representing `99% of the trade volume"(emphasis in original), depicted in the following graphic:

| Month | Transaction Volume ($000s) | # of Transactions | |
|---|---|---|---|
| Jun-19 | 21,767 | 18 | |
| Jul-19 | 373,394 | 209 | |
| Aug-19 | 314,729 | 187 | |
| Sep-19 | 225,845 | 168 | |
| Oct-19 | 313,351 | 187 | |
| Nov-19 | 267,442 | 178 | |
| Dec-19 | 813,945 | 470 | |
| Jan-20 | 159,821 | 123 | |
| Feb-20 | 1,285,515 | 764 | |
| Mar-20 | 821,890 | 417 | |
| Apr-20 | 1,297,092 | 398 | |
| May-20 | 432,151 | 226 | |
| Jun-20 | 662,006 | 346 | |
| Jul-20 | 742,891 | 340 | |
| Aug-20 | 863,449 | 443 | |
| **Ethereum Blockchain Captured Total:** | 8,595,288 | 4,474 | (A) |
| **Triterras Reported Total:** | 8,700,000 | 4,800 | (B) |
| **Ethereum Blockchain Captured / Triterras Reported** | 99% | 93% | =(A)/(B) |

Note: Data excludes one trade in September 2019 representing $1bn of volume and $200k of revenue that we believe was erroneously entered given the magnitude differential between other trades (1000x) and the unlikely nature of single $1bn shipment in Grade A Copper Cathodes

---

[14]    Although Triterras disputed Phase 2's conclusion and raised vague objections to the accuracy of the information underlying it, Koneru lent reliability to the data by confirming that Kratos users expressed concern over exposure of their information and that Triterras strengthened data security to prevent further exposure.  Addressing these matters at B. Riley Securities' January 28, 2021 Virtual Vision Day, for example, Koneru – referencing Phase 2 – said: "what they have put out, is a lot of data that should [sic] need not have been put out, just to prove their points . . . ."  And he said Kratos users "have been understanding but are also expressing concern for the unauthorized release of their data," noting Triterras "hired . . . cyber security experts in October [2020]" to improve data security.

140.     On a page entitled "Related parties compromise marketplace quality," the report set forth the following findings (all emphases in original), supported elsewhere therein with data:

a.     From June 2019 "[t]hrough August 2020, 64% of transactions on the platform involved 2 key parties," specifically Longview and Rhodium;

b.     "Following financial distress of a related party (Rhodium)" – which Maybank sued in September 2020 – "there have been only 2 people entering trades on the platform, trading on behalf of 4 trading firms," since October 2020, and those individuals often traded with themselves;

c.     "[T]rading firms with related parties to Mr. Maurer or Mr. Koneru, which are undisclosed, account for another 11% of trading volume or a total of 75%";

d.     "Mr. Maurer's neighbor in Alpharetta, GA is a director at firms accounting for another 13% of transactions on this Singapore-based trading platform"; and

e.     "The marketplace experiences unusual volume spikes around Triterras' fiscal quarter ends," as depicted in the following charts from the report:



141.     Additionally, the report concluded that the following additional entities accounted for 11% of transactions through August 2020, which Phase 2 believes are related parties based on ties between affiliated individuals and Maurer or Koneru (explained in the report): Agritrade; Puissant; Quant Impex; Rockshore Trading; Supernova Enterprises; and Yeskey Enterprises.  For example, the

report indicates that James Cheer Chua Boon is an officer or authorized representative of Supernova and Quant Impex, and that Ching Sook Yee is an officer or authorized representative of Supernova.

142.    However, the report also revealed that only three individuals effectuated nearly 80% of all transactions on the Kratos platform "across multiple firms" before February 2020, "raising red flags around the authenticity of the trades and the platform."  As support for this finding, the report identified the traders by name and set forth the trading volume percentage attributable to them from June 2019 through August 2020.

143.    Following its issuance, the media and other outlets extensively publicized the Phase 2 report's findings, including those regarding the previously undisclosed connections between Maurer and Koneru and the startling revelations derived from the transactional blockchain data.  The report's findings proved so troublesome for defendants that Triterras issued a response (albeit vague), vowed to launch an independent investigation, and announced a stock buyback program and Koneru's plans to buy stock – all, evidently to assuage analyst and investor concerns.  As explained herein, however, controversy continued, as Triterras's (purportedly) independent auditor KPMG resigned due to its involvement in Rhodium's business and two directors resigned from the Triterras board, with one of those directors confirming an unresolvable disagreement on how to officially respond to the report.

### 3.    KPMG and Two Triterras Directors Resign as Fallout Intensifies from the Exposure of Previously Undisclosed Information

144.    In a January 25, 2020 Form 6-K, Triterras announced that KPMG – its independent auditor since 2019 – had resigned, leaving Triterras auditor-less.  In a press release of the same date (attached as an exhibit to the Form 6-K), Triterras revealed that it had considered replacing KPMG because KPMG also worked for Rhodium, a previously undisclosed fact:

> The Company has also announced that they will be replacing KPMG LLP as the Company's independent accountants.  For some time, there has been consideration and discussion with respect to replacing the independent accountants of the Company for various considerations, including to further separate the operations of Triterras,

Inc. from its related party company Atanium [sic] (formerly Rhodium Resources). KPMG LLP resigned as the Company's independent accountants effective January 20, 2021.

145.    In the same press release, Triterras reported that its Audit Committee had initiated a purportedly "independent investigation into accusations made by a recent short report" – presumably meaning Phase 2's report – adding, without elaboration, that the report "caused significant volatility in the Company's share price."

146.    Fifteen months later, two members of Triterras's board resigned without warning.  In an April 28, 2021 Form 6-K, Triterras reported that Richards and Slowey – who had occupied two of three positions on the Audit Committee – resigned.  In his April 22, 2021 resignation letter (attached as an exhibit to the Form 6-K), Richards said he disagreed with the views of Koneru and Triterras's General Counsel in responding to KPMG's resignation and the Phase 2 report, explaining:

> Following the discussions at the board of directors' meeting on 21 April 2021, it is clear that the Chairman and the company's interim general counsel's office have very different views to my own as to the optimal path forward for the company at this extremely challenging time.  I strongly believe that the company's board must be united in its approach as to how the company will respond to the resignation of the company's auditors and the allegations made in the 14 January 2021 short position article.  Dissent within the board will not assist the company in navigating these issues.

147.    In her resignation letter (also attached as an exhibit to the Form 6-K), Slowey did not explain why she resigned.  But the nature and timing of her resignation strongly suggest a connection with Richards's resignation: they both resigned by letter dated April 22, 2021, effective immediately; and they were two of three members of the Audit Committee (the remaining member was Adrian Kow Tuck Hoong, who assumed the role in February 2021 after Jaskel's death).

148.    Under ordinary circumstances, it would be unusual for a board member to resign from an audit committee charged with investigating serious allegations of nondisclosure and wrongdoing. It was especially alarming for Richards and Slowey to resign in the situation here: (i) as two of three

members of the audit committee and two of four purportedly independent directors of a seven-person

board; (ii) overseeing and directing an investigation into allegations tied to the founder, Executive

Chairman, and CEO, as well as others; (iii) in the wake of the resignation of an auditor that had also

audited a related party's financials and a report exposing troubling information; (iv) while publicly

disagreeing with the CEO's views on handling the corporate response.

## VI.   ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS

149.   All of the above allegations are incorporated by reference herein, except to the extent

they sound in fraud.  The Securities Act allegations herein are based in strict liability and negligence,

and any allegation or inference of fraud or scienter is expressly disclaimed for these allegations.  The

only statements and omissions actionable under Sections 11 and 12(a)(2) of the Securities Act are

those in the Materials and oral communications associated with inducing investors to buy securities

in connection with the transaction.

### A.   The Materials Misrepresented and Omitted Material Facts Associated with the Transaction, the Background and Relationships of Insiders, and Fintech's (Now, Triterras's) Business, Including Facts about Rhodium

150.   As detailed herein, the Materials misrepresented and otherwise omitted material facts

concerning: (i) the background and relationships of the officers and directors of Netfin and Fintech,

as well as their conflicts of interest; (ii) the prearranged or preconceived nature of the transaction;

(iii) Rhodium's financial difficulties and liabilities and overlapping management with Fintech; (iv)

the contribution of related parties and affiliates to Kratos's transaction volume and number of users;

(v) adverse developments in the commodities trading and trade finance business; and (vi) the risks,

trends, and uncertainties arising from these issues that were reasonably likely to (and did) materially

adversely affect Triterras's financial condition.  These issues, when publicly revealed to the market,

caused substantial declines in the value and trading price of Triterras's securities and accordingly

damaged purchasers of those securities.

1.    **The Background and Relationships of Officers and Directors of Netfin and Fintech and Their Conflicts of Interest**

151.    The rules and regulations governing preparation of the Materials required disclosure of granular detail on the backgrounds and employment histories of Triterras's directors and officers (then acting as Netfin or Fintech directors or executives), as well as their relationships with each other and the entities involved, including related parties.  Likewise, representations in the Materials on these issues, as well as the conflicts of interest affecting the directors and officers discussed, gave rise to an obligation to disclose additional information necessary to render those representations non-misleading, accurate, complete, and truthful.

a.    **Forms F-4 and 20-F Impose Rules Governing Disclosure Regarding Directors, Officers, and Related Parties**

152.    As detailed herein, Holdco, as a foreign private issuer, filed a registration statement on Form F-4 (as amended), for the transaction involving Netfin and Fintech in which Holdco would emerge as the surviving entity.  Subpart D.2 of the "Application of General Rules and Regulations" part of the General Instructions of Form F-4 references SEC Regulation S-K and Form 20-F "for the requirements applicable to the content of non-financial statement portions of registration statements under the Securities Act."  As subpart D.2 provides, where Form F-4 "directs the registrant to furnish information required by Regulation S-K or Form 20-F . . . information need only be furnished to the extent appropriate."

153.    Part I of Form F-4, entitled "Information Required in the Prospectus," identifies the nature and type of information a foreign issuer must disclose for a transaction.  Subpart D of Part I, entitled "Voting and Management Information," provides the disclosure framework when soliciting proxies or shareholder approval.  Item 18 of subpart D, entitled "Information If Proxies, Consents or Authorizations Are To Be Solicited," identifies several categories of information.  As relevant here, Item 18(7)(i) and (iii) require disclosure, "[w]ith respect to each person who will serve as a director

- 63 -

or an executive officer of the surviving or acquiring company, [of] the information required by: (i) Item 6.A of Form 20-F, directors or officers of registrant" and "(iii) Item 7.B of Form 20-F, interest of management in certain transactions."

154.    As Item 6 of Form 20-F, entitled "Directors, Senior Management and Employees," explains (emphasis in original):

> *The purpose of this standard is to provide information concerning the company's directors and managers that will allow investors to assess such individuals' experience, qualifications and levels of compensation, as well as their relationship with the company. Information concerning the company's employees is also required.*

155.    Item 6.A, which governs disclosure on "directors and senior management," requires the following information, broken down into five subparts: (i) "Name, business experience, functions and areas of experience in the company"; (ii) "Principal business activities performed outside the issuing company (including, in the case of directors, other principal directorships)"; (iii) "Date of birth or age (if required to be reported in the home country or otherwise publicly disclosed by the company)"; (iv) "The nature of any family relationship between any of the persons named above"; and (v) "Any arrangement or understanding with major shareholders, customers, suppliers or others, pursuant to which any person referred to above was selected as a director or member of senior management."

156.    Item 7 of Form 20-F, entitled "Major Shareholders and Related Party Transactions," establishes the standard of disclosure for transactions involving related parties. As Item 7 explains (emphasis in original):

> *The purpose of this standard is to provide information regarding the major shareholders and others that control or may control the company. The standard also provides information regarding transactions the company has entered into with persons affiliated with the company and whether the terms of such transactions are fair to the company. These standards may require disclosure of related party transactions not required to be disclosed under the body of accounting principles used in preparing the financial statements. This standard is not intended to address*

*the thresholds at which shareholders are required, on a continuing basis, to disclose their beneficial ownership of securities.*

157.    In turn, Item 7.B of Form 20-F, entitled "Related party transactions," provides a broad framework for disclosure of transactions between a company and "related" individuals and entities. Relevant here, Item 7.B(1) requires, from "the beginning of the company's preceding three financial years up to the date of the document," disclosure of: "The nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services, or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party."  Item 7(B) also identifies an exceedingly broad range of individuals and entities who qualify as related parties:

> (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company; (b) associates; (c) individuals owning, directly or indirectly, an interest in the voting power of the company that gives them significant influence over the company, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the company, including directors and senior management of companies and close members of such individuals' families; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence.

158.    As Item 7(B) explains, the above definition "includes enterprises owned by directors or major shareholders of the company and enterprises that have a member of key management in common with the company."

### b.    The Materials Incompletely and Misleadingly Described Background on the Directors and Officers of Netfin and Fintech and Their Many Conflicts of Interest

159.    The Materials incompletely and therefore misleadingly described the backgrounds of several directors and officers of Netfin and Fintech, including those who would become directors or

officers of Triterras, as well as their many potential and actual conflicts of interests. These persons include Maurer, Koneru, Tan, Galani, Groh, Pascale, Rosenberg, and Komissarov.

### (1)    Maurer and Koneru

160.    Under the heading "Information About Executive Officers, Directors and Nominees," the Materials described the backgrounds of Koneru, Maurer, and others slated to serve as executives or directors of Holdco/Triterras. As the Materials noted, Koneru founded and served as a director of Fintech and Maurer founded and served as both CEO and a director of Netfin; after the transaction, Koneru would serve as Triterras's Executive Chairman and CEO and Maurer as a director. Despite extensively describing their backgrounds and employment history, however, the Materials disclosed almost nothing substantive about their relationship – certainly not enough information for an investor to understand their business together or appreciate the conflicts of interest arising from it.

161.    With respect to Koneru, for example, the Materials did not disclose his involvement in numerous business ventures with Maurer. The Materials' description of Maurer was barely more informative, noting in passing that one of the many entities in which he has "involved" over a career spanning "more than 40 years" "was Exxova Inc., where he first met Mr. Koneru." Separately, the Materials cryptically alluded to Maurer's ties to Koneru by noting "previous business affiliations":

> Mr. Koneru was known to Mr. Maurer because of previous business affiliations, including as a 10% minority shareholder of Exxova, Inc., an IT-services business founded by Mr. Koneru in 2005 which was subsequently sold in 2010. In addition, one of Mr. Maurer's ventures, Longview Resources Group, was then an existing customer of Fintech and remains a customer of Fintech as of the date of this proxy statement/prospectus, accounting for 5.2% and 9.4% of Fintech's revenue for the fiscal year ended February 29, 2020 and the six months ending August 31, 2020, respectively.

162.    This fleeting reference to "previous business affiliations" is not remotely sufficient to alert investors to the extensive business Maurer and Koneru did together over at least two decades, nor the nature of that business. Investors could not tell, for example, that Maurer and Koneru had

formed Saarika while discussing the transaction, nor that Maurer had formed an entity with Koneru (Rhodium Ga.) with the same name as Koneru's existing commodity trading business (Rhodium). The discussion of Exxova was also misleading, because it implied that their business together took place between 2005 and 2010, when, in fact, it continued long after.

163.    As for Koneru's ties to Rhodium, that section of the Materials said he "invested to co-found Rhodium in 2012, and has subsequently been a member of the board of directors and risk committee of Rhodium . . . ." Yet under the heading "Employment Agreements," the Materials said Holdco would enter into an employment agreement with Koneru (and others) after the transaction, representing that he would be a "full-time" employee, as Executive Chairman/CEO. In describing his forthcoming employment agreement, the Materials indicated that he would be subject to a broad non-compete provision, as follows:

> During the term of employment and for 6 months thereafter, each employee is subject to a non-compete whereby such employee may not engage in any business or entity in the same field of commercial activities as Holdco, in any instance, anywhere Holdco conducts its commercial activities.

164.    Surprisingly, however, the Materials did not disclose the role Koneru would play at Rhodium while purportedly working full time for Triterras, nor the way in which this non-compete provision would function given his involvement with Rhodium – a physical commodities broker that could ultimately elect to use a different commodities trading platform in the future at its discretion.

165.    All of these undisclosed facts, taken together, expose potential and actual conflicts of interest facing Maurer and Koneru which the Materials did not address. Even those portions of the Materials that delineate the fiduciary duties of directors and officers do not sufficiently describe the conflicts facing these individuals.

166.    For example, under a heading entitled "Risks Related to Netfin and the Business Combination," the Materials warned, with emphasis (bold removed): *"Directors of Netfin have*

*potential conflicts of interest in recommending that shareholders vote in favor of approval of the Business Combination and approval of the other proposals described in this proxy statement*."  In detailing Maurer's potentially divergent interests, however, the Materials identified his "anticipated election" to the board of Holdco/Triterras, his "continued indemnification" and "the continuation of directors' and officers' liability insurance," and certain financial interests he had in Netfin securities. That description did not alert investors to any conflicts arising from Maurer's lengthy preexisting business and personal relationship with Koneru, or *vice versa*.

167.    And in detailing "Directors' Fiduciary Duties" under the law of the Cayman Islands (where Holdco/Triterras is incorporated), the Materials explained that "directors and officers owe," among others, fiduciary duties: (i) "to act in good faith in what the director or officer believes to be in the best interests of the company as a whole"; (ii) "to exercise powers fairly as between different sections of shareholders"; (iii) "not to put themselves in a position in which there is a conflict between their duty to the company and their personal interests," including the duty "not to engage in self-dealing, or to otherwise benefit as a result of their position"; and (iv) "to exercise independent judgment."  Despite these expansive legal obligations, the Materials did not disclose any information on potential or actual conflicts of interest arising from the extraordinary relationship between Maurer or Koneru, or Koneru's connections to Tan, Galani, and Rhodium (outlined herein).

### (2)    Tan and Galani

168.    Under the heading entitled "Information About Executive Officers, Directors and Nominees," the Materials also described the backgrounds of Tan – who would serve as CFO and a director of Holdco/Triterras – and Galani – who would serve as COO.  Despite disclosing Koneru's connections to Rhodium, however, the Materials did not mention Rhodium in describing Tan's and Galani's employment histories.

169.    Instead, the Materials said "Tan has over 20 years of financial experience in several leading commodity trading firms," identifying by name Cargill entities at which he spent "15 years" working while noting he also "worked at Golden Agri Resources and Musim Mas Holdings." As for Galani, the Materials said he "has over 20 years' experience in trade, trade finance and the build out of platforms," noting he worked at Delta Trading, Centurion European Capital, and Phoenix Vision Management and describing his work as far back as 20 years ago.

170.    In contrast to those descriptions, Galani's personal LinkedIn page lists "Rhodium Resources" as his employer for over five years, beginning in October 2015 and ending in November 2020 – after the Materials went effective in October 2020, and well after discussions were underway with Netfin regarding a transaction involving Rhodium and then Fintech alone. Although Tan's own LinkedIn page does not list Rhodium, it indicates that his most recent employer before Triterras was Musim Mas and that his tenure there ended in 2016. Additionally, as discussed elsewhere herein, Rhodium's 2018 presentation identifies Galani and Tan as two out of a handful of senior executives, confirming they played a significant role in Rhodium's development and operations as recently as 2018 and even beyond.

171.    The only connection remotely disclosed in the Materials between either of these two individuals and Rhodium are three August 18, 2020 "service agreements" with Fintech, attached as exhibits to the October 1, 2020 draft of the Materials (which was not disseminated to investors), which confusingly list Tan's title on the signature line as "Chief Financial Officer" of three entities: "Rhodium Europe Limited"; "Rhodium Resources USA, Inc."; and "Rhodium Resources Pte. Ltd." That sole mention, buried at the end of an early draft of the Materials that no investor received or had reason to review, could not possibly place anyone on notice of Tan's extensive and ongoing ties to Rhodium – and certainly not Galani's.

172.    The Materials also stated that Holdco would enter into employment agreements with Tan and Galani (as well as Koneru and Groh), representing that after the transaction – when they assumed roles for Holdco/Triterras – they would be "full-time employees."  But the Materials did not disclose that Tan and Galani occupied full-time roles at Rhodium, either at that moment or close in time thereto, as noted herein.

### (3)    Groh, Rosenberg, and Pascale

173.    The Materials also described Groh's employment history in general terms, noting that he "assisted over twenty companies in achieving their public listing goals in the US as an advisor or investment banker" and that he "previously held FINRA Series 7, 63 and 24 licenses."  As detailed, however, Groh worked at Halter entities alongside Rosenberg for the formative part of his career and established lengthy business and personal relationships with Halter executive Brigante and Netfin CFO Pascale – two individuals with whom he formed Bellfield Advisors.

174.    Additionally, Groh and Rosenberg were involved in many of the same transactions while at the Halter group of entities, even after Groh's tenure ended.  The Materials do not mention Groh's employment at the Halter entities (disclosing only the licenses he held there), and there is no description of his ties to Pascale and Rosenberg.  In fact, the Materials do not even reveal that Groh employed Pascale through Heritage, an experience so prominent in Pascale's life that he continued to describe it when providing background on his employment history (as shown above), albeit not in the Materials.

175.    Likewise, in describing Rosenberg and Pascale, the Materials did not disclose their involvement in entities associated with Groh or their shared connection, Brigante.  As to Rosenberg, the Materials extensively described his involvement in various Halter entities, without disclosing his involvement in many of the entities in which Groh was involved as a Halter employee or consultant.  As the Materials confirmed, however, Rosenberg and Groh were on opposite sides of the transaction:

Rosenberg was a director of Netfin since its IPO and its President since April 2019; Groh handled U.S. investor relations for Fintech and was slated to serve as Triterras's Executive Vice President after the transaction. And Rosenberg invested in numerous companies for years alongside Brigante, and likely still does. Despite the lengthy relationship between all three individuals, the Materials did not mention Brigante even once.

176.    As to Pascale, the Materials disclosed that he served as Netfin CFO since April 2019 and formed SCF, his consulting business, in November 2008. Unlike the SCF website, however, the Materials did not describe Pascale's involvement in Heritage (Groh's consultancy), as these excerpts confirm (emphasis is added):

| Description in Materials | Description on SCF Website |
| --- | --- |
| As the President, Founder and Managing Member of SC Financial Group, LLC since November 2008, Mr. Pascale specializes in advising both US and international clients on valuation, financial modeling and the responsibilities of public companies. In this role, Mr. Pascale works closely with clients throughout the process of raising capital and becoming a publicly listed company in the US and Canada. He has detailed experience analyzing business plans, reviewing financial statement preparation, preparing financial projections and developing valuation models in order to advise clients throughout the process of public and private equity transactions as well as mergers and acquisitions and corporate restructurings. | As the Founder and Managing Partner of SC Financial Group, LLC, Gerry specializes in advising both US and international clients on valuation, financial modeling and the responsibilities of publicly traded US companies. In this role, Gerry works closely with clients either preparing to become public or having recently become public in the US. As a result of his experience and relationships, Gerry is able to assist clients by providing financial management and advisory services throughout this process. <br><br> In addition, Gerry spent 3 years responsible for managing and completing all of the finance activities with Heritage Management Consultants. In this role he specialized in providing finance and SEC support throughout the entire process of listing on a US exchange. This role included developing business plans, reviewing financial statement preparation, preparing financial projections and budgets and preparing and making presentations to US investors. |

177.    As detailed above, Pascale performed extensive work for Heritage – including with respect to entities in which Rosenberg, Pascale, and Groh invested – and Pascale and Groh partnered with Brigante to form Bellfield Advisors. Again, despite this lengthy relationship, the Materials did not mention Brigante. As with Rosenberg and Groh (who each found themselves on opposite sides of the transaction between Netfin and Fintech), Pascale (as Netfin CFO) and Groh (Fintech investor-relations) occupied opposite sides of the transaction.

### (4)    Rosenberg and Komissarov

178.    As explained above, Rosenberg and Komissarov have extensive connections, forming and managing the Trident SPAC together.  The Materials, when effective, did not disclose all of their connections.

### 2.    The Prearranged or Preconceived Nature of the Transaction

179.    The Materials stated and otherwise implied that the transaction between Netfin and Fintech was the product of an open and arm's-length process, without a preordained outcome, which leveraged the expertise and experience of Netfin's directors and officers.  Under the "Background of the Business Combination" heading, for example, the Materials represented:

> The Business Combination is the result of an extensive search for a potential transaction utilizing the global network and investing and transaction experience of Netfin's management team and Board. As part of this search, Netfin signed eleven (11) non-disclosure agreements related to potential targets for the Business Combination. The terms of the Business Combination Agreement are the result of arm's-length negotiations between representatives of Netfin and the Sellers. The following is a brief discussion of the background of these negotiations, the Business Combination Agreement and the Business Combination.

180.    The Materials also represented that "[p]rior to the consummation of the IPO, neither Netfin, nor anyone on its behalf, contacted any prospective target business or had any substantive discussions, formal or otherwise, with respect to a potential business combination."  To the contrary, the Materials said that Maurer, Rosenberg, Komissarov, and Pascale conducted a robust exploratory process designed to identify a potential acquisition for Netfin, including that they: (i) "developed a list of over 50 business combination candidates"; (ii) "held conversations with management teams, sponsors and representatives of numerous potential targets"; and (iii) "evaluated fourteen potential transactions, including the Business Combination . . . prior to focusing their efforts on the Business Combination."

181.    Yet the Materials disclosed that on August 5, 2019 – three days after Netfin's August 2, 2019 IPO – Maurer called Koneru "to discuss a potential transaction between Triterras Asia and Netfin."  On October 1, 2019, Netfin entered into a letter of intent with Koneru and others which "provided for an exclusive negotiating period . . . through December 30, 2019" – a period extended to February 29, 2020 in a December 20, 2019 amendment to the letter of intent.  The Materials also indicated that talks stalled on March 10, 2020 "with the onset of COVID-19," but that discussions resumed on or shortly after April 30, 2020.

182.    Given the short periods in which Netfin was not subject to exclusivity with Fintech or talks had stalled, as well as the close relationship between Maurer and Koneru and others involved in Netfin's transaction (the contours of which the Materials did not adequately disclose), it is in fact substantially likely  that the transaction was prearranged or at least preconceived.  Indeed, Netfin had previously represented, in the materials for its IPO, that it "ha[d] not selected any specific business combination target" or "engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination . . . ."  Even then, Netfin stated in its IPO materials that it would focus on the fintech industry, identifying "trade finance":

> While we may pursue an initial business combination target in any business or industry, we intend to focus our search for targets in the financial technology, technology and financial services industries (collectively, "fintech"), including those engaged in commercial, online and mobile banking and payments, trade finance and telecommunications, that offer a differentiated technology platform and product suite for interfacing with the financial services sector.

183.    The Materials incorporated this aspect of Netfin's IPO materials, representing: "The prospectus for the IPO states that we intended to use the following general criteria and guidelines to evaluate potential acquisition opportunities . . . whether the target was located in a faster-growing segment in developed and emerging international markets, with potential focuses on technology, financial technology, trade finance and mobile banking . . . ."

184.    Additionally, in the June 29, 2020 press release announcing the first iteration of the transaction – which was then slated to involve Netfin, Fintech, and Rhodium – Rosenberg stated that acquiring Fintech and Rhodium satisfied Netfin's "fintech SPAC mandate."  This acknowledgement, in turn, confirmed that Netfin had in fact instituted a mandate which governed the type of company Netfin would acquire – lending further support to the notion that the transaction ultimately involving Fintech was preordained.

185.    The Materials' representation that Netfin had not identified a particular target as of its IPO, as well as its description of the background of the transaction and the efforts exerted to identify Fintech as an acquisition candidate, were materially misleading in the absence of disclosure of the connections between insiders of Netfin and Fintech.  By describing the process as open and robust and negotiations as arm's-length, defendants obscured their extensive prior and current relationships and potential and actual conflicts of interests – all of which deprived investors of facts necessary to understand and appreciate the risks of investing in Triterras.

### 3.    Rhodium's Financial Difficulties and Liabilities and Overlapping Management with Fintech

186.    The Materials provided select information about Rhodium, explaining that Fintech had historically relied on Rhodium to refer substantially all of Kratos's users and that an "adverse change in Rhodium's business or [Triterras's] relationship with [it]" could affect Fintech's business, as the following passages reflect (bold emphasis removed):

> *Our business has substantially depended on our relationship with Rhodium Resources Pte. Ltd., a physical commodity trader, to initially deliver customers and drive traffic for our platform, and any future changes in this relationship may adversely affect our business, financial condition and results of operations.*

> Substantially all of the users of our Kratos platform during the year ended February 29, 2020 were referred to the platform by Rhodium Resources Pte. Ltd. and its subsidiaries ("Rhodium"), an entity controlled by Mr. Srinivas Koneru.  While we are working on expanding the user base of the platform to become more independent, we rely on Rhodium to both use our platform for their transactions and to promote

- 74 -

the use of our platform to their trading counterparties and contacts in the trade finance, credit insurance and logistics markets. There can be no assurance that Rhodium will continue to support our platform in this way or that we will be able to grow the user base of the platform as quickly, or at all, on an independent basis. Any adverse change in Rhodium's business or our relationship with Rhodium may adversely affect our business, financial condition and results of Operations.

187.    The Materials also represented that Fintech's "success significantly depends on our credibility and reputation, and to some extent the reputation and credibility of Rhodium, with all of our stakeholders, including suppliers, customers, employees, financiers and insurance underwriters." Thus, the Materials expressed Rhodium's historical and ongoing importance to Fintech strictly from the standpoint of driving customers and traffic to the Kratos platform, emphasizing its "credibility and reputation" without any focus on its financial condition or management of its own operations.

188.    Yet the Materials also indicated that Fintech had reduced its reliance on Rhodium and would continue to do so as time went on, going so far as to state "[t]his year, Rhodium is anticipated to attribute less than 15% of Fintech's net revenue, and this decrease is expected to continue," and that Fintech had projected for fiscal year 2021 transaction volume of $17 billion and net revenue of $122.7 million. Again, these representations conveyed that Fintech's reliance on Rhodium extended to driving traffic to Kratos – a function that was becoming less important as transactions organically grew on the platform without Rhodium's involvement.

189.    In this way, the Materials conveyed the collective impression that while Rhodium was initially important to the formation and growth of Kratos – and, hence, Fintech – its importance was declining and would continue to shrink as Fintech independently (and exponentially) grew Kratos's user base and transaction volume in the near future. And by representing that "[a]ll transactions between [Fintech] and Rhodium since February 29, 2020 have been on an arm's length basis, as with all other users on the platform, and w[ould] continue to be," the Materials assuaged any concern that the relationship favored Rhodium or subjected Fintech to Rhodium's influence.

190.    In truth, Fintech and Kratos were tremendously dependent on Rhodium, which shared management with Fintech.  In fact, the Materials disclosed that Fintech had only 17 employees (and various consultants), a number that Triterras's November 16, 2020 Form 20-F indicates stayed the same after the transaction (because the Form 20-F specifically incorporated that information from the Offering Materials).  Indeed, Tan and Galani occupied overlapping executive roles at Fintech and Rhodium – a fact, explained above, that the Materials did not disclose.

191.    In fact, Fintech was uniquely exposed to Rhodium's financial condition, not merely dependent "to some extent" on its "credibility and reputation," as the Materials represented.  By the October 29, 2020 effective date of the Offering Materials, Rhodium was already subject to millions of dollars in liabilities and legal claims.  In September 2020, for example, Maybank sued Rhodium for over $3 million arising out of a series of commodities trades.  And in December 2020, shortly after the transaction closed, Triterras revealed that Rhodium owed it over $1 million and was subject to an additional $5 million claim – a claim Rhodium refused to pay, presumably with the knowledge and approval (if not at the direction) of overlapping management at Triterras.  At that time, Triterras also disclosed that COVID-19 had adversely affected Rhodium's business.

192.    These issues caused Rhodium to seek protection from creditors under the Insolvency Act so it could restructure its liabilities, which had an immediate and profound impact on the trading price of Triterras's securities.  Contrary to representations in the Materials, Rhodium was critical to Triterras's success, and investors linked Rhodium's precarious financial condition with Triterras's ability to sustain and grow the business.  Yet the Materials made no mention of Rhodium's financial troubles or any of the other developments that insiders of Netfin and Fintech reasonably understood could adversely impact Triterras after the close of the transaction.

193.    Additionally, while the Materials acknowledged that COVID-19 could broadly affect the global economy and, more specifically, Kratos's users, they failed to disclose that COVID-19

was evidently then adversely affecting Rhodium – a major Kratos user and business referrer whose precarious financial condition only began to emerge for investors in December 2020.  The Materials instead expressed defendants' purported belief that the "pandemic will increase the importance and prominence of digital financial solutions such as Kratos," hypothetically noting that it "may delay" Kratos's development, affect transaction volumes, or cause "service interruptions" or "delays in the completion of the [transaction] . . . ."  The Materials also extolled Fintech's lack of "balance sheet exposure," even emphasizing that reason as one of the Netfin directors' central justifications for the transaction, while representing that Kratos had in fact benefited from COVID-19, as the following passage illustrates:

> **Kratos and COVID-19**
>
> Kratos has outperformed our expectations for its performance and growth during 2020. Kratos has benefited from COVID-19 because the pandemic has caused the commodity trading and trade finance ecosystem of buyers, sellers, traders and financiers to shift online as a result of worldwide closures. This is driving increased total transaction volume from our existing users, resulting in a 97% increase in monthly average total transaction volume for March through August 2020, and a similar increase in platform user growth, each as compared to June 2019 through February 2020. In addition to the ease of use of the platform during worldwide closures, we believe that less trade finance liquidity due to a risk-off environment and fewer available funding sources are exacerbating the US$1.5 trillion annual shortfall in trade finance funding for SMEs, making our offering and solutions even more compelling. We believe that the fintech industry, Asian economies and nonpetroleum commodity consumption will drive the post-COVID-19 recovery.

194.     The Materials' discussion of COVID-19 and its potential impact on the trade finance and commodities business, Kratos users, and Triterras was materially misleading without disclosure that Rhodium was already experiencing difficulties at least in part from COVID-19 – a fact Triterras would first disclose in December 2020 – and that Rhodium's issues were already causing problems for Triterras's business beyond the hypothetical difficulties described.  Far from COVID-19 acting as a catalyst for Triterras's business (as the Materials described), the pandemic's effect on Rhodium

was rendering Rhodium more vulnerable to other problems – such as mounting legal liabilities – that were poised to adversely impact Triterras in material ways.

### 4. The Contribution of Related Parties and Affiliates to Kratos's Transaction Volume and Number of Users

195.    The Materials prominently represented that Fintech's unique ties to Rhodium allowed it to "instant[ly] scale" the business and provide "profitability," while emphasizing the purportedly "[h]igh barriers to entry" for competitors lacking a unique relationship with a physical commodities broker.  In fact, the Materials listed these factors among those the Netfin board found most favorable in recommending the transaction to investors (bold emphasis removed):

> *High barriers to entry and sticky user base exhibiting a referral network effect, showing significant growth potential.*  Launching a working and effective platform of this type for users requires a critical mass of traders and lenders. Platform launches are a difficult undertaking, and Kratos had a strategic advantage in accomplishing this goal through its relationship with Rhodium, which allowed it to have instant scale and profitability, which Netfin believes would be difficult to replicate. Kratos as of June 30, 2020 had more than 65 distinct users. Initial adoption and usage has been very strong. Fintech expects its current customers will continue bring their trading counterparties onto the platform.

196.    The Materials also disclosed that Maurer entity Longview accounted for 5.2% and 9.4% of Fintech's revenue for the fiscal year ended February 29, 2020 and six months ended August 31, 2020, respectively.

197.    In its report, Phase 2 utilized its specialized knowledge of blockchain technology to examine the blockchain register of transactions on the Kratos platform.  As Phase 2 revealed, 64% of transactions on Kratos through August 2020 involved parties associated with Maurer or Koneru; and after Rhodium revealed its financial problems in December 2020, only two people – also associated with Maurer or Koneru – entered trades on behalf of only four firms.  Phase 2 also identified unusual trading activity on Kratos near the end of the 2019 and 2020 third quarters, with an abnormal spike

in transactions in the three weeks leading up to the end of each such quarter followed by minimal or no transactions for days thereafter.

198.    This information contradicted aspects of the transactional information included in the Materials, raising the substantial likelihood that Kratos – and thus Fintech – was far more dependent on related parties than the Materials had portrayed.  This information also raised serious concerns about the resiliency and operation of Triterras's business, as well as Triterras's exposure to adverse conditions affecting those related or affiliated parties.

### 5.    A Confluence of Adverse Developments Disrupted Commodities Trading and Trade Finance before the Materials' Effective Date

199.    The Materials described in hypothetical terms what might happen if disruption in the commodities market occurred, noting funders could withdraw from the industry or decline to finance trades on the Kratos platform:

> More generally, the participation of third-party financing providers on the Kratos platform may cease at any time because of situations which we are unable to control, such as general market disruptions, regulatory changes, sharp increases or decreases in the prices of commodities or an operational problem that affects our users or our business. For example, if the commodities market begins to decline, finance providers may begin to withdraw from the sector, which may reduce the availability of trade finance on the Kratos platform. We can make no assurance that a current major provider of trade finance will not withdraw from the Kratos platform or the commodities business, despite otherwise profitable dealings. Any failure to facilitate sufficient third-party financing or to facilitate third-party financing on reasonable terms, could have an adverse impact on our business, financial condition and results of operations.

200.    As the above passage demonstrates, the Materials specifically mentioned a situation in which "the commodities market begins to decline," causing "finance providers . . . to withdraw from the sector" – resulting in a reduction in financing on the Kratos platform.  But developments had already occurred in the commodities industry before the Materials' effective date which caused a reduction in available financing.

201.    As detailed above, the commodities industry was rife with fraud, which caused banks

– including ABN Amro, BNP Paribas, ING, and Societe Generale – to reduce trade funding or cease

providing trade financing entirely.  These and other banks – including CIMB, HSBC, and Maybank

– also found themselves embroiled in litigation initiated to recover their losses from providing trade

financing.  The Materials did not mention these developments or their impact on the availability of

trade financing on Kratos (for SMEs or otherwise).

### 6.    Risks, Trends, and Uncertainties Arising from These Issues Were Reasonably Likely to, and Did, Adversely Affect Triterras

202.    Rules and regulations governing preparation of the Materials required the disclosure

of information regarding known events, trends and uncertainties that threatened to materially affect

Triterras, as well as risks that impacted the viability of Triterras's securities.  As explained herein,

these risks, trends, and uncertainties involved critical aspects of the commodities trading industry

and Rhodium's business.

### a.    Forms F-4 and 20-F and Items 303 and 105 of Regulation S-K Require Disclosure of Risks, Trends, or Uncertainties

203.    As detailed herein, Holdco, as a foreign private issuer, filed a registration statement

on Form F-4 (as amended), for the transaction.  Subpart D.2 of the "Application of General Rules

and Regulations" part of the General Instructions of Form F-4 references SEC Regulation S-K and

Form 20-F "for the requirements applicable to the content of non-financial statement portions of

registration statements under the Securities Act."  As subpart D.2 provides, where Form F-4 "directs

the registrant to furnish information required by Regulation S-K or Form 20-F . . . information need

only be furnished to the extent appropriate."

204.    Part I of Form F-4, entitled "Information Required in the Prospectus," identifies the

nature and substance of information an issuer must disclose for a transaction.  Subpart B of Part I,

entitled "Information About the Registration," requires foreign registrants unable to use Form F-3

(such as Holdco) to provide information specified in Item 14, entitled "Information With Respect to Foreign Registrants Other Than F-3 Registrants." Item 14(g)(1) requires the information in Item 5 of Form 20-F, which Item 14(g)(1) refers to as an "operational and financial review."

205.    In turn, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," requires an issuer to disclose "*management's assessment of factors and trends which are anticipated to have a material effect on the company's financial condition and results of operations in future periods*." As Item 5 explains, "*[a] discussion and analysis that meets these requirements is expected to better allow investors to view the registrant from management's perspective*." As Item 5 further instructs:[15]

> The discussion and analysis must also focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. Provide the information specified below as well as such other information that is necessary for an investor's understanding of the company's financial condition, changes in financial condition and results of operations.

206.    Item 5.D, entitled "Trend information," provides more specific guidance on the types of information Item 5 (and, by extension, Form F-4) requires, mandating a description of "trends, uncertainties, demands, commitments or events" necessary to accurately portray an issuer's financial condition and prospects, as follows:

> The company must identify material recent trends in production, sales and inventory, the state of the order book and costs and selling prices since the latest financial year. The company also must discuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

---

[15]    All emphasis in this numbered paragraph is contained in Item 5.

207.    The scope of the information required in Item 5.D events is coextensive with that required under Item 303(a)(3)(ii) of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Thus, in May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *       *       *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

208.    The 1989 Interpretive Release set forth the following test to determine if disclosure under Item 303(a) is required, and this framework provides guidance of the disclosure required under Item 5.D:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

209.    Additionally, the SEC published interpretive guidance, effective December 29, 2003, "regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K,

Items 303(b) and (c) of Regulation S-B, Item 5 of Form 20-F and Paragraph 11 of General Instruction B of Form 40-F." The SEC advised that "companies must identify and disclose known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on financial condition or operating performance," citing the 1989 Interpretive Release and quoting, in footnote 6, the following text of the 1989 Interpretive Release:

> MD&A mandates disclosure of specified forward-looking information, and specifies its own standards for disclosure – i.e., reasonably likely to have a material effect. The specific standard governs the circumstances in which Item 303 requires disclosure.

210.    Furthermore, in adopting amendments in 2003 to require disclosure of off-balance sheet arrangements for domestic and foreign issuers, the SEC recognized that "for Form 20-F annual reports, the existing MD&A-equivalent requirements for foreign private issuers currently mirror the substantive MD&A requirements for U.S. companies." Because Form F-4 incorporates the MD&A requirements from Form 20-F and they are the same for domestic issuers, disclosure of uncertainties, trends, and events was required in the Materials.

211.    Separately, Item 105(a) of SEC Regulation S-K, 17 C.F.R. §229.105(a), requires an issuer to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [securities] . . . speculative or risky."[16] Item 105(a) warns that "[t]he presentation of risks that could apply generically to any registrant . . . is discouraged," while Item 105(b) directs the issuer to "[e]xplain how each risk affects the registrant or the securities being offered." Item 105 does not impose any knowledge requirement.

---

[16]    Amendments to Regulation S-K, effective May 2, 2019, redesignated Item 503 of Regulation S-K, 17 C.F.R. §229.503(c), as Item 105, but Item 105 is substantively identical to its predecessor.

### b.  Based on Developments Described Herein, Risks, Trends, and Uncertainties Required Disclosure in the Materials

212.  By the effective date of the Materials, many of the above developments posed risks, trends, and uncertainties for Triterras's business whose disclosure was required under the rules and regulations governing the preparation of the Materials.  For example:

a.  The extensive personal and business relationships involving Maurer, Koneru, Tan, Galani, Groh, Pascale, Rosenberg, and Komissarov gave rise to myriad potential, if not actual, conflicts of interest.  These conflicts, in turn, gave rise to significant risks related to the transaction involving Netfin and Fintech and, ultimately, Triterras's operations.  Without information on the ties between and among these insiders, investors could not adequately assess or appreciate the risks of investing in Triterras, including the way in which the undisclosed allegiances between these insiders might influence the conduct of the business and operations of Triterras or favor insiders' interests to the detriment of investors.

b.  The tight-knit relationship between Fintech and Rhodium posed both risks and uncertainties for Triterras because Triterras was uniquely exposed to Rhodium's financial condition, which itself posed uncertainties given Triterras's historical and ongoing dependence on Rhodium to transact substantial business on Kratos and refer users to the platform.  An investment in Triterras was particularly risky given the opaque management structure of Rhodium – which shared officers with Fintech, unbeknownst to investors – and the degree to which Rhodium suffered from financial liabilities that, by extension, could (and did) impact Triterras.  Rhodium was also uniquely exposed to the adverse effects of COVID-19, which investors did not know.  Investors could not appreciate how the softening in Rhodium's business from COVID-19 might impact Triterras, given repeated representations in the Materials that Triterras could benefit from COVID-19 because of the digital nature of its Kratos platform and its purported lack of "balance sheet exposure."

c.      Tightening in trade finance and the commodities industry posed uncertainties for Triterras because it signaled a sustained and large-scale withdrawal of funding for commodities trades, which could adversely affect Kratos's online trade financing platform and the commodities industry in general.  Large-scale frauds in the commodities industry caused funders to reduce or even eliminate financing for commodities transactions, and funders resorted to the global judicial system for recourse.  These dynamics exposed Rhodium and other physical commodities traders to liabilities that could prevent them from using Kratos while reducing the overall availability of trade financing, all of which, in turn, created risks and uncertainties for Triterras.

d.      As Phase 2's analyses indicate, a handful of Kratos users tied to Maurer and Koneru accounted for substantially all of the platform's transaction volume.  Aside from implicating undisclosed conflicts of interest and inflated transaction volumes or other metrics, this concentration of users (and risk) rendered Triterras's business especially vulnerable to the financial condition and trading activity of those users – presenting risks and uncertainties that investors could not glean from the Materials' statement that "as of June 30, 2020," Kratos "had more than 65 distinct users."  Phase 2 also exposed trends in trading activity on Kratos, including that trades typically occurred for three weeks before the end of the third quarter of 2019 and 2020 only to fall off a cliff the week after the quarter's end.

213.    To the extent required, knowledge of these trends and uncertainties on the part of the defendants was derived from: (i) the Netfin individual defendants' self-proclaimed extensive due diligence on Fintech and Rhodium in advance of the transaction; (ii) the personal involvement of at least Maurer, Koneru, Tan, and Galani in the commodities trading and trade finance industry, as well their involvement in and knowledge of Rhodium, Fintech, Kratos, and affiliated entities; (iii) the Business Combination Agreement's identification in Section 1.61 of Koneru, Galani, and Tan as individuals "likely to have knowledge" of matters involving Fintech and presumably Rhodium, and

of Rosenberg and Pascale as to Netfin; and (iv) the defendants' issuance of public statements about certain of these matters, which evidences their knowledge and awareness of the underlying facts.

**B.    When Truthful Information about Triterras's Operations Emerged, the Value and Trading Price of its Securities Substantially Declined**

214.    The revelation of information about the true condition of Triterras's operations, and the materialization of previously undisclosed or misrepresented risks, caused significant declines in the value and trading price of Triterras's securities.  These facts revealed that Triterras's operations remained dependent on a handful of individuals and their affiliated entities, that conflicts of interest permeated every aspect of its business, that its financial and operational results and projections likely did not accurately reflect the true state of the business, and that an investment in Triterras was riskier than represented.

## VII.    ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS

215.    All of the above allegations are incorporated by reference herein.  The Exchange Act allegations herein sound in fraud and expressly incorporate any allegation or inference of fraud or scienter.  The statements and omissions actionable under Section 10(b) of the Exchange Act herein are those issued or otherwise disseminated during the Class Period, including those in the Materials.

**A.    Defendants Knowingly or Recklessly Misled Investors with Materially Misleading Statements and Omissions during the Class Period**

**1.    The June 29, 2020 Press Release and Form 8-K**

216.    The Class Period begins on June 29, 2020.  On that date, Netfin issued a press release, filed as an exhibit to a June 29, 2020 Form 8-K which Maurer signed, announcing a non-binding letter of intent to acquire Fintech and Rhodium, defined therein collectively solely as "Triterras." The press release, however, was apparently issued by all of those entities, as it listed New York (for Netfin) and Singapore (for Fintech and Rhodium) as locations of the news, it provided information

on all of these entities under the headings "About Netfin Acquisition Corp." and "About Triterras," and it listed Rosenberg as the contact for Netfin and Groh as the contact for "Triterras."

217.    Evidently referencing Rhodium, the press release stated that the "combined" Triterras entity (as referred to therein) was "[f]ounded in 2012," billing them as "a leading commodity trading and trade finance fintech company." More importantly, the press release represented that the entities were continuing to capitalize on the current commercial environment, stating:

> The combination of this transformational technology and a world-class institutional commodity trading organization continues to accelerate Triterras' leadership position. In fiscal year 2019, Triterras generated over $4.1 billion of transaction volume, $87 million in EBITDA and $46 million in net income on a consolidated basis. Given its current trajectory, the company expects each of the aforementioned financial metrics to more than double by fiscal year 2021.

218.    Commenting on this news, Rosenberg emphasized that these entities "fit[] the ideal criteria for the type of asset we have been seeking in our fintech SPAC mandate[.]" He also claimed that their management team was a selling point for Netfin's directors, representing: "Their successful operating track record and management's deep industry expertise were also major factors in our overall evaluation process"; and "We have enjoyed working with Triterras' founder and highly experienced management team, and we look forward to supporting them in their new growth phase as a public company."

219.    In turn, Koneru favorably emphasized the "resiliency" of the entities' business despite otherwise challenging times, claiming that the business had not suffered – but instead had blossomed – in light of COVID-19:

> The combination of our technology and industry experience forms the backbone of an advanced and versatile platform that is unique in our field. Our business has been resilient in the face of COVID-19, which is only accelerating the migration of trade as well as trade finance to our online platform. With the fintech experience and capital that Netfin brings to the table, we are confident we can continue our growth in an industry ripe for disruption.

220.    Unbeknownst to investors, these representations were materially false and misleading. For example:

a.    The press release's representations about the fortunes of Fintech and Rhodium and their "current trajectory" were materially misleading in the absence of disclosure about the ways in which COVID-19 and negative developments in the commodities trading business were adversely affecting Rhodium. Those representations were also misleading without disclosing that Fintech was particularly vulnerable to negative developments affecting Rhodium, or that Rhodium and Fintech shared executive management teams and were naturally predisposed to myriad conflicts of interest. The "current trajectory" statement was likewise materially misleading because it was based at least in part on then-undisclosed business that physical commodities traders Rhodium and Longview did with Fintech on the Kratos platform, and Koneru and Maurer each controlled one of those traders.

b.    Rosenberg's comments on Netfin's "SPAC mandate" and the management of Fintech and/or Rhodium were materially misleading without disclosure of the relationships between insiders of Netfin and Fintech/Rhodium. Those extensive and close relationships were undoubtedly a driving force of the transaction and strongly suggest it was prearranged, yet they are not mentioned in addressing the justification for the transaction. Instead, Rosenberg discussed "Triterras' founder" Koneru as though Netfin's executives and insiders had only just met him, when in reality Maurer – Netfin's founder, CEO, and director – had a decades-long business and personal relationship with Koneru and Maurer's entity Longview was responsible for a substantial portion of Kratos's volume. Netfin executives Rosenberg and Pascale even knew Groh, who the press release listed as the contact for Fintech and Rhodium (under the catchall "Triterras" moniker).

c.    Koneru's past and present-tense statements that Fintech/Rhodium's "business has been resilient in the face of COVID-19," and that COVID-19 was "accelerating" the generation of business on Kratos, were materially misleading in the absence of disclosure regarding the unique

ways in which COVID-19 was adversely impacting Rhodium's business and, by extension, Fintech. Those statements also failed to reveal Fintech's substantial reliance on Rhodium and even Longview to generate business and revenue or Koneru's own relationship with Netfin's Maurer. And virtually no one at Netfin had "fintech experience," contrary to Koneru's representation.

221.    Given Koneru's knowledge of and continued involvement in Rhodium's operations, Koneru knew that Rhodium was then grappling with the adverse consequences of COVID-19 on the commodities trading industry. He also knew that a reduction in Rhodium's business and Rhodium's mounting liabilities would adversely affect Fintech's business, undermining his positive statements. Likewise, Netfin insiders who approved the press release – such as its directors and management, including Maurer and Rosenberg – knew of the many personal and business connections they shared with insiders at Fintech and Rhodium, yet purposely or recklessly disregarded those relationships in publicizing the transaction.

## 2.    The July 29, 2020 Press Release, Investor Call and Presentation, and Form 8-K

222.    On July 29, 2020, news of a revised transaction emerged. Now, Netfin would acquire Fintech only, excluding Rhodium – and its physical commodities trading business – from the deal. The defendants publicized this version of the transaction in a press release, investor call, and investor presentation, and these materials – including a transcript of the investor call – were described in and attached as exhibits to a Form 8-K, which Maurer signed and Netfin filed with the SEC, that also described the terms of the transaction and the Business Combination Agreement that memorialized those terms.

### a.    The July 29, 2020 Press Release and Form 8-K

223.    The Form 8-K also advised that Netfin and Holdco would issue the Materials, which would be mailed to investors once declared effective, and instructed investors to contact Netfin CFO

Pascale for more information.  The Form 8-K also confirmed that Netfin's and Fintech's officers and directors qualified as participants in soliciting Netfin investors to support the transaction.  Under the heading "***Participants in the Solicitation***," the Form 8-K provided, in pertinent part:

a.    "Netfin and its directors and executive officers may be deemed participants in the solicitation of proxies from Netfin's shareholders with respect to the Business Combination."

b.    "The Target and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of Netfin in connection with the Business Combination."

224.    As with the June 29, 2020 press release, the July 29, 2020 press release was evidently issued by Netfin and Fintech, as it listed both New York (for Netfin) and Singapore (for Fintech) as the source of the news, it provided information on these entities under the headings "About Netfin Acquisition Corp." and "About Triterras Fintech," and it listed Rosenberg as the contact for Netfin and Groh as the contact for "Triterras" (meaning, in this instance, Fintech).

225.    In describing the revised transaction's exclusion of Rhodium, the press release noted Fintech's purported lack of "balance sheet exposure," representing:

> Following Netfin's announcement of a non-binding letter of intent to combine with Triterras Fintech and its affiliate, Triterras Holdings Pte. Ltd. on June 29, 2020, the parties made the strategic decision for Netfin to combine solely with Triterras Fintech and not with its affiliated Rhodium commodity trading business in order to create a standalone, fast-growing fintech pure-play business with a 100% fee-based platform and no balance sheet exposure.

226.    Although the press release included favorable (albeit lower) financial results for fiscal year 2019 after excluding Rhodium, Netfin and Fintech still represented that transaction volume for fiscal year 2020 would double:

> In fiscal year 2019, Triterras Fintech generated $3.6 billion of transaction volume, $16.9 million of revenue, $14.8 million of EBITDA and $13.2 million of net income. The company projects to generate approximately $7.8 billion of transaction volume, $56.6 million of revenue and $39.8 million of EBITDA for fiscal year 2020 (12

months ending February 28, 2021) and grow at more than a 60% compound annual growth rate ("CAGR") through 2023.

227.    They also reinforced this message elsewhere in the press release, stating: "Triterras' growth strategy is expected to generate $123 million of revenue, $84 million of EBITDA and $71 million of net income for fiscal year 2021 (12 months ending February 29, 2022)."  In essence, then, the defendants represented that the projections they had previously publicized to the market in the June 29, 2020 press release – that "financial metrics" would "more than double by fiscal year 2021" – was still true, even without any contribution from Rhodium.

228.    Commenting on the revised transaction in the press release, Rosenberg emphasized the "pure-play fintech" aspect of solely acquiring Fintech: "Our business combination with Triterras Fintech creates a leading pure-play fintech company that is digitizing a large and growing industry, while making transactions more cost-efficient, secure and faster[.]"  To underscore the benefits of the transaction, he described Fintech as "a high-margin, fast-growing platform business with scale," also stating: "As a public company with access to capital markets to fund its growth, we believe Triterras Fintech will deliver strong near and long-term value for Netfin shareholders."  As in the previous press release, he also expressed interest in "supporting Triterras Fintech's leadership through their new growth phase as a public company."

229.    For his part, Koneru continued to claim that Fintech actually benefited from COVID-19 and that a transaction with Netfin would provide it with "experience and capital" to improve the business going forward, representing:

> Triterras Fintech's tech-enabled platform combined with our deep industry experience provides us a first-mover advantage in disrupting the physical trade and trade finance industry. COVID-19 has rapidly accelerated the migration of trade as well as trade finance to our online platform, Kratos, which has experienced a significant increase in customer activity and transaction volumes since the onset of this pandemic. The experience and capital that Netfin adds will enable us to accelerate our growth and more effectively capitalize on our pipeline and broader market opportunity.

230.    As before, these representations were materially false and misleading, unbeknownst to investors, for many of the same reasons that the representations in the June 29, 2020 press release were materially false and misleading.  For example:

a.    The press release's discussion of the "strategic decision" to exclude Rhodium from the transaction was materially misleading in the absence of disclosure of Fintech's continued dependence on Rhodium and vulnerability to Rhodium's financial condition and mounting liabilities. Additionally, given Rhodium's precarious financial status and exposure to continuing disruption in the commodities market as a result of COVID-19 and banks' increasing reluctance to finance trades, Rhodium – and by extension Fintech – was at risk of experiencing significant business losses.  But because defendants understood that publicly disclosing extensive financial information on Rhodium would dissuade investors from acquiring Netfin or Triterras securities, they revised the transaction to exclude Rhodium.  The disclosure of information about Fintech, by contrast, would not implicate the same concerns because Fintech – which operated the Kratos platform – had limited physical assets and a minimal number of employees given its overlapping management with Rhodium.  It was thus in the best interests of insiders to alter the transaction so as to exclude Rhodium ostensibly from the same degree of disclosure necessary for Fintech.

b.    Fintech's financial results and projections in the press release were materially misleading without disclosure of its dependence on Rhodium and Longview – which had until then been responsible for a substantial portion of Fintech's business – particularly given the involvement of Koneru and Maurer in the Netfin transaction and the business of their affiliated entities.  Including those financial results and projections and positive statements about that information also gave rise to an affirmative obligation to disclose the source of those results and projections, again implicating information about Fintech's dependence on Rhodium and Longview and the contribution they made

to its business.  By then, Rhodium was experiencing financial difficulties associated with COVID-19 and legal liabilities, which drastically undermined the likelihood that it would continue to contribute to Fintech's results as it once had.  Even so, the results and projections conveyed the impression that Fintech grew its business organically and would continue to do so.

c.      Rosenberg's press release statements were also materially misleading because he failed to disclose the conflicts of interest permeating the identification of Fintech as a target for Netfin, as well as the circumstances which prompted revising the terms of the previously announced transaction.  Additionally, his positive representations misleadingly concealed the risks associated with a transaction involving Fintech, given all of the undisclosed conflicts of interest involved and Fintech's substantial reliance on Rhodium and Longview.  The failure to disclose that Rhodium and possibly other commodities traders using Kratos were experiencing the adverse effects of COVID-19 and the withdrawal of funding from the industry also contributed to the materially misleading nature of his statements.

d.      For similar reasons, Koneru's statements in the press release were materially misleading.  In representing that "COVID-19 has rapidly accelerated" Kratos's adoption and use and resulted in an increase in transaction volume on the platform, Koneru concealed that COVID-19 was then adversely affecting Rhodium – on which Fintech was substantially dependent.  His statements also conveyed that Fintech's business was resilient in the face of a challenging environment that was then decimating other companies and industries, when, in fact, Fintech's success and performance were closely tied to Rhodium's success, performance, and overlapping management.  And Koneru's reference to Netfin's "experience" implicated the close personal and business relationships between insiders at Fintech/Rhodium and insiders at Netfin, which Koneru and others purposely concealed from the public.

231.    Representations in the July 29, 2020 press release were intended to mislead investors about the development of the revised transaction and Fintech's business, as well as the preexisting relationships between insiders of Netfin and Fintech/Rhodium.  This press release thus had the same misleading impact on investors as the June 29, 2020 press release did.

### b.    The July 29, 2020 Investor Call and Presentation

232.    On July 29, 2020, Netfin and Fintech held an investor call regarding the transaction. Koneru and Groh participated on behalf of Fintech; Rosenberg participated on behalf of Netfin; and Matt Glover, Senior Managing Director of Gateway Investor Relations (referred to in the transcript as External Director of Investor Relations), also participated.  Gateway provided investor relations support for Netfin (and, separately, Trident, the SPAC that Rosenberg and Komissarov founded).

233.    During the investor call, the participants referenced an investor presentation that the call operator said "provide[d] more detail behind the presenter's commentary," was "available for download on Netfin's website at NetfinSPAC.com," and was also "publicly filed with the SEC." The operator instructed investors to "refer to that [presentation] as a guide" for the call.

234.    The call itself was transcribed, and a copy of the transcript was filed as an exhibit to the Form 8-K alongside the press release and presentation materials.  The transcript indicates that the call was scripted: the title of the transcript is "Netfin & Triterras Business Combination Call Script," and the top of each page bears the bold text "Netfin & Triterras Definitive Announcement Call Script for July 29, 2020, 12:00 PM ET."  Thus, the conference call comments and presentation materials are defendants' collective product, which each of them prepared, authorized, or approved.

235.    Rosenberg first reiterated information on the evolution of the transaction, representing that Netfin excluded Rhodium because Fintech had "no balance sheet exposure":

> After signing an LOI to acquire both subsidiaries of Triterras, we decided to complete the binding business combination agreement and merge with Triterras Fintech only, which is the 100% owner of Kratos, and not Triterras Holdings, which

included its Rhodium commodity trading business. Our decision was motivated by a desire to combine with a fast growing fintech pure-play, with a 100% fee-based platform and no balance sheet exposure.

236.    As support for this representation, Rosenberg referenced page 3 of the presentation materials, entitled "Final Composition of Business Combination; Triterras Fintech Standalone," which stated: "After signing an LOI for both subsidiaries of Triterras, Netfin has agreed to acquire only Triterras Fintech and its Kratos platform, not Triterras Holdings and its Rhodium commodity trader." That page also represented that the revised transaction offered the following advantages, among others: "Creates a fast growing fintech pure-play"; "100% fee-based platform business" and "Mitigates balance sheet exposure in Rhodium business[.]"

237.    Referencing page 4 of the presentation materials, Rosenberg claimed that "Triterras Fintech checks every box for the type of asset we wanted to acquire when we started the process," representing that Netfin sought a target in trade finance from the outset of its IPO: "During our IPO roadshow, we spoke extensively about the technology disruption opportunities in trade finance, and this company is a leader in this movement." Favorably emphasizing Fintech's business, industry positioning, and growth potential, Rosenberg also said Kratos "has significant scale, has been highly profitable since inception and is growing rapidly." He further represented: "The Kratos marketplace is one of the world's highest volume commodity trading and trade finance platforms and it enables traders and lenders to transact directly online and solves critical problems for its users."

238.    Without detailing the nature or scope of insiders' preexisting relationships, Rosenberg conveyed that Netfin had only recently established a close working relationship with Koneru and the Fintech team purportedly as a result of negotiating the transaction: "We have a close relationship and have enjoyed working with Triterras' founder and highly experienced management team, who will continue to run the business post business combination, and we look forward to supporting them in their new growth phase as a public company."

239.    Walking through page 5 of the presentation materials, Koneru introduced himself and Fintech's "senior leadership team" – identifying COO Galani, CFO Tan, and EVP Groh – without revealing that Galani and Tan were longtime employees of Rhodium (likely even then) or that Groh had a lengthy preexisting relationship with Rosenberg and Netfin CFO Pascale.  As he stated:

> My senior leadership team is comprised of our COO John Galani who is based in London, and our CFO Alvin Tan who works with me in Singapore.  My colleagues have extensive experience in our industry and are well qualified to lead the company. Joining me on the call today is our Executive Vice President Jim Groh who has a vast amount of experience in the US capital markets.

240.    Page 5 of the presentation materials, entitled "Management and Presenters," provided detail on the personal and employment background of these individuals (and Rosenberg) consistent with Koneru's remarks, as follows:



241.    Koneru then ran through financial metrics and guidance for Fintech's business, using page 6 of the presentation materials to guide the discussion.  He indicated that "Kratos was launched in June 2019 and as end of June 2020 there have been over 3,500 transactions representing over $6.6 [b]illion of transaction volume conducted on our platform."  Then he described Fintech's financial

projections, noting: "We are forecasting $123 million of revenue and $84 million of EBITDA for fiscal year 2021, which is representative of the 12 months ending February 2022." Page 6 of the presentation materials set forth this information, also indicating that management expected Fintech to achieve a 169% revenue compounded annual growth rate for fiscal year 2019 to fiscal year 2021 and a 69% EBITDA margin for fiscal year 2021.

242.    After his initial remarks, Koneru turned the call over to Groh, who likened Fintech to "Amazon," emphasizing its dramatic, continuing organic growth and providing an overwhelmingly positive account of the business. As the following representations from his discussion demonstrate, Groh especially emphasized Fintech's supposedly skyrocketing growth and future prospects:

    a.    "Kratos as an online marketplace is so effective that it has organically grown into one of the world's largest commodity trade and trade finance platforms in just over a year. Our platform solves important and critical problems faced by our clients."

    b.    "Kratos was launched with a critical mass of users and has been growing rapidly since inception."

    c.    "In both the short and long term, we are expecting rapid growth. We believe that Triterras Fintech through Kratos can be as transformative as the leading online retailers have been in the retail industry, such as Amazon."

    d.    "We have identified a number of catalysts that we believe will drive our expansion going forward and these are: an exponential organic growth model, expanding the geographies where we operate, new platform enhancements and expanded trade financing alternatives."

243.    Unlike Rosenberg and Koneru, Groh unabashedly attributed Fintech's early growth to Rhodium, linking the two entities together without revealing that Fintech's senior management team overlapped with Rhodium's. As he explained: "Kratos had the benefit of a major trader client with

- 97 -

Rhodium that provided the initial critical mass of traders and volumes that kick started the platform. Scaled networks, like Kratos, are hard to replace, and we have significant and growing scale."

244.     Referencing page 21 of the presentation materials, Groh emphasized that Fintech's business exploded after Rhodium sourced Kratos's initial users, which, he claimed, provided Fintech with "critical mass":

> [W]e kickstarted the platform with the Rhodium trading business which upfront gave us the required critical mass of traders and transaction volume to run a viable platform. We then added the Trade Finance module and to date have on-boarded lenders that we estimate have $17 [b]illion assets under management that are ready, willing and able to provide trade finance to our community of traders. As evidenced in our growth, we are seeing how traders have attracted new lenders onto the platform. And those lenders in turn attracted more new traders and have created a virtuous cycle of growth, which we anticipate will continue to accelerate.

245.     Page 21 of the presentation materials, entitled "Kratos Launch and Growth Cycle Aided by Rhodium," identified Rhodium as a purported "growth catalyst" without explaining how it contributed to Fintech's business beyond the initial introduction of Kratos users, as follows:



246.     In support of the notion that Kratos had already substantially increased its number of users and would experience exponential user growth over the short and long-term, Groh cited page 22 of the presentation materials, which he claimed "outline[d] a separate network effect" to "drive

potentially exponential growth." Essentially, Groh claimed that word-of-mouth referrals by Kratos uses to the counterparties on their trading transactions would increase the overall number of users, and page 22 depicted meteoric growth: from 52 users in fiscal year 2019 to as many as 1,500 users in fiscal year 2023, with the aggregate volume of transactions ranging from $3.6 billion to $37 billion during that period.

247.    As for the impact of COVID-19 on the business, Groh echoed the internal party line that the pandemic was positive for business – citing page 25 of the presentation materials, which said that the "Kratos platform is outperforming 2020 pre-COVID projections." For example, during the first four months of fiscal year 2020, Groh and the presentation materials represented that Kratos's monthly transaction volume had increased by 70% (as compared to the period between its launch in June 2019 and its 2019 fiscal year end in February 2020). Groh and this presentation page claimed that because COVID-19 caused "less liquidity" and resulted in "fewer lending sources," Fintech was flourishing as traders flocked to Kratos for financing they could not obtain elsewhere.

248.    Lastly, Groh reviewed financial information set forth on page 27 of the presentation materials, including transaction volume, revenue, EBITDA, net income, and financial forecasts for fiscal year 2020. Transaction volume for the first fourth months of 2020, he claimed, "imputes a run rate that shows we are very much on track to meet or exceed our 2020 projections" – a view that he suggested the presentation page supported.

249.    In closing, Rosenberg described the transaction as "quite compelling," citing pages of the presentation materials regarding the combined company's pro forma market capitalization and emprise value and analyses of supposedly comparable publicly traded companies. Explaining why publicly traded securities exchanges were comparable to Fintech (as discussed on pages 30-32 and 35-37 of the presentation materials), Rosenberg had this to say:

Moving on to slide 30, we provide an overview of three fintech segments including exchanges and alternative trading systems, transactions solution companies and financial marketplaces that have a similar business model as Triterras Fintech. Specifically, nearly all of the public fintech companies listed on the slide have an asset-light, transaction-based revenue model along with other similar attributes and represent the correct comp groups. From a relevance standpoint we believe that the exchanges and alternative trading systems as well as transaction solutions companies have the highest correlation. I believe Triterras Fintech compares very favorably to the comps on this slide given its strong EBITDA margin, excellent growth profile and disruptive technology addressing underserved market need in trade and trade finance. On the next slide 31, you can see just how favorably Triterrras [sic] compares to every group in every metric – it is growing significantly faster with a meaningfully higher EBITDA margin. And then please turn to slide 32, where you can see the significant multiples discount at which the transaction is being priced, across all 3 valuation benchmarks. So not only is Triterras performing better, growing faster, and being offered at a meaningful discount. We believe this presents a compelling opportunity and entry point for our shareholders.

250.    In truth, many representations from the July 29, 2020 conference call and presentation materials were materially false and misleading.  For example:

a.    Rosenberg's comment that Netfin revised the transaction to eliminate balance sheet exposure that Rhodium carried was misleading without disclosure that Fintech nevertheless remained vulnerable to Rhodium's financial condition and liabilities, as explained with respect to the June 29, 2020 statements.  The true purpose of excluding Rhodium was to reduce investor disclosure of Rhodium's problems and their consequences for Fintech, which depended on Rhodium to operate its business.  Similar representations on page 3 of the presentation materials were likewise false and materially misleading for the same reasons.

b.    Rosenberg's representation about Netfin's identification of Fintech as a target, which suggested that Netfin had no preconceived intention of acquiring Fintech (or Rhodium) but instead sought a target in the fintech industry, was also false and misleading.  In fact, the transaction likely was predetermined and preplanned, given the close preexisting relationships between insiders at Netfin and Fintech and the fact – only later disclosed – that Maurer contacted Koneru within three days of Netfin's IPO to discuss a transaction.  These relationships – which had yet to be disclosed –

also rendered false and misleading Rosenberg's suggestion that Netfin had only recently established a close working relationship with Koneru and other members of Fintech's team.

        c.      Rosenberg's discussion of comparable companies and the related information on pages 35-37 of the presentation materials were materially misleading, because the entities listed in no way represented companies comparable to Fintech.  For example, the companies listed under "Exchanges and Alternative Trading Systems" included long-established securities exchanges, such as the parent companies of the Nasdaq and London Stock Exchange, with market capitalizations in the tens of billions of dollars.  Companies listed under "Transaction Solutions" included widely-used payment processors such as PayPal Holdings, Inc. and Square, Inc., also with tens of billions of dollars in market capitalization.  And the companies listed under "Financial Marketplaces" included online loan issuer LendingTree, Inc. and insurance quoting platform EverQuote, Inc.  In short, these so-called "comparables" were not in fact comparable to Fintech, and any suggestion that they were – especially coming from all of the conference call participants and other defendants – could only have been intended to mislead investors.

        d.      Koneru's introduction and description of Fintech's senior management team, and page 5 of the presentation materials (presenting similar information), were materially misleading without disclosure that Tan and Galani were also employed as senior executives of Rhodium and that Groh had preexisting and extensive ties to Rosenberg and Pascale, high-level executives at Netfin. Instead, the presentation materials provided a similar level of disclosure on the background of these individuals as the Materials later did, disclosing, for example, some of the companies for which Tan and Galani worked, but not mentioning Rhodium.

        e.      Groh's representations on Kratos's growth, including statements attributing its initial growth to a "critical mass of traders and transaction volume" to Rhodium, were materially misleading because he failed to disclose the extent to which Fintech continued to rely on Rhodium

and Longview. For this reason, the growth-based representations at pages 21-22 of the presentation materials, which Groh referenced in his comments, were also misleading.

f.    Groh's statements regarding the impact of COVID-19 on Fintech's business, as well as page 25 of the presentation materials, were materially misleading because they conveyed that COVID-19 benefited Fintech notwithstanding that the virus was wreaking havoc on Rhodium. Indeed, while Groh acknowledged (as other defendants had) that COVID-19 had adversely impacted the commodities trading industry and was continuing to do so, he (and they) nevertheless portrayed the effect on Fintech as a net positive – that COVID-19 was contributing to the migration of traders from seeking financing from traditional banks and sources of funding to Kratos, an online platform, where funding was purportedly readily available. In this way, the statements in Groh's presentation and the presentation materials concealed the negative impact that COVID-19 directly could have on Fintech and understated the implications for Fintech of turmoil in the broader commodities industry.

g.    Favorable commentary on the call, and positive statements in the presentation materials, about Fintech's growth and financial results and projections were materially misleading in the absence of disclosure of the degree to which Fintech continued to rely on Rhodium, as well as the potential ramifications on Fintech's business of Rhodium's then-existing or looming precarious financial condition. As Phase 2 later revealed, a handful of related/affiliated individuals and entities using Kratos, including Rhodium and Longview and others tied to Maurer and Koneru, historically accounted for the substantial majority of Fintech's business, and, hence, historical financial results. The discussion of these financial results and projections also placed at issue the source of Fintech's results, which required disclosure of this information. The projections also lacked a reasonable basis because the assumptions on which they were based were themselves unreasonable, given problems in Rhodium's business and adverse developments in the commodities industry.

251.     Given the nature of the information misrepresented, the extent of the misstatements and omissions, and defendants' involvement in developing and disseminating the information (and misinformation), the July 29, 2020 representations were not only false and misleading when made, but they were also made with scienter.  And because defendants intended to utilize the presentation materials in publicizing the transaction and Triterras presumably even after the transaction's close, the misstatements and omissions remained alive during the Class Period and until the truth emerged.

### 3.    The July 31, 2020 Form 10-Q

252.     On July 31, 2020, Netfin filed a Form 10-Q, signed by Maurer, for the quarter ended June 30, 2020.  Consistent with prior representations, the Form 10-Q represented that Netfin had not identified a particular target but would focus on the fintech industry:

> Although the Company is not limited to a particular industry or sector for purposes of consummating a Business Combination, the Company intends to focus its search for targets in the financial technology, technology and financial services industries, including those engaged in commercial, online and mobile banking and payments, trade finance and telecommunications, that offer a differentiated technology platform and product suite for interfacing with the financial services sector.

253.     This representation was materially false and misleading, however, because Netfin's insiders had always conceived of a transaction with Fintech.  As explained herein, the transaction was preconceived, if not prearranged.

254.     The Form 10-Q included Certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Exchange Act, as adopted under Section 302 of the Sarbanes-Oxley Act of 2002, which CEO Maurer signed as Principal Executive Officer and CFO Pascale signed as Principal Financial and Accounting Officer.  In their Certifications, Maurer and Pascale certified that they had reviewed the Form 10-Q and that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered . . . ."

255.    The Form 10-Q also included Certifications pursuant to 18 U.S.C. § 1350, as adopted under Section 906 of the Sarbanes-Oxley Act of 2002, which Maurer and Pascale signed as officers of Netfin.  In their Certifications, Maurer and Pascale certified that the Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d)" of the Exchange Act and also that "the information [therein] . . . fairly presents, in all material respects, [Netfin's] financial condition and results of operations . . . ."

256.    These Certifications were false and misleading because Maurer and Pascale knew that the Form 10-Q contained material omissions and misstatements that portrayed Netfin's condition and prospects in a misleading light.

**4.    The August 20, 2020 Investor Call and August 24, 2020 Press Release and Form 8-K**

257.    On August 20, 2020, Netfin and Fintech held an investor presentation and question-and-answer session by telephone regarding Fintech's business and proposed transaction with Netfin. Koneru, Groh, Galani, and Karthik Annapragada (of Fintech's finance team) participated on behalf of Fintech; Rosenberg participated on behalf of Netfin; and Cody Slach, Senior Managing Director of Gateway, moderated.  The call was held for subscribers of SPACInsider, a web-based platform for SPAC investing, and a recording of it was available until October 1, 2020.

258.    During the investor call, the participants referenced the July 29, 2020 presentation materials.  The call itself was transcribed, and a copy of the transcript was filed as an exhibit to an August 24, 2020 Form 8-K alongside an August 24, 2020 press release, which reported on the call after it took place.  The transcript evidently was the product of a collective effort, with headings that introduced each of the topics the speakers addressed.  As the transcript reflects, the call was broken down into several segments:

        a.      "Overview of Proposed Business Combination," "Details of the Transaction,"

and "Closing Remarks," by Rosenberg;

        b.      "Introduction of Triterras," by Koneru;

        c.      "Triterras in More Detail," by Groh; and

        d.      Question-and-Answer Session ("Q&A"), with Groh, Galani, Annapragada, and Slach.

259.     Addressing the decision to exclude Rhodium from the transaction, Rosenberg again stated that the change was intended to eliminate balance sheet exposure. This time, however, he also claimed the change was intended to reduce investor confusion over the nature of assets involved, among other reasons. As he represented:

        a.      Including Rhodium in the transaction "had the potential to drag down the value of the Kratos business" and "create a lower multiple business," given Rhodium's supposedly lower valuation multiple as a physical commodity trader and the "much higher multiple business at Kratos . . . ."

        b.      "There were some concerns that investors and analysts would not be able to find the correct comps, and it would be confusing to understand if the combined company would either be viewed as a digital platform or a commodity trader or a financing business with balance sheet exposure, or some hybrid of the three." These issues purportedly gave rise to a "concern that this type of stock could eventually be orphaned over time."

        c.      "Rhodium invest[s] a portion of its balance sheet in the form of equity to provide trade finance for some of its trading transactions," and "in a post- COVID world[,] investors would be more reluctant to invest in a story that had any type of balance sheet exposure."

260.     Rosenberg also claimed "two key developments" prompted revising the transaction to exclude Rhodium: *first*, that Kratos "grew significantly faster than anyone expected"; and *second*,

that Rhodium "started as 100%" of Kratos's business, but now "represents 11% of revenue." In fact, he claimed that Kratos "is a very well-distributed platform" with "no reliance on Rhodium" or "any one customer" and "no balance sheet exposure."

261.    Lastly, Rosenberg again conveyed the impression that the Netfin team only recently established a relationship with the Fintech team, claiming: "we have developed a very close working relationship, and I have really enjoyed working with Triterras's founder and their highly experienced management team, who are going to run this business after the business combination."

262.    Picking up where Rosenberg left off, Koneru introduced Fintech's management team by reference to page 5 of the "investor presentation" materials, noting: "My senior leadership team is comprised of our COO, John Galani, who is based in London; our CFO, Alvin Tan, who works with me here in Singapore; and my colleague Jim Groh, who is our Executive Vice President, and who has a vast [amount] of experience in US capital markets; and Karthik and others." Koneru also ran through Fintech's results through June 2020 and projected performance for fiscal year 2021.

263.    Groh, who had the largest speaking role, then highlighted Fintech's "organic growth," echoing Rosenberg by saying Kratos "launched with a critical mass of users and has been growing rapidly from the get-go." As he explained, Rhodium accounted for 100% of Kratos's total revenue at launch in June 2019. He claimed, however, that Fintech "ha[s] a well-diversified business with no single customer representing more than 16% of revenues in our last fiscal year."

264.    According to Groh, "all of the 11 Rhodium subsidiaries combined" would contribute 15% of total revenue for 2020, but Kratos had "a tremendous rate of adoption by independent third parties" as a result of "the so-called network effect": "As traders or lenders joined the platform . . . [they] work to bring their counterparties onto the platform" because "[they] see it as a better system for conducting business with their existing relationships."

265.    Reiterating prior representations, Groh also invoked the Amazon analogy, stating: "We believe that Triterras Fintech, through Kratos, can be as transformative in our industry as the leading online retailers were in the retail industry. Our aspiration is to do in our industry what Amazon did in theirs."

266.    In discussing the impact of COVID-19, Groh reiterated previous representations that the pandemic caused "clients [to] move more and more business online in an expedited manner," adding that Kratos "provided our clients with a way to conduct their business during the lockdowns" – transaction volume that, Groh said, put Fintech on course to exceed projections.  He also said that, "[i]n trade finance, COVID-19 has caused . . . less liquidity and fewer lending sources," "driving an even more compelling need for," and "growth of," the platform.  He then discussed financial results.

267.    Following Groh's presentation, Rosenberg presented one last time before the Q&A. Virtually the entirety of Rosenberg's discussion involved the so-called "comparables" identified in the July 29, 2020 presentation materials.  Likening Fintech to the exchanges and alternative trading systems purportedly based on Fintech's "EBITDA margin and growth," he attempted to show why all of the companies were comparable in some respect to Fintech despite the substantial differences in their business models:

> Now moving on to slide 30, we provide an overview of three fintech comp segments, which in our opinion, really covers all the possible comps and looks at this thing from every single direction. This first group includes exchanges and alternative trading systems. The second group are the transaction solution companies. And finally, the third is the financial marketplaces. And they all have in many ways, similar business models to Triterras Fintech, specifically, nearly all of these public fintech comps listed have an asset-light, transaction-based revenue model and similar attributes. So we believe this certainly represents the correct comp group overall, but from a relevance standpoint, we believe that the exchanges and the alternative trading systems, as well as the transaction solution companies actually have the highest correlation. And the reason for that is because those tend to have higher EBITDA margins and faster growth rates in the financial marketplaces.
>
> And I believe that Triterras Fintech compares very favorably to the comps on the slide because its EBITDA margin and growth is actually even faster than even the

best performing ones. And the disruptive technology that it has is really in a market that is completely underserved and Triterras are in a much less competitive marketplace than any of those comps at this point. And they have a better first-mover advantage.

268.    In closing his discussion of these purported comparables, Rosenberg referenced page 32 of the presentation materials to claim that various valuation benchmarks supported a stock price for Triterras well above – indeed, double – Netfin's trading price: "just under $20" by one estimate; $25 by another.  Based on these numbers, he stated: "[A]ny way you look at it, not only is Triterras performing better and growing faster, but it is also being offered at a really meaningful discount. And we believe the $10.17 per share price at the transaction and where it currently trades represents a compelling opportunity and entry point for our shareholders."

269.    During the Q&A session, Galani reiterated that Fintech's business was resilient and even growing in the face of COVID-19, stating: "we have had much larger traders coming onto the platform, asking for demos, asking us how to put them in touch with financiers, because they cannot even physically meet them or talk to them."  He doubled down on these representations when Slach asked if the trade finance industry was volatile and the business model was resilient, noting that: the situation is "quite neutral and sometimes positive on the platform"; there was "lending capacity and capability" due to "liquidity" in the U.S. and Western Europe; and "there is a lot of stability in terms of the market and the interest."

270.    For their part, Annapragada and Groh claimed that Fintech's financial estimates were "conservative," noting management was "not pricing in additional revenues" from other modules on the platform or Fintech's business initiatives – an effort, Groh said, to avoid the fate of new "public companies" for "miss[ing] their projections": severe punishment by the market.

271.    In truth, many representations on the August 20, 2020 call were materially false and misleading for the same reasons that the July 29, 2020 representations, including in the presentation materials, were false and misleading.  For example:

a.    Rosenberg's explanation for excluding Rhodium from the transaction did not reveal that aspects of the transaction, if not the entire transaction itself, were prearranged or at least preconceived.  Nor did he reveal that Fintech's exposure to Rhodium required altering the terms of the initial transaction to conceal adverse information on Rhodium's liabilities and their likely impact on Fintech.  It was misleading to discuss excluding Rhodium from the transaction without disclosing this information, particularly because Rosenberg affirmatively represented that Rhodium's exclusion eliminated Fintech's "balance sheet exposure" – which led investors to believe that Fintech was not subject to adverse developments in Rhodium's business, when that was not, in fact, true.

b.    Rosenberg's discussion of purportedly comparable companies was misleading because he had no legitimate basis to believe those companies were in fact comparable to Fintech, and his assurances to the market that they were served no purpose other than to mislead investors.  Similarly, Rosenberg's claimed justification of a price for Triterras's shares above Netfin's trading price, or the contemplated price associated with Triterras's shares in the transaction, was misleading because that representation also lacked a reasonable basis in fact.  Again, that representation was intended to mislead investors and served to conceal the conflicted nature of the transaction and the problems facing Fintech's business, all of which defendants were aware of or recklessly disregarded.

c.    Koneru's statements about Fintech's senior management team concealed that Fintech's officers also worked for Rhodium, and Rosenberg's statements on working with Fintech's team kept hidden lengthy preexisting relationships between insiders at Netfin and insiders at Fintech.

d.    Rosenberg and Groh discussed Rhodium's historical and current contribution to total revenue, acknowledging that Rhodium accounted all of Fintech's revenue at Kratos's launch.

But they failed to disclose the extent to which Fintech continued to rely on Rhodium or the unique ways in which Fintech was vulnerable to Rhodium's financial condition and liabilities. In fact, they said nothing about Rhodium's current status, business, or operations, much less Longview's. It was materially misleading to downplay Rhodium's involvement in and influence over Fintech's business or to omit any discussion of Longview's previous and congoing contribution to Fintech's business.

        e.      Rosenberg's, Groh's, and Galani's respective discussions of COVID-19 and its implications for the trade finance industry – and Fintech, in particular – concealed the true impact of COVID-19 on Fintech's operations, especially by virtue of Rhodium's financial troubles resulting from COVID-19. Their statements thus did not reflect then-existing conditions and were misleading.

        f.      Statements by Galani and Groh on Fintech's growth and prospects, including its financial projections, were materially misleading without disclosure of information within their possession which undermined those representations. As executives of Fintech and Rhodium (at least for Galani), they knew or recklessly disregarded that their favorable and optimistic representations lacked a reasonable basis in fact. And they misleadingly omitted any discussion of Longview.

272.    Accordingly, the representations on August 20 and 24, 2020 were not only false and misleading when made, but they were also made with scienter. And because defendants continued to utilize the presentation materials in publicizing the transaction and intended to utilize those materials even after the transaction closed, the misstatements and omissions therein remained alive during the Class Period and until the truth emerged.

        **5.**      **The August 28 and 31, 2020 Draft Materials, September 9, 2020 Gateway Conference, and Related Transcript and SEC Filings**

273.    On August 28, 2020, Holdco filed with the SEC a draft registration statement, which also included and incorporated Netfin's proxy statement and prospectus – draft materials that Netfin also filed with the SEC on August 31, 2020 to solicit investors in connection with the transaction.

These draft materials ultimately formed the Materials, and were later declared effective by the SEC on October 29, 2020, as otherwise detailed herein. The Materials contained false and misleading statements and omissions, as outlined in the Securities Act allegations.

274.    On September 3, 2020, Netfin and Fintech issued a press release announcing that they would present at the 9th Annual Gateway Conference, to be held virtually on September 9, 2020. The press release indicated that Netfin and Fintech also planned to hold "one-on-one meetings" the same day. According to the press release, "[t]he 9th Annual Gateway Conference is an invite-only conference" that "was created to bring together the most compelling companies with the nation's top institutional investors and analysts." As it further described, "[t]he format has been designed to give attendees direct access to senior management via company presentations, Q&A sessions and one-on-one meetings." It included contact information for Gateway for investors and analysts to "request an invitation or to schedule a one-on-one meeting with management," and also included information for Rosenberg (on behalf of Netfin) and Groh (on behalf of Fintech). Netfin filed the press release as an exhibit to Form 8-K, which Maurer signed, and Holdco filed the release pursuant to Rule 425 under the Securities Act.

275.    On September 9, 2020, the 9th Annual Gateway Conference took place. Again, Slack moderated this conference, and Rosenberg and Groh presented on behalf of Netfin and Fintech using the July 29, 2020 presentation materials. On September 10, 2020, Holdco filed the transcript of the conference with the SEC pursuant to Rule 425 under the Securities Act. As the transcript reflects, Rosenberg and Groh each made similar statements to those they previously made, even citing the same pages of the presentation materials they previously cited. For example:

a.    Rosenberg: (i) referenced page 3 of the presentation materials to explain why Netfin excluded Rhodium from the transaction; (ii) referenced page 4 of the presentation materials to detail how Netfin "focused [its] mandate on . . trade and trade finance"; (iii) discussed Fintech's

financial results and projections; (iv) claimed Netfin had "a very good close working relationship with Triterras, with the Founder, [and] with the highly experienced management team"; (v) stated that Fintech had "a highly aligned and incentivized management team"; and (vi) cited pages 31 and 32 of the presentation materials in discussing purported comparable companies and claiming Fintech was "about a 50% discount to all 3 comp groups" and justified "a $25 stock price."

        b.      Groh: (i) referenced page 5 of the presentation materials to discuss Fintech's senior management team; (ii) detailed Fintech's financial performance; (iii) referenced pages 19 and 21 of the presentation materials in "outlin[ing] [Fintech's] strong competitive situation" and "years of operating expertise in trade and trade finance"; (iv) cited page 23 of the presentation materials in claiming that Rhodium and its subsidiaries accounted for 100% of Kratos's initial trade volume, but that Rhodium would account for "only 15%" of 2020 revenues and that Fintech had "a tremendous rate of adoption by independent third parties"; and (v) cited page 25 of the presentation materials in stating that "[f]or many traders, Kratos was an invaluable tool to deal with the pandemic," which was "causing less liquidity in the trade finance markets, making [Fintech's] alternative trade finance solution . . . even more compelling."

276.    The statements outlined above that Rosenberg and Groh made during the September 9, 2020 conference were materially false and misleading for the same reasons that virtually identical statements, made previously, were. The September 9, 2020 statements, and the September 10, 2020 transcript, continued to convey the false and misleading representations that defendants previously communicated publicly.

### 6.    The September 16, 2020 Press Release and Related SEC Filings

277.    On September 16, 2020, Fintech issued a press release, which Netfin filed with the SEC as an exhibit to Form 8-K that Maurer signed and Holdco filed pursuant to Rule 425 under the

Securities Act.  In the press release, Fintech reported $5 billion in total transaction volume for the first six months of fiscal year 2020 and reaffirmed its full-year projections.

278.    Commenting on this news, Koneru claimed Fintech was "on track to meet or exceed" its fiscal-year 2020 projections, announced in July 2020.  He also represented: "We are encouraged by the trajectory of both our respective trade and trade finance volumes and fees, as traders and lenders continue to realize significant business benefits from our Kratos platform."

279.    These statements were false and misleading in the absence of disclosure that Kratos's transaction volume was reliant on Rhodium, Longview, and other entities and individuals associated with insiders of Fintech and Netfin.

### 7.    The September 17, 2020 Investor Presentation and Related SEC Filings

280.    On September 17, 2020, Netfin filed a Form 8-K, which Maurer signed, with a copy of an investor presentation.  Holdco also filed a copy of the presentation materials pursuant to Rule 425 under the Securities Act.

281.    The presentation materials were substantially similar to the July 29, 2020 presentation materials and contained many similar, if not identical, misstatements and omissions of material fact. Thus, for example, representations on the reasons for excluding Rhodium from the transaction and about the background of Fintech's senior management team remained the same.  The September 17, 2020 presentation materials, however, replaced any mention to Rhodium with "Founder" (Koneru) on a page that addressed Kratos's launch and growth, as follows:

282.    Nevertheless, the September 17, 2020 presentation materials updated certain financial information, disclosing Kratos's transaction volume through August 2020 and financial estimates for Fintech's fiscal-years 2020 and 2021 (ending February 28, 2021 and 2022, respectively).

283.    Factual representations and updated financial information in the September 17, 2020 presentation materials were materially false and misleading for substantially the same reasons as the representations and financial information in the July 29, 2020 presentation materials. Additionally, like that presentation, the September 17, 2020 presentation materials were evidently the product of defendants' collective effort and were purposely designed to solicit and mislead investors.

### 8.    The September 30, 2020 Form 8-K, Earnings Press Release, and Investor Presentation

284.    On September 30, 2020, Netfin filed a Form 8-K, which Maurer signed, with a copy of: (i) a press release reporting Fintech's financial results for the first six months of fiscal-year 2020 ended August 31, 2020; (ii) Fintech's unaudited balance sheet and income statement for that period; and (iii) an investor presentation, dated September 30, 2020, substantially similar to prior investor presentation materials. Holdco also filed a copy of these documents pursuant to Rule 425 under the Securities Act.

285.    Fintech's press release, which listed Groh as the Fintech contact and Rosenberg as the Netfin contact, reported that revenue was $23.7 million, net income was $14.2 million, and EBITDA was $17.3 million, for the six months ended August 31, 2020.  Commenting on these results, Koneru claimed that Kratos's "traction in the marketplace is building each month" because of a "first-mover advantage" in trade finance.  He said that more users, coupled with "users' counterparties joining our platform," was "driving significant growth," and "[w]e expect these results to continue . . . ."

286.    These statements were materially false and misleading in the absence of disclosure that Rhodium, Longview, and other individuals and entities associated with insiders of Netfin and Fintech were continuing to contribute substantial trade volume and revenue.  These statements were also misleading without disclosure that Fintech's business remained exceedingly vulnerable to issues in Rhodium's own business, including Rhodium's distinct liabilities.

287.    The September 30, 2020 presentation materials, like the earlier presentation materials, contained similar, if not identical, misstatements and omissions of material fact to the July 29, 2020 presentation materials – all of which were false and misleading for substantially the same reasons as the misstatements and omissions in the preceding materials.  For example, representations about the background of Fintech's senior management team and the revised page of the September 17, 2020 presentation materials (shown above) remained the same, but the September 30, 2020 presentation materials no longer contained a page explaining the final composition of the business combination – a page that had claimed to explain why Rhodium was ultimately excluded from the transaction.

### 9.    The October 1, 2020 Investor Presentation and Related SEC Filings

288.    On October 1, 2020, only one day after filing another investor presentation, Holdco filed with the SEC pursuant to Rule 425 under the Securities Act revised presentation materials.  The

Rule 425 filing indicated that Netfin had filed a copy of the October 1, 2020 presentation materials as an attachment to a Form 8-K.

289.    The October 1, 2020 presentation materials, like the earlier presentation materials, contained similar, if not identical, misstatements and omissions of material fact to the July 29, 2020 presentation materials – all of which were false and misleading for substantially the same reasons as the misstatements and omissions in the previous materials.

290.    Additionally, the October 1, 2020 presentation materials replaced the revised page of the September 30, 2020 presentation materials shown above (which had revised a page from earlier presentation materials), with a further revised page, as follows:



291.    As this snapshot demonstrates, the new page removed direct references to Rhodium and Fintech "Founder" Koneru, instead providing a "Revenue Contribution Summary" that showed the revenue attributable to "Triterras [Fintech] Affiliates" (presumably, Rhodium and subsidiaries) and, for the first time, "Affiliate of Netfin Sponsor" (presumably Longview, although not mentioned by name, or expressly connected to Maurer, therein).  The representation that an affiliate of Netfin's "sponsor" – *i.e.*, MVR – contributed revenue was materially misleading, because Maurer, in fact, founded and operated Longview, the entity referenced in that graphic.

292.    Notably, in Amendment No. 1 to the Materials, also filed October 1, 2020, defendants provided information for the first time on Maurer's affiliation with Longview and Longview's status as a Kratos user.  The disclosure of this information, in turn, appears to have resulted from inquiries by the SEC in the review and comment process for the Materials.  Even so, these developments do not explain why defendants failed to disclose in the October 1, 2020 presentation materials Maurer's preexisting and continued involvement in Longview and, by extension, Fintech.

### 10.    The October 1, 2020 Analyst Call Presentation

293.    On October 1, 2020, Netfin and Fintech held an analyst call regarding the transaction. Rosenberg, Koneru, and Groh referenced investor materials as they presented, and Galani and others answered questions; Slach moderated.[17]  The transcript evidently was the product of a collective effort, with headings that introduced each of the topics the speakers addressed.  As the transcript reflects, the call was broken down into several segments and included a Q&A session.  Holdco filed the transcript with the SEC on October 6, 2020, pursuant to Rule 425 under the Securities Act.

294.    The presentations during the call closely followed the outline of other presentations defendants gave on the transaction, with few exceptions.  For example:

a.    Rosenberg discussed the merits of the transaction, highlighting "no balance sheet exposure [for Fintech] and no transactional risk that the platform has taken," noting "[t]he user base is extremely sticky, and referrals are driving a well-distributed user base."  Consistent with his prior representations, he also claimed "this deal is extremely well-priced" – "an over 50% discount to all the three comp groups," supporting $25 per share – and touted a "very close relationship . . . with the Triterras Founder and their very highly experienced and capable Management team."

---

[17]    During his presentation, Koneru referenced slides from investor presentation materials that do not match with page numbers of the October 1, 2020 presentation materials.  Thus, it is possible, if not likely, that he used earlier presentation materials during his discussion.

b.      Koneru once again introduced the senior management team, citing page 5 of the presentation materials and discussing himself, Tan, Galani, and Groh.  He then referenced page 6 in detailing the number and volume of transactions on Kratos through August 2020, while walking through financial forecasts for fiscal year 2021 (ending in February 2022).

c.      Groh, who again spoke the longest, discussed Kratos's organic growth, said it "was launched with the critical mass of users," and claimed it is "a well-diversified business with no single customer representing more than 16% in [its] revenue."  Invoking the defendants' well-worn analogy to Amazon, he noted that Kratos launched with "major trader clients brought to the platform by our CEO's network in the trading business" – but claimed that Kratos users grew the platform by inviting their trading counterparties.  He also said the COVID-19 pandemic was a growth catalyst which increased use of Kratos and discussed Fintech's financial results and projections.

295.    Unlike previous comments, however, Rosenberg claimed that he and his "partner" (likely, Komissarov) set their sights on identifying a target in the trade finance space "[a]bout four years" earlier and "decided to do a SPAC to go after the opportunity . . . ."  Explaining that Maurer formed a "physical commodity trading business" that "now happens to be a big customer" of Fintech and user of Kratos, Rosenberg stated that "through [Maurer] and through this affiliation, this is how [the] SPAC not only met the target, but really gave us a lot of comfort and insight into how our target's business works . . . ."  These representations were not made in any earlier presentations, and Amendment No. 1 to the Materials for the first time revealed that Maurer's Longview was a major Kratos user.

296.    During the Q&A session, Koneru and Galani represented that COVID-19 not only exacerbated a general shortage in trade financing, but drove Kratos's business and growth as traders were unable to obtain funding for their transactions.  Groh then explained that Fintech was vetting "several hundred very highly well-known to us prospects" sourced by Rhodium.

297.    The factual representations identified above were materially false and misleading for the same reasons as the substantially similar, if not identical, representations in previous presentation materials.  Additionally, Rosenberg lent credence to the notion that the transaction was prearranged or at least preconceived, although he stopped short of acknowledging that was the case and other representations undermined that suggestion.

### 11.    The Materials and Form 8-A

298.    As explained in the Securities Act section above, the registration statement and proxy statement and prospectus were amended several times and filed with the SEC by Netfin and Holdco in various forms, all of which together are referenced herein as the Materials.  The SEC declared the Materials effective as of October 29, 2020 Materials.  The Materials contained false and misleading statements and omissions of material fact, as set forth in the Securities Act section.

299.    On November 10, 2020, Netfin and Fintech announced that Netfin's stockholders had approved the transaction and the transaction had successfully closed, and Holdco became known as Triterras.  Also on November 10, 2020, Triterras filed with the SEC Form 8-A12B, which Koneru signed and which incorporated by reference the Materials, to register ordinary shares and warrants. The Form 8-A12B was false and misleading for the same reasons that the Materials were.

### 12.    The November 16, 2020 Form 20-F

300.    On November 16, 2020, Triterras filed with the SEC a Shell Company Report on Form 20-F, which provided information on its background, operations, and financial condition, as well as the transaction with Netfin.  The Form 20-F, which Koneru signed, incorporated by reference certain information set forth in Amendment No. 3 (October 26, 2020) to the Materials and versions of the proxy statements that form part of the Materials, including:

a.    Information on the directors and officers of Fintech and Netfin who assumed roles in Triterras, including their backgrounds, qualifications, and relationships, including the section in the Materials entitled "*Information About Executive Officers, Directors and Nominees*";

b.    Information on Fintech's business and operations, including the section in the Materials entitled "*Business of Fintech*," which included other sections on Fintech regarding, among other subjects, Fintech's founding and history, relationship with Rhodium, employees, growth, and exposure to COVID-19;

c.    Financial information on Fintech, including its historical financial results and financial projections, including the sections in the Materials entitled "*Selected Historical Financial Information – Fintech*" and "*Operating And Financial Review And Prospects of Fintech*" and certain versions of the proxy statement/prospectus which included then-updated financial information and results on Fintech;

d.    Information regarding related-party transactions and relationships, including the section in the Materials entitled "*Certain Relationships and Related Person Transactions – Fintech Related Person Transactions*"; and

e.    Information regarding some of the most significant risks that could adversely impact Fintech's business, operations, and financial condition, including the section in the Materials entitled "*Risk factors*."

301.    As detailed elsewhere herein, these sections of the Materials contained numerous false and misleading statements and omissions of material fact of which investors were not aware. Because the Form 20-F incorporated by reference these statements and omissions, the Form 20-F kept these misrepresentations and omissions alive in the market and was itself materially false and misleading and therefore actionable for the same reasons that the Materials are actionable.

302.     Additionally, Item 5 of Part I of Form 20-F, entitled "Operating and Financial Review and Prospects," and Item 5(D) specifically, required the disclosure of material trends, events, and uncertainties, as set forth above in the Securities Act section.  The November 16, 2020 Form 20-F did not include the information required by Form 20-F.

303.     Information contained in the November 16, 2020 Form 20-F was also issued in aid of registering securities, and thus Triterras filed the information set forth in the Form 20-F also under Form 20FR12B, which was false and misleading for the same reasons.

### 13.     The December 3, 2020 Form 6-K and Results of Operations for Six Months Ended August 31, 2020

304.     On December 3, 2020, Triterras filed a Form 6-K, which Koneru signed, attaching as exhibits its Operating and Financial Review and Prospects and Condensed Consolidated Interim Financial Statements for the six months ended August 21, 2020, and incorporating the September 30, 2020 press release announcing these results.  These results were false and misleading for the same reasons that the earlier announced results were.

### B.     Defendants Try to Staunch the Adverse Effects on Triterras as the Truth Emerges, and the Class Period Ends When They Can Do So No Longer

305.     On December 17, 2020, Triterras filed a Form 6-K, which Koneru signed, announcing that Rhodium had received a statutory demand for payment, filed by a creditor on December 1, 2020, under the Insolvency Act.  According to the Form 6-K, Rhodium sought a moratorium order from a Singapore court to shield itself from creditor actions while it tried to restructure its debts.  The Form 6-K added that Rhodium's "traditional commodity trading business has been adversely impacted by the COVID-19 pandemic and the lack of availability of trade finance funding for commodity trades involving SMEs."

306.     Despite this adverse news and its implications for Triterras, the defendants attempted to downplay its significance.  In the Form 6-K, for example, Triterras said it still expected to meet its

financial guidance and would "provide a business update for the three months ending November 30, 2020 on January 5, 2021." Triterras also said that Rhodium would honor its obligations to Triterras, while representing that Triterras "has become less dependent on Rhodium's business as the platform achieves a growing mass of users, other than Rhodium and its subsidiaries."

307.    Notwithstanding these assurances, the market understood that Rhodium's condition to a large extent dictated Triterras's and confirmed weakening in the trade finance industry that could adversely affect Triterras. In fact, based on the level of disclosure in the Form 6-K, investors learned that Triterras's management believed this news about Rhodium was adverse to Triterras's business. This news undermined previous representations in the Materials and throughout the Class Period that Triterras was no longer substantially dependent on Rhodium and that COVID-19 was not adversely affecting the business.

308.    Also on December 17, 2020, additional information emerged which undermined prior representations during the Class Period. In its report, The Bear Cave revealed troubling information about the defendants, including that: Maurer incorporated Rhodium Ga. in 2004 and registered the domain triterras.com in February 2013, years before the transaction; Maurer and Koneru formed a company after Netfin had approached Fintech/Rhodium; Rosenberg of Netfin and Groh of Fintech were executives of the Halter entities; and another analyst was unable to conform through industry research that Kratos had in fact gained wide market acceptance. Information in this report publicly spread as concerns about Rhodium and its implications for Triterras intensified.

309.    As noted above, almost immediately, Triterras management moved to counter this development with favorable announcements. On December 21, 2020, Triterras issued a press release disclosing that Koneru and other "company insiders . . . intend to add to their stockholder ownership upon the opening of the trading window" following a business update call scheduled the next day – a call Triterras had scheduled for January 5, 2021 (as announced in the December 17, 2020 Form 6-K).

The press release quoted Koneru, who conceded that "[o]ur recent 6K on our customer Rhodium clearly caused some concerns amongst investors."  Even so, he continued to claim that "[the] stock is significantly undervalued . . . ."

310.    On December 22, 2020, before convening the update call, Triterras issued a press release reporting estimated results for the third quarter of fiscal-year 2020, while reiterating full-year 2020 guidance.  This news release was evidently intended to stop the freefall in the trading price of Triterras's securities, as detailed herein.

311.    Later on December 22, 2020, Triterras held its update call with analysts and investors to assuage concerns over Rhodium's situation and potential impact on the business.[18]  Koneru, Tan, Galani, and Groh participated.  At that time, Koneru revealed that a lender had demanded $5 million from Rhodium and refused to extend the maturity of the loan after a commodity buyer, which had arranged financing through Rhodium, sought an extension of its own payment term to Rhodium. According to Koneru, "Rhodium's main concern was that if they took an action to pay this one unsecured creditor based on the demand then it could discourage the other lenders from agreeing to ordinary course extension and cause other lenders to take similar action," and "Rhodium would not have been able to meet all this demand."

312.    The situation, however, was tied directly to COVID-19, as Koneru admitted when he provided additional color on Rhodium's problems:

> As we understand that issue, the COVID-19 pandemic has resulted in a number of commodity buyers which are Rhodium's primary customers asking for extensions of their payment term to their suppliers such as Rhodium and in turn causing their suppliers to ask for extensions from their credit client providers. While in general,

---

[18]    On December 28, 2020, Triterras filed a Form 6-K, which Koneru signed on December 24, 2020, attaching the December 21, 2020 press release (about Koneru's plans to purchase shares in the open market), the transcript of the December 22, 2020 update call, and the December 22, 2020 earnings release.

traders caught in the middle of this request such as Rhodium have been receiving extensions in payment terms from their lenders, one of Rhodium's lenders recently refused to further extend the maturity of their loan to Rhodium, which was used to help provide $5 million of credit finance to one of Rhodium's customers. Unfortunately, this is one of the 30% or so of trade finance transactions that Rhodium does not regularly insure, and therefore Rhodium had no credit production.

313.    Left unsaid was the degree to which Koneru and Fintech's other executives – who then worked for Rhodium or had recently worked for it – knew about Rhodium's problems.  Rather, Koneru told call participants that "the purpose of today's call is not to discuss the content of 6-K, [but] rather to provide you with information about the company's performance and future prospects." He also assured analysts and investors that Triterras's outlook remained consisted with that disclosed in the Materials, describing the decline in the stock price as fleeting "volatility" instead of a market correction to its true value.  Specifically, he stated that "in spite of the recent volatility in the stock, Triterras continues to be a strong, growing and vibrant company," adding:

> [W]hile the circumstances with Rhodium are unfortunate, it does not affect our expectation for our results for this year or next which remain consistent with the projections contained in our registration statement on Form F-4.

314.    In the same vein, and expressly for the purpose of "convey[ing] . . . my confidence in the company and its future," Koneru reiterated that his – and, apparently, management's – guidance expectations for 2020 and 2021 remained the same despite Rhodium's issues:

> I would like you to all understand that nothing has transpired that has changed our expectations from our results for fiscal 2020 or 2021. While we have not formally provided guidance to the street, our current expectation for full 2020 are consistent with the projections, we included in the F-4 for our business combination.

315.    Claiming to "personally believe that our stock price at current levels is significantly undervalued," Koneru referenced his claimed "plan" – announced abruptly on December 21, 2020 – to purchase "shares in the open market as soon as our trading window opens."

316.    In turn, Groh echoed Koneru's sentiment that Triterras would achieve its guidance, representing: "We've said we're going to make our numbers – we're projecting to make the numbers

that were in our F-4 and all our approximations support that." Nonetheless, he claimed that Triterras would no longer provide information on certain financial metrics, earlier disclosed in the Materials. Instead, going forward, Triterras resolved to provide only a handful of metrics, as Groh explained:

> Based on where we are in a year-to-date basis, we believe this positions us extremely well to meet our full-year estimates. I know that historically we provided detailed fees for each part of our business, that being the trade and trade finance segments. And we disclosed those specific rates in F-4.

> We are reluctant to continue to do so going forward for some very important commercial concerns. We have found that releasing that level of detail had cost us greatly in our ability to implement certain commercial strategies and decided that in the future neither our business or [sic] our shareholders are well-served by publishing that level of detail.

> In the future we are going to publish our average transaction fee percentage, the trade transaction volumes, and the trade finance volumes. On a year-to-date basis, our average transaction fee was 0.53% of total combined trade finance transaction volumes and for Q3, we estimate it was 0.62%. The higher fees in Q3 are directly attributable to the growth and the portion of our transactions that were trade finance, which we now describe as the financing ratio.

317.    During the Q&A session, Groh attempted to downplay Rhodium's impact on Triterras for any trades on which Rhodium was a counterparty to other traders on the platform, describing it in a positive light by claiming that any counterparty who normally traded with Rhodium would have to find a replacement on the platform: "[W]e don't think that there's going to be any material effect if Rhodium was the counterparty on some of these trades. And if they're not able to be, it makes our platform more important to those traders because they'll need to establish another counterparty and we tee it up for them to do it." In fact, he claimed it "would be more of a positive network effect[.]"

318.    Koneru was also optimistic, telling analysts "Kratos wants to be the Amazon for the traded and trade finance." So when asked whether Triterras would initiate a stock repurchase plan, Koneru deflected and expounded on Triterras's "elaborate plan" for "organic growth," including "a long list of M&A prospects . . . which makes a lot more sense . . . ." That sentiment was short-lived,

however, when previously-undisclosed information emerged which again undermined defendants' Class-Period representations.

319.    On January 14, 2021, the last day of the Class Period, Phase 2 published its report. As detailed herein, the report, which was widely publicized, exposed additional information about: (i) relationships between insiders at Netfin and Fintech and entities tied to them, such as Rhodium, which exposed troubling conflicts of interest; (ii) trades transacted on Kratos, including the identities of traders and business they transacted, reflecting unusual activity; (iii) Triterras's reliance on Rhodium and Longview; and (iv) the prearranged nature of the Netfin transaction.  None of this information was disclosed in the Materials or defendants' other statements during the Class Period.

320.    This report had a profoundly adverse impact on Triterras's trading price as the market digested the implication of this information.

**C.    Post-Class Period Developments Confirm that Triterras Is in Disarray, As Its Independent Auditor and Two Board Members Resign**

321.    After several days of heavy trading price declines on unusually high volume, Triterras tried to stabilize its stock price.  On January 18, 2021, Triterras issued a press release announcing a $50 million share repurchase program – something Koneru said it would not do, only several weeks earlier.  Triterras also released a "statement" in response to the Phase 2 report, ignoring the report's hard facts, denying the report's conclusions, and providing an optimistic assessment of the business. These releases were included as exhibits to a Form 6-K on January 19, 2021, which Koneru signed.

322.    On January 25, 2021, Triterras filed a Form 6-K, which Koneru signed, announcing that KPMG had resigned as its independent auditor.  As Triterras revealed, KPMG made the decision to resign effective January 20, 2021 – only six days after the Phase 2 report, and just two days after Triterras issued its half-hearted response to the report.  According to a January 25, 2021 press release

attached to the Form 6-K, Triterras had long considered replacing KPMG to "further separate" its operations from Rhodium's:

> The Company has also announced that they will be replacing KPMG LLP as the Company's independent accountants. For some time, there has been consideration and discussion with respect to replacing the independent accountants of the Company for various considerations, including to further separate the operations of Triterras, Inc. from its related party company Atanium [sic] (formerly Rhodium Resources). KPMG LLP resigned as the Company's independent accountants effective January 20, 2021.

323. That KPMG performed independent auditing services for Triterras and Rhodium only served to underscore that the operations were intertwined in many ways that the defendants had not revealed during the Class Period, heightening the importance of overlapping management between Fintech/Triterras and Rhodium.

324. Additionally, in the January 25, 2021 press release, Triterras disclosed that its Audit Committee had "initiated an internal investigation into accusations made by a recent short report," apparently referring to the Phase 2 report. According to the press release: "The Audit Committee is in the process of selecting the legal counsel that will conduct the investigation into the blockchain, related party transaction and other accusations made." Triterras said it "expects this review to set the record straight regarding the false and/or incomplete information included in the recent short report."

325. Instead of setting the record straight, however, two of three purportedly independent members of the Audit Committee left – leaving the Triterras board without two members. On April 22, 2021, defendants Richards and Slowey advised Triterras of their respective decisions to resign, with Richards voicing concern over an apparently irreconcilable disagreement in how to respond to KPMG's resignation and the Phase 2 report, as noted above. Following these developments, Global Trade Review – a global trade and trade finance periodical – reported that these "directors quit amid [a] row over related party claims," confirming it had independently verified certain transactional data that Phase 2 examined in crafting the January 14, 2021 exposé.

326.    On June 18, 2021, Triterras announced that it had finally engaged Nexia TS Public Accounting Corporation to replace KPMG as its independent auditor – an astounding five months after KPMG resigned.  Predictably, on June 28, 2021, Triterras reported that it would file its Annual Report on Form 20-F late.

### D.    Loss Causation and Economic Loss

327.    As detailed herein, the defendants engaged in a scheme to deceive the market and a purposeful, if not reckless, course of conduct which artificially inflated the price of the securities at issue and operated as a fraud or deceit on Class Period purchasers, including Plaintiffs.  When these misrepresentations and fraudulent conduct were exposed and became apparent to the market, the trading price of the securities fell precipitously as the artificial inflation was removed.  Accordingly, as a result of their Class Period purchases, Plaintiffs and other investors suffered economic loss, *i.e.*, damages, under the federal securities laws.

328.    In response to news on December 16, 2020, for example, Triterras's Class A common stock fell by $4.11 (31%) to close at $9.09 and its warrants fell by $1.11 (35%) to close at $2.05, on December 17, 2020 – on unusually high volume.  On December 18, 2020, as the market digested the information, these securities declined even further, with the stock closing at $8.45 (trading as low as $8.08) and the warrants at $1.80.  And in response to news on January 14, 2021, the trading price of the stock declined by $2.30 (21%) to close at $8.08, and the warrants declined by $0.68 (28.7%) to close at $1.69, on January 15, 2021.

### E.    A Presumption of Reliance Applies

329.    A presumption of reliance applies under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims alleged are predicated upon omissions of material fact for which there was a duty to disclose, as alleged herein.

330.    Additionally, a presumption of reliance applies under the fraud-on-the-market theory of reliance because the market for Triterras securities was efficient for at least the following reasons:

a.    Triterras securities were listed and actively traded on the Nasdaq, an efficient and electronic stock market that reflected the prompt incorporation and reflection of information, throughout the Class Period;

b.    Triterras securities traded at volumes during the Class Period that reflected the impact of available information and the trading price of the securities reacted promptly to publicly available news and information;

c.    Triterras filed periodic public reports with the SEC and otherwise regularly communicated with analysts and investors using established market communication mechanisms, including press releases; and

d.    Securities analysts and investors followed Triterras and issued reports on its prospects and performance, and information on Triterras regularly entered the marketplace and was reflected in the trading price of its securities.

331.    As a result, the market for Triterras securities promptly digested relevant information from publicly available sources and the trading price of the securities reflected such information. Under these circumstances, all purchasers of such securities during the Class Period suffered similar injury by purchasing at artificially inflated prices and a presumption of reliance applies.

**F.    The Safe Harbor Does Not Insulate Defendants' Representations**

332.    The statutory safe harbor for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements or omissions alleged herein.

333.    *First*, the materially false and misleading statements and omissions relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor.  Such false or misleading statements are not forward-looking because they: (i) relate to historical or current fact;

(ii) implicate existing conditions; and (iii) do not contain projections of future performance or future objectives.  If any statements might be construed to touch on future intent, they are mixed statements of present fact and future intent and are not entitled to safe harbor protection with respect to the part that refers to the present.

334.    *Second*, any purported cautionary language was not meaningful and therefore was ineffectual because any risks warned of had already transpired and the language was boilerplate, was not specifically tailored to the risks at issue, did not change as risks evolved or conditions changed, and did not mention important factors of similar significance to those actually realized.

335.    *Third*, defendants are liable for any forward-looking statement identified as such (or otherwise) because they knew the statement was false or misleading when made.  Additionally, any such statement was authorized or approved by a defendant or executive officer who could bind any of the defendants and who knew the statement was false or misleading when made.  All such false or misleading statements are accordingly attributable to Triterras and/or the other defendants, whether identified as forward-looking or otherwise.

## VIII.  CLASS ACTION ALLEGATIONS

336.    Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all those who purchased or otherwise acquired Triterras securities: (i) pursuant or traceable to the Materials, including purchasers who were successfully solicited by any defendant, seeking to pursue remedies under the Securities Act; and (ii) during the Class Period, seeking to pursue remedies under the Exchange Act (collectively, the "Class").  Excluded from the Class are defendants and their families; officers, directors and affiliates of defendants and members of their immediate families at all relevant times; legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any defendant has or had a controlling interest.

337.    The members of the Class are so numerous that joinder is impracticable.  Triterras securities are publicly traded on the Nasdaq and millions of shares and warrants were issued and sold in the transaction and the purchases are traceable or were pursuant to the Materials.  While the exact number of Class members is unknown at this time and can only be ascertained through discovery, there are likely hundreds, if not thousands, of members in the Class.  Record owners and other Class members may be identified from records held by Triterras or its transfer agent and may be notified of the pendency of this action using a form of notice customarily used in securities class actions.

338.    Common questions of law and fact exist as to all Class members that predominate over any questions solely affecting individual Class members, including:

        a.    whether defendants violated the Securities Act or Exchange Act, as alleged;

        b.    whether the Materials or oral communications associated with the transaction misrepresented or omitted material information in violation of the Securities Act;

        c.    whether defendants misrepresented or omitted material information during the Class Period in violation of the Exchange Act; and

        d.    whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

339.    Plaintiffs' claims are typical of the claims of the Class, as all Class members were similarly affected by defendants' conduct.

340.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in securities class actions.

341.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if

not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## IX.    CLAIMS

### A.    FIRST COUNT: For Violations of Section 11 of the Securities Act (Against Defendants Triterras (formerly Holdco), Netfin, Maurer, Koneru, Tan, Richards, Slowey, Stratton, and MVR)

342.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

343.    Plaintiffs allege this Count under Section 11 of the Securities Act on behalf of the Class, against defendants Triterras, Netfin, Maurer, Koneru, Tan, Richards, Slowey, Stratton, and MVR.  This Count does not allege, and does not intend to allege, fraud or scienter, which are not required elements of Section 11, and any implication of fraud or scienter is disclaimed.

344.    The Materials, which incorporated the registration statement, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein, as of their effective date.

345.    Defendants named in this Count were responsible for the contents and dissemination of the Materials and are otherwise liable under Section 11.  For example:

   a.    Triterras (formerly Holdco) issued the securities at issue;

   b.    Maurer signed the Materials;

   c.    Maurer, Koneru, Tan, Richards, Slowey, and Stratton signed director consents and were named in the Materials as director-nominees for Holdco (now Triterras);

   d.    Netfin acted in the capacity of an underwriter of the issuance of the securities at issue and is otherwise liable, under principles of agency and *respondeat superior*, for violations of Section 11 by Holdco (now Triterras) and Maurer.  Netfin's directors and officers formed Holdco for the transaction and, through these individuals and its efforts, marketed the transaction and securities.

- 132 -

As of the effective date of the Materials, Holdco was a wholly owned subsidiary of Netfin and thus subject to Netfin's direction. Netfin structured the transaction in such a way as to cause Holdco to issue securities to effectuate the transaction, albeit requiring the approval of Netfin's shareholders. In doing so, Netfin used Holdco as an agent to accomplish the transaction and therefore is liable as though it were the issuer of the securities itself. Thus, Netfin is within the zone of defendants liable for any primary violations of the Securities Act for having created Holdco as its agent to issue the securities at issue. Excluding Netfin from Section 11 liability in this situation would contravene the investor protections and policy of the Securities Act, by enabling public companies (principals) to create shell entities or other strawmen (agents) for the purpose of issuing securities so as to insulate themselves, and their directors, from liability to investors who purchase such securities.

e.      MVR, Netfin's sponsor, acted in the capacity of an underwriter of the issuance of the securities at issue and is otherwise liable, under principles of agency and *respondeat superior*, for violations of Section 11 committed by Holdco (now Triterras), Netfin, and Maurer. MVR caused Netfin to create Holdco and to structure the transaction, and its principals – Maurer, Rosenberg, and Komissarov – publicized the transaction and signed, authorized, or issued the Materials, given their status as principals of MVR and the only three directors of Netfin.

346.    No defendant made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Materials were complete, accurate or non-misleading.

347.    By reason of the conduct alleged herein, each defendant named in this Count violated, and/or controlled a person who violated, Section 11 of the Securities Act.

348.    Plaintiffs and the Class members purchased the securities pursuant and/or traceable to the Materials and sustained damages as a result. The value of the securities declined substantially subsequent and due to these alleged violations.

349.    At the time of their purchases of the securities, Plaintiffs and other members of the Class were without knowledge of the truthful facts concerning the wrongful conduct alleged herein.

350.    Less than one year elapsed from the time that Plaintiffs discovered, or reasonably could have discovered, the facts upon which these claims are based to the time this action was filed. Less than three years has elapsed between the time the securities were offered to the public and the time this action was filed.

**B.     SECOND COUNT: For Violation of Section 12(a)(2) of the Securities Act (Against Defendants Triterras (formerly Holdco), Netfin, Fintech, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR)**

351.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

352.    Plaintiffs allege this Count under Section 12(a)(2) of the Securities Act on behalf of the Class, against defendants Triterras, Netfin, Fintech, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR.  This Count does not allege, and does not intend to allege, fraud or scienter, which is not a required element of Section 12(a)(2), and any implication of fraud or scienter is disclaimed.

353.    By means of the defective prospectus, which was incorporated in and formed part of the Materials, the defendants named in this Count promoted and sold, for the benefit of themselves and their associates, securities to Plaintiffs and other members of the Class.  In fact, the Materials recite that Netfin's directors would use the Materials to solicit investors, which those directors did in connection with the vote on the transaction, which, by necessity, called for Netfin investors to agree to receive Triterras securities.  Even before that, Netfin's July 29, 2020 Form 8-K confirmed that Netfin's and Fintech's officers and directors qualified as participants in soliciting Netfin investors.

354.    As detailed herein, the defendants held meetings for the explicit purpose of soliciting investors to purchase the securities at issue.  In his closing remarks on the August 8, 2020 investor call, for example, Rosenberg confirmed that he and others met with investors regularly leading up to the transaction, noting:

> So, I think with the moves that we have made, the institutional response is evidenced by the meetings we have been having post he business combination announcement has been very positive. We have had good support going into the announcement from some of our existing investors. And we have had very good reception from new investors. I think anyone that spends time understanding the fundamental underpinnings of the story, why this is happening, really understands and gets why this is just going to continue to be a really big success.

> So I think we have good support. We have good momentum. As you know, in a typical SPAC process, we are going to be filing a more robust F4 and proxy. And there is going to be a lot more information to gleam on in there. And we are going to continue to build momentum into September and October when we anticipate that the De-SPAC is going to conclude.

> So we think we have a good transaction here. We think we are slowly building the momentum. We think it is the right story, we have the right types of investors coming into this and we hope that one-on-one meetings like this help clarify the message and really continue to get people, both institutions and both retail, excited about the opportunity.

355.    Additionally, the defendants held other meetings for the explicit purpose of soliciting investors to purchase the securities at issue.  The defendants also engaged in other conduct for the purpose of soliciting investors.  In the absence of defendants' efforts to publicize the transaction and solicit securities purchasers, the transaction could not have occurred.  For example:

a.    Triterras, Netfin, and Fintech issued press releases and/or SEC filings for the explicit purpose of soliciting investors to approve the transaction and purchase the securities, and held investor and analyst meetings to publicize the transaction and the sale of the securities.

b.    Maurer signed SEC filings to disseminate information intended to promote the transaction and the securities at issue, as detailed herein.  Given his role in Netfin and his extensive background in professional investing, Maurer also presumably solicited investors to participate in the

transaction and purchase securities.  Indeed, the success of the transaction – a so-called de-SPAC event – depended in large part on Maurer's involvement.

c.       Rosenberg, Koneru, Tan, Groh, and Galani participated in meetings with investors and analysts to publicize the transaction.  Pascale, Netfin's CFO, also presumably attended these meetings, and Pascale, Groh, and Rosenberg were identified as individuals with information on the transaction whom investors should contact.  All of these defendants, together with Maurer and Komissarov, were responsible for publicizing the terms of the transaction and courting investors.

d.       MVR, as Netfin's sponsor, was responsible for setting in motion – through Maurer, Rosenberg, and Komissarov – aspects of the solicitation process, and additionally is liable, under principles of agency and *respondeat superior*, for violations of Section 12(a)(2) committed by those individuals.

e.       Given Komissarov's involvement in MVR, interest in a successful transaction, and relationship with Maurer and Rosenberg, Komissarov also likely assisted in soliciting investors in connection with the transaction.  Each of Maurer and Rosenberg, and Komissarov, as principals of MVR and directors of Netfin, authorized and approved disclosures used to solicit investors.

f.       Netfin and Fintech – and their officers and directors – prepared, utilized, and disseminated various iterations of presentation materials designed for the sole purpose of soliciting investors.  A key theme of these presentations was that the securities were offered at a significant discount – purportedly exceeding 50% – to various comparable companies.

356.   The Materials contained untrue statements of material fact and failed to disclose material facts, as detailed above.  The defendants owed Plaintiffs and other Class members a duty to make a reasonable and diligent investigation of the statements contained in the Materials to ensure they were truthful and accurate.  In the exercise of reasonable care, defendants should have known of the misstatements and omissions contained in the Materials.

357.     Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Materials when purchasing their securities.

358.     By reason of the conduct alleged herein, defendants violated Section 12(a)(2) of the Securities Act.  As a direct and proximate result of these violations, Plaintiffs and other members of the Class sustained substantial damages in connection with their purchases.  Accordingly, Plaintiffs and the other members of the Class who hold securities issued pursuant to the Materials have the right to rescind those purchases and recover the consideration paid for such securities.  Class members who sold their securities seek damages to the extent permitted by law.

C.     **THIRD COUNT: For Violation of Section 15 of the Securities Act (Against Defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, MVR, and Fintech)**

359.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, other than those that allege fraud or scienter, as if fully set forth herein.

360.     Plaintiffs allege this Count under Section 15 of the Securities Act on behalf of the Class, against defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, MVR, and Fintech.  This Count does not allege, and does not intend to allege, fraud or scienter, which is not a required element of Section 15, and any implication of fraud or scienter is disclaimed.

361.     As detailed herein, all defendants committed primary violations of the Securities Act, or are directly responsible and primarily liable for any such violations, by committing conduct in contravention of Sections 11 and 12(a)(2) or having responsibility for such conduct.

362.     The defendants named in this Count were control persons of other violators because they had the discretion and power to sign SEC filings or to draft, issue, or disseminate statements on behalf of primary violators.  For example:

a.     Maurer, Rosenberg, and Komissarov were control persons of MVR given their roles and/or ownership interests.

b.     MVR, as Netfin's sponsor, was a control person of Netfin and Holdco (now Triterras), given its shareholdings in and *de facto* control over Netfin.

c.     Netfin was a control person of Holdco (now Triterras), given its ability to create Holdco to consummate the transaction and to influence its operations and functioning.

d.     Maurer, Rosenberg, Komissarov, and Pascale were control persons of Netfin and Holdco (now Triterras) given their roles and/or ownership interests, including the ability to sign or approve SEC filings, sign binding agreements, or issue public statements on behalf of Netfin and Holdco.

e.     Koneru, Tan, Galani, and Groh were control persons of Fintech given their roles and/or ownership interests, including the ability to sign binding agreements or approve or issue public statements on behalf of Fintech.

363.    In fact, Maurer, Rosenberg, Pascale, Koneru, Tan, Galani, and Groh made or issued statements variously on behalf of Triterras, Netfin, and Fintech.

364.    Alternatively, because Fintech employed Tan, Galani, and Groh and Netfin employed Pascale, Fintech and Netfin had the power to control their employees, each of whom committed primary violations of the Securities Act.

365.    By reason of the conduct alleged herein, these defendants violated Section 15 of the Securities Act, and Plaintiffs and the Class have suffered harm as a result.

**D.     FOURTH COUNT: For Violation of Section 10(b) of the Exchange Act (Against Defendants Triterras, Netfin, Fintech, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR)**

366.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, except those that disclaim fraud or scienter, as if fully set forth herein.

367.    Plaintiffs allege this Count under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder on behalf of the Class, against defendants Triterras, Netfin, Fintech, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, and MVR.

368.    During the Class Period, these defendants knowingly or recklessly prepared, issued, or approved false and misleading statements without regard for the truth, and in doing so, they:

        a.    employed devices, schemes, and artifices to defraud;

        b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        c.    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other Class members who purchased securities during the Class Period.

369.    As alleged herein, these defendants acted with scienter in that they knew that the public documents and statements they issued, approved, or otherwise disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

370.    Additionally, as set forth elsewhere herein, defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts, their control over the allegedly materially false and misleading statements and omissions, and their access to non-public information.

371.    Further, as detailed above, these defendants had a duty to disclose the material facts described herein, and violated the affirmative disclosure obligations imposed by the rules and regulations governing the preparation of the Materials and other SEC filings during the Class Period, including Form 20-F.

372.     Given the level of due diligence supposedly done in connection with the transaction and many of the defendants' dual roles in working for Fintech and Rhodium, each of the defendants knew or recklessly disregarded important information about Rhodium's financial condition that they failed to disclose – for the purpose of inducing investors to purchase securities without knowledge of the true facts or in reckless disregard that such investors would do so.

373.     Additionally, these defendants withheld information about their personal and business relationships and connections with each other and various affiliates because they knew that investors would look more critically (and skeptically) at the Netfin transaction or the nature of Fintech's – and, later, Triterras's – business.  It was essential for these defendants to conceal their backgrounds from official corporate communications to perpetuate the fraud.

374.     These defendants also purposely or recklessly concealed other business information, and were knowing sources of misinformation supplied to others, which they knew or disregarded would be disseminated to the investing public.

375.     Plaintiffs and the Class have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for the securities at issue.   They would not have purchased the securities at the prices they paid, or at all, had they been aware that market prices had been artificially and falsely inflated by defendants' misleading statements.

376.     As a direct and proximate result of these defendants' misconduct, Plaintiffs and other Class members suffered damages in connection with their Class Period securities purchases.

E.     **FIFTH COUNT: For Violation of Section 20(a) of the Exchange Act (Against Defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, MVR, and Fintech)**

377.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above, except those that disclaim fraud or scienter, as if fully set forth herein.

378.    Plaintiffs allege this Count under Section 20(a) of the Exchange Act on behalf of the Class, against defendants Netfin, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, MVR, and Fintech.

379.    As alleged herein, Netfin, Maurer, Rosenberg, Komissarov, Pascale, Koneru, Tan, Galani, Groh, MVR, and Fintech each controlled primary violators of the Exchange Act.  To the extent necessary, each of these defendants culpably participated in the underlying violation given their knowledge of and/or involvement in the wrongful conduct alleged herein.

380.    As a result, these defendants are liable as control persons under Section 20(a).

381.    As a direct and proximate result of these defendants' misconduct, Plaintiffs and other Class members suffered damages in connection with their Class Period securities purchases.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, respectfully pray for judgment against Defendants as follows:

A.    Determining that this action is properly brought as a class action and certifying the Class accordingly, designating Plaintiffs as Class representatives, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    Awarding Plaintiffs and the Class compensatory damages against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment interest thereon;

C.    Awarding rescission or a rescissory measure of damages, to the extent available under the Securities Act, together with prejudgment interest thereon;

D.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other, further and/or different relief as the Court deems just and proper.

## XI.   JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  July 1, 2021                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        JOSEPH RUSSELLO
                                        WILLIAM A. MASSA


                                        */s/ Samuel H. Rudman*
                                        SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)
                                        srudman@rgrdlaw.com
                                        jrussello@rgrdlaw.com
                                        wmassa@rgrdlaw.com

                                        *Lead Counsel for Plaintiffs*

                                        LEVI & KORSINSKY LLP
                                        MARK S. REICH
                                        55 Broadway, 10th Floor
                                        New York, NY  10006
                                        Telephone:  212/363-7500
                                        212/363-7171 (fax)
                                        mreich@zlk.com

                                        *Additional Counsel for Plaintiff Norris*

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, certify that on July 1, 2021, I authorized a true and correct copy of the

foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel registered to receive such notice.

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN